UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2005 JUL 18 P 12: 01

-----------------------------------------------------------------x
SAFECO INSURANCE COMPANY OF          DOCKET NO.:
AMERICA and GENERAL INSURANCE
COMPANY OF AMERICA,                  302CV1966-AJC
                                     AVC
        Plaintiffs

   v.

LOCAL TOWING INC., GEORGE GARDELLA,    July 14, 2005
JESSICA HELQUIST-GARDELLA, and
JAMES GARDELLA,

        Defendants.
-----------------------------------------------------------------x

LOCAL TOWING INC., GEORGE GARDELLA,
JESSICA HELQUIST-GARDELLA, and
JAMES GARDELLA,

        Third-Party Plaintiffs

   v.

ASSOCIATED INSURANCE AGENCY, INC.,
FREDERICK J. SMITH, AFNY, INC., MELWAIN
ENTERPRISES, INC., WAYNE PRICE, MARYANNE
PRICE, and ERIC EMPEY,

        Third-Party Defendants
-----------------------------------------------------------------x

## AFFIDAVIT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

STATE OF CONNECTICUT  )
                                )   ss.  Norwalk, July 14, 2005
COUNTY OF FAIRFIELD     )

JAMES R. GARDELLA, of Norwalk, Connecticut being duly sworn, deposes and says:

1. I am seventy (70) years of age and believe in the obligation of an oath. I am a defendant in this action, and I make and submit this affidavit to the court in support of my motion for summary judgment on the basis that there is no contract between me and the plaintiffs that requires me to indemnify the plaintiffs for the losses that they suffered as a result of bonds they issued for Local Towing, Inc.

2. I have no contract with Safeco Insurance Company or General Insurance Company to be responsible for the debts that Local Towing, Inc. I never signed an agreement that made mention of any jobs in Aguadilla, Puerto Rico or St. Thomas, U.S. Virgin Islands. I signed a General Agreement of Indemnity, but the plaintiffs never asked me to indemnify them for any job other than the Pentagon Boat Basin Job, which was being bonded when I signed the General Agreement of Indemnity.

3. In 1998, I transferred all my interest in Local Towing, Inc. to my son, George "Chris" Gardella, and he was thereafter at all times the president of the company, the sole operating officer, and the sole stockholder.

4. In 1999, Local Towing, Inc. wanted to bid on a project Arlington, Virginia, known as the "Pentagon Boat Basin Job." This job was a simple, dredging job near shore and was the kind of work I had ever done in my years in the dredging business.

5. In order to bid on that project, Local Towing, Inc. had to submit a bid bond, a completion bond, and a payment bond to the federal government.

6. The plaintiffs in this action were approached by Chris Gardella and Fred Smith of Associated Insurance Agency about issuing those bonds, and Safeco agreed

2

to issue those bonds provided a General Agreement of Indemnity was signed by Local Towing, Inc. as principal, Chris Gardella, Jessica Helquist-Gardella, Chris Gardella's wife, and James R. Gardella as indemnitors. Safeco also requested a signed General Agreement of Indemnity from Fran Empey, a joint venturer with Local Towing, Inc. Fran Empey was to run the Pentagon Boat Basin Job, and he did.

7.    The General Agreement of Indemnity was signed on October 6, 1999. A copy of that General Agreement of Indemnity is attached as Exhibit A. This is the only agreement I ever signed with the plaintiffs.

8.    When I was signed the General Agreement of Indemnity, I knew the scope of the work on the Pentagon Boat Basin Job, dredging a boat basin on a river, and I knew that the plaintiffs would be using my offer of indemnity in connection with the issuance of the bonds for that dredging job.

9.    Once the dredging job started, I visited the project at least twice, and I understood how the job was being performed and how the dredging was progressing. The work at the Pentagon Boat Basin was within driving distance from my home. This marina dredging work was of the same size project and the same type of work that I had done for fifteen years. I understood and was comfortable with the mechanics of the job and the ability of Local Towing, Inc. to do it with the equipment available. I understood the risk that I was assuming on this job.

10.   I made it clear in 1999, when the General Agreement of Indemnity was signed, as well as later, that I did not want to be an indemnitor on other bonds for Local Towing, Inc., and this was known to the people working for the plaintiffs.

11. After the completion of the Pentagon Boat Basin Job, I was told that Local Towing, Inc. had between $700,000 and $800,000 of operating capital in their bank account. This change in financial condition provided the plaintiffs with more security for future bonds, and I was told by Fred Smith that Local Towing, Inc. no longer needed me to be an indemnitor because of the money in the bank.

12. The next two jobs bid by Local Towing, Inc. were in San Juan, Puerto Rico. Other than being told by my son, Chris Gardella, that Local Towing, Inc. was going to raise abandoned wrecks in San Juan Harbor. I knew nothing about those jobs and took no part in them. I had never raised sunken wrecks in my life, nor had Local Towing, Inc. when I owned it.

13. The sureties never communicated with me in any way that they were going to issue the bonds for the projects in San Juan or that they thought that I was involved as an indemnitor. The plaintiffs never communicated with me about their assumption that I was taking on significant financial risk or my offer to indemnify under the General Agreement of Indemnity. Local Towing, Inc. did not tell me that any sureties were relying on my being an indemnitor, and not being involved with those jobs, I had no knowledge of the extent of any liability.

14. If I had been told by the plaintiffs or their agents that they were going to issue these bonds relying on my being one of their indemnitors, I would have told them that I would not be an indemnitor for a number of reasons. The location of the work was far from any place that I had done work, and I did not know what the local conditions were or what local problems might exist; the size and complexity of the projects was

greater than anything that I had ever contracted for; and raising sunken wrecks was something that I would never consider or ever would have attempted. I have never done dredging work south of Long Island.

15. I never visited or was invited to visit the work in San Juan Harbor and do not know where the work was done. I never reviewed any plans, specifications, contracts, or bids for those jobs. I do not know how the work was done. The plaintiffs never informed me of anything having to do with those jobs, including the amount of the contracts and whether any claims were ever made on any of the bonds.

16. I was told by my son that Local Towing, Inc. was bidding on a job in Aguadilla, Puerto Rico placing stone along the entrance a harbor. I had never done such work. I was also told by my son that Local Towing, Inc. was bidding on a job in the Virgin Islands laying pipe under water from the shore out into the open ocean to install the outfall for a sewage treatment plant. I had never done a contract laying pipe, nor had I ever worked in the open ocean.

17. I had no involvement with those projects, just as I had no involvement with the jobs in San Juan Harbor. I did not see the contracts, the bonds, the plans, the specifications, the lists of necessary equipment and materials, the bid package, the bid submission, or any correspondence about the jobs. As far as I was concerned, I had no interest in these jobs and no reason to be concerned with them.

18. Once again, the sureties never told me that they wanted to use my offer of indemnity in writing those bonds. I received no communications from the sureties even though they assumed that I was assuming substantial, financial obligations. The

contract price and the amount of the performance bond for the job in St. Thomas was $3,773,000. I did not know the risks involved in these jobs or the contract amounts or the costs of the work. I had never worked outside of New England and knew nothing about whatever problems there might be working in the Caribbean in coordinating the labor, equipment, and supplies necessary to do the work. These projects were beyond my experience and my willingness to serve as an indemnitor.

19. The bonds were issued by the plaintiffs for the job in St. Thomas in August of 2000 without a signed General Agreement of Indemnity from Fran Empey, who was to supervise that job. Fran Empey died in September of 2000, before the work started. The notice to proceed in St. Thomas was issued by the territorial government in early November of 2000, and after a substantial amount of coral was removed from the site, the dredging and pipe-laying portions of the work started in early January of 2001. Michael Empey, Fran Empey's son, took over the running of the job following his father's death.

20. In April of 2001, when Local Towing, inc. was no longer able to make the lease payments on a large excavator that was being used on the St. Thomas job, my son asked that I sign as a guarantor of a note to a bank so that it could be purchased. The excavator had an extended arm, capable of digging a trench from a barge in thirty feet of water. I agreed, based on a then-current requisition.

21. The requisition was not paid, and Michael Empey was fired. Chris Gardella then asked me for a loan to help him out of the financial problems that he and Local Towing, Inc. were having as a result of this job. I loaned Chris Gardella $135,000

6

with the understanding that I would receive my loan money back once the St. Thomas job was finished. If I had thought that I was obligated on the binds, there would have been no reason for me to guarantee a note for the purchase of equipment or make a loan to my son; the plaintiffs would have had to pay the lease payments on the excavator and finance the remainder of the job before I was out of pocket anything.

22. Local Towing, Inc. was unable to pay all of its suppliers for the projects in Aguadilla and St. Thomas, and claims were filed under the bonds by various suppliers. The plaintiffs paid those claimants.

23. The plaintiffs requested a meeting in New Jersey concerning Local Towing, Inc. in February of 2002. I went to the meeting with Chris Gardella to find out what was going to happen to Local Towing, Inc. and all the creditors it had then, of which I was one. I was hoping that the loan on the excavator would be paid and that I would be repaid the money that I had loaned Chris Gardella. I did not go to the meeting to become an indemnitor. Plaintiffs' lawyers were present, but I was not represented by counsel.

24. I never knew until the St. Thomas job was in trouble and I attended the meeting in New Jersey requested by the sureties that the sureties believed that I had agreed to indemnify them. This was the first communication from the plaintiffs to me about the projects in Aguadilla, Puerto Rico and St. Thomas, U.S. Virgin Islands.

25. There is no contract between the sureties and me for my indemnity for the claims made in the complaint. I agreed to indemnify the plaintiffs for the Pentagon Boat

Basin Job, but I never agreed to indemnify them for jobs I knew nothing about or jobs where they did not request my indemnity.

_____
James R. Gardella

Sworn to before me this 14th day of July, 2005

_____
Duncan B. Hume
Commissioner of the Superior Court

Exhibit A



# GENERAL AGREEMENT OF INDEMNITY FOR CONTRACTORS

SAFECO INSURANCE COMPANY OF AMERICA
GENERAL INSURANCE COMPANY OF AMERICA
FIRST NATIONAL INSURANCE COMPANY OF AMERICA
SAFECO NATIONAL INSURANCE COMPANY
AMERICAN STATES INSURANCE COMPANY
AMERICAN ECONOMY INSURANCE COMPANY
SAFECO PLAZA
SEATTLE, WASHINGTON 98185

THIS AGREEMENT is made by the Undersigned in favor of the SAFECO Insurance Companies for the purpose of indemnifying them from all loss and expense in connection with any Bonds for which any SAFECO Insurance Company now is or hereafter becomes Surety for any of the following as Principal: **LOCAL TOWING, INC.**

_____
_____
_____

In consideration of the execution of any such Bonds for Contractor and as an inducement to such execution by Surety, the Undersigned, jointly and severally, agree as follows.

**DEFINITIONS:** Where they appear in this agreement, the following terms shall be considered as defined in this paragraph:

**Contractor:** Any one, combination of, or all of the persons, firms or corporations set forth above or their successors in interests, whether alone or in joint venture or as members in limited liability companies with others not named herein.

**Bond:** Any and all bonds, undertakings or instruments of guarantee and any continuation, extension, alteration, renewal or substitution thereof, whether with the same or different penalties, executed by Surety.

**Surety:** Any one or combination of the following: SAFECO Insurance Company of America; General Insurance Company of America; First National Insurance Company of America; SAFECO National Insurance Company; American States Insurance Company; American Economy Insurance Company; any person or company joining with any of the aforesaid companies in executing any Bond, executing any Bond at their request or providing reinsurance to them with respect to any Bond.

**Contract:** Any contract between Contractor and a third party, the performance of which is guaranteed by any Bond for which Surety is surety.

**Default:** Contractor shall be deemed to be in default under this agreement in the event it:
(1) Is declared to be in default by the Obligee of any Bond;
(2) Actually Breaches or abandons any Contract;
(3) Fails to pay, to the extent due in whole or in part, claims, bills or other indebtedness incurred in connection with the performance of any Contract;
(4) Becomes the subject of any agreement or proceeding of liquidation or receivership, or actually becomes insolvent;
(5) If an individual, dies, is adjudged mentally incompetent, is convicted of a felony or disappears and cannot be immediately found by Surety by use of usual methods;
(6) Breaches, fails to perform, or comply with, any provision of this agreement.

**INDEMNITY TO SURETY:** Undersigned agree to pay to Surety upon demand:

1. All loss, costs and expenses of whatsoever kind and nature, including court costs, reasonable attorney fees (whether Surety at its sole option elects to employ its own attorney, or permits or requires Undersigned to make arrangements for Surety's legal representation), consultant fees, investigative costs and any other losses, costs or expenses incurred by Surety by reason of having executed any Bond, or incurred by it on account of any Default under this agreement by any of the Undersigned.

   In addition the Undersigned agree to pay to Surety interest on all disbursements made by Surety in connection with such loss, costs and expenses incurred by Surety at the maximum rate permitted by law calculated from the date of each disbursement;
2. An amount sufficient to discharge any claim made against Surety on any Bond. This sum may be used by Surety to pay such claim or be held by Surety as collateral security against loss on any bond;
3. Any original, additional or renewal premium due for any bond.

With respect to claims against Surety:

1. Surety shall have the exclusive right for itself and the Undersigned to determine in good faith whether any claim or suit upon any Bond shall, on the basis of belief of liability, expediency or otherwise, be paid, compromised, defended or appealed.
2. Surety may incur such expenses, including reasonable attorneys' fees, as deemed necessary or advisable in the investigation, defense and payment of such claims.
3. Surety's determination in good faith of the foregoing shall be final and conclusive upon the Undersigned.
4. An itemized statement of loss and expense incurred by Surety, sworn to by an officer of Surety, shall be prima facie evidence of the fact and extent of the liability of Undersigned to Surety in any claim or suit by Surety against Undersigned.

**SURETY'S REMEDIES IN EVENT OF DEFAULT:** In event of default by Contractor, Surety shall have the right, at its sole discretion, to:

1. Take possession of the work under any and all Contracts and to arrange for its completion by others or by the Obligee of any Bond;
2. Take possession of Contractor's or any of Undersigneds' equipment, materials and supplies at the site of the work, or elsewhere, if needed for prosecution of the work, as well as Contractor's office equipment, books and records, and utilize the same in completion of the work under the Contract without payment of any rental for such use;
3. Loan or guarantee a loan to Contractor of such money as Surety shall see fit, for the purpose of completing any Contract, or for discharging Contractor's obligations for labor, material, equipment, supplies and other charges, incurred in connection with any contract;
4. Take such other action as Surety shall deem necessary to fulfill its obligations under any Bond.

S-0002/SAEF 6/98

Page 1 of 4

® Registered trademark of SAFECO Corporation.

Undersigned waive all notice of such default, of the payment of any claim or of the making of any loan to Contractor by Surety. Should Undersigned learn of any claim or suit against Contractor, for which Surety may be held liable, Undersigned shall give prompt notice to Surety of such claim or suit.

Separate suits may be brought under this agreement as causes of action accrue, and the pendency or termination of any such suit shall not bar any subsequent action by Surety.

**SECURITY TO SURETY:** As collateral security to Surety for the agreement of the Undersigned to repay all loss and expense to Surety, the Undersigned:

1. Assigns to Surety, as of the date of execution of any Bond, all rights of the Contractor in, or in any manner growing out of:
   a. Any Contract or modification thereof;
   b. Any subcontract or purchase order and against any legal entity and its surety who has contracted with Contractor to furnish labor, materials, equipment and supplies in connection with any Contract;
   c. Monies due or to become due Contractor on any Contract, including all monies earned or unearned which are unpaid at the time of notification by Surety to the Obligee of Surety's rights hereunder;
   d. Any actions, causes of action, claims or demands whatsoever which Contractor may have or acquire against any party to the Contract, or arising out of or in connection with any Contract including but not limited to those against obligees and design professionals and any surety or sureties of any obligee, and Surety shall have the full and exclusive right, in its name or in the name of the Contractor, but not the obligation, to prosecute, compromise, release or otherwise resolve such actions, causes of action, claims or demands;
   e. Any and all rights, title, interest in, or use of any patent, copyright or trade secret which is or may be necessary for the completion of any bonded work;
   f. All monies due or to become due to Contractor on any policy of insurance relating to any claims arising out of the performance of any Contract or to premium refunds, including, but not limited to, builders risk, fire, employee dishonesty or workers' compensation policies.

The Surety agrees to forbear exercising the rights granted to it in (a) through (f) until there is a Default under this agreement;

2. Irrevocably nominate and appoint any officer of Surety as the true and lawful attorney-in-fact of the Undersigned, with full right and authority in event of Contractor's default to:
   a. Sign the name of the Undersigned to any voucher, release, satisfaction, check, bill of sale of property referred to herein, or any other paper or contract necessary or desired to carry into effect the purposes of this agreement;
   b. Dispose of performance of any Contract by subletting it in Contractor's name or otherwise;
3. Authorize Surety to join any and all of the Undersigned as parties defendant in any action, regardless of venue, against Surety on account of any Bond, and to enforce the obligations hereunder directly against any of the Undersigned without the necessity of first proceeding against the Contractor;
4. Agree that all monies earned by Contractor under any Contract are trust funds, whether in the possession of Contractor or otherwise, for the benefit of, and for payment of Contractor's obligations for, labor, material, and supplies furnished to Contractor in performance of such Contract for which Surety would be liable under any Bond on such Contract;
5. Agree that this agreement may at any time be completed and filed by Surety in such a manner that it will qualify as a financing statement under the applicable provisions of any statute of any state which has adopted The Uniform Commercial Code, and that Surety may add such schedules to this agreement, describing specific items of security covered hereunder as shall be necessary under such statutes.

**GENERAL PROVISIONS:**

1. Assent by Surety to changes in any Contract or Bond or refusal to assent shall not release or affect the obligations of Undersigned to Surety even though any such assent by the Surety does or might increase the liability of the Undersigned.
2. Surety has the right to decline to execute, provide or procure any bond requested by Contractor. If Surety does execute, provide or procure the execution of a bid bond or proposal bond, or agrees or consents to provide such contract of suretyship, Surety retains the right to decline to execute the final bond (including, but not limited to, performance, payment or maintenance bonds) that may be required in connection with any award that may be made under the bid proposal or tender to which the bid proposal bond or agreement or consent to provide such contract of suretyship is given.
3. Surety shall have every right, defense or remedy which a personal surety without compensation would have, including the right of exoneration and the right of subrogation.
4. Until Surety shall have been furnished with competent evidence of its discharge, without loss from any Bonds, Surety shall have the right to free access at reasonable times to the books, records and accounts of each of the Undersigned for the purpose of examining, copying or reproducing them. Each one of the Undersigned hereby authorizes any depositories in which funds of any of the Undersigned may be deposited to furnish to Surety the amount of such deposits as of any date requested, and any legal entity doing business with the undersigned is authorized to furnish any information requested by Surety concerning any transaction. Surety may furnish in confidence copies of any information, which it now has or may hereafter obtain concerning each of the Undersigned, to other persons or companies for the purpose of procuring co-suretyship or reinsurance or of advising interested persons or companies.
5. The undersigned will, on request of Surety, procure the discharge of Surety from any Bond and all liability by reason thereof. If such discharge is unattainable, the Undersigned will, if requested by Surety, either deposit collateral with Surety, acceptable to Surety, sufficient to cover all exposure under such bond or bonds, or make provisions acceptable to Surety for the funding of the bonded obligation(s).
6. Undersigned warrant that each of them is specifically and beneficially interested in the obtaining of each Bond.
7. In case the execution hereof by any of the Undersigned may be defective or invalid for any reason, such defect or invalidity shall not in any manner affect the validity of this obligation or the liability hereunder of any other of the Undersigned. Invalidity of any provision of this agreement by reason of the laws of any state or for any other reason shall not render the other provisions hereof invalid.
8. Execution by Contractor or any of the Undersigned of any application for any Bond or of any other agreement of indemnity in behalf of Contractor, or the taking of indemnity of any other person by Surety with respect to any Bond of Contractor, shall in no way be deemed to waive, diminish or abrogate any rights of Surety under this agreement.
9. The Undersigned waive and subordinate all rights of indemnity, subrogation and contribution each against the other until all obligations to the Surety under this agreement, at law or in equity, have been satisfied in full.
10. The rights and remedies afforded to the Surety by the terms of this agreement and the terms themselves may not be waived or modified orally and no written change or modification shall be effective until signed by an employee of the Surety.
11. This agreement is to be liberally construed so as to protect, exonerate and indemnify the Surety.
12. All parties agree that any microfilmed, scanned or electronically digitized copy of this document made by Surety as part of its record storage and retention program shall be as effective as the original for all purposes.

**TERMINATION:** This agreement is a continuing obligation of the Undersigned unless terminated as provided in this paragraph. An Undersigned desiring to terminate liability as to future Bonds of Contractor must:
1. Give written notice to Surety at Seattle, Washington 98185, by certified or registered mail, of such termination;
2. State in such notice the effective date (not less than thirty days after the receipt of notice by Surety) of termination of such Undersigned's liability for future Bonds.
3. It is understood and agreed that oral notice to or constructive notice to any agent or employee of Surety shall not constitute effective notice of termination under this agreement.

After the effective date of termination, the Undersigned giving notice shall be liable hereunder for:
1. Bonds executed or authorized prior to such date, and renewals and extensions thereof;
2. Bonds executed pursuant to a bid or proposal bond executed or authorized prior to such date, and renewals and extensions thereof.

Such termination of liability as to an Undersigned shall in no way affect the obligation of any other Undersigned who has not given notice as herein provided.

EXECUTED this 6th day of October, 1999

Attest: _James Gardella, Secretary_

LOCAL TOWING, INC.
By: _George Gardella, President_

X _James Gardella, Individually_

Without in any way diminishing the indemnity of any other signators to this agreement, it is understood and agreed that the indemnity if the undersigned shall exclude:

1. Residence at 41 Turkey Plain Road, Bethel, Connecticut 06801

X _George Gardella, Individually_

X _Jessica Helqvist-Gardella, Individually_

ALL SIGNATURES MUST BE ACKNOWLEDGED.

S-0002/SAEF 6/98

Page 3 of 4

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF Connecticut
COUNTY OF Fairfield  } ss.
On this 10th day of October, 1999, before me personally appeared George Gardella and Jessica Holqvist-Gardella, to me known and known to be the person described in and who executed the foregoing agreement and acknowledged that they executed the same for the purposes, considerations and uses therein set forth as their free and voluntary act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL, the day and year first above written.

(SEAL)                          Notary Public, residing at MARGARET V. CASTANGO
                                (Commission expires       NOTARY PUBLIC
                                                          MY COMMISSION EXPIRES JAN. 31, 2004 )

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF _____
COUNTY OF _____  } ss.
On this ____ day of _____, ____, before me personally appeared _____ of _____, to me known to be the (a) _____ of _____, the Limited Liability Company executing the foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said Limited Liability Company, for the uses and purposes therein mentioned and on oath stated _____ signed said instrument by authority of the Limited Liability Company's operating agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL, the day and year first above written.

(SEAL)                          Notary Public, residing at _____
                                (Commission expires _____)

## CORPORATE ACKNOWLEDGMENT

STATE OF Connecticut
COUNTY OF Fairfield  } ss.
On this 10th day of October, 1999, before me personally appeared George Gardella and James Gardella, to me known to be the President and Secretary of LOCAL TOWING, INC. the corporation executing the above instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said corporation and that it they executed said instrument by order of the Board of Directors of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL, the day and year first above written.

(SEAL)                          Notary Public, residing at MARGARET V. CASTANGO
                                (Commission expires      NOTARY PUBLIC
                                                         MY COMMISSION EXPIRES JAN. 31, 2004 )

## CORPORATE ACKNOWLEDGMENT

STATE OF _____
COUNTY OF _____  } ss.
On this ____ day of _____, ____, before me personally appeared _____ and _____, to me known to be the _____ of _____ the corporation executing the above instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said corporation and that it _____ executed said instrument by order of the Board of Directors of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL, the day and year first above written.

(SEAL)                          Notary Public, residing at _____
                                (Commission expires _____)

IF ADDITIONAL ACKNOWLEDGEMENTS ARE NEEDED
USE S-802 (INDIVIDUAL) OR S-803 (CORPORATE)

S-0002/SAEF 6/98

Page 4 of 4

INDIVIDUAL ACKNOWLEDGMENT

STATE OF Connecticut
COUNTY OF Fairfield } ss

On this 5th day of November, 1999, before me personally appeared James Gardella to me known and known to be the person described in and who executed the foregoing agreement and acknowledged that he executed the same for the purposes, considerations and uses therein set forth as his free and voluntary act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL, the day and year first above written.

(Seal)

Notary Public, residing at _____

(Commission expires _____)

MARGARET V. CASTANGO
NOTARY PUBLIC
MY COMMISSION EXPIRES JAN. 31, 2004

All parties agree that any microfilmed, scanned or electronically digitized copy of this document made by Surety as part of its record storage and retention program shall be as effective as the original for all purposes.

S-0802/GEEF 6/98