87

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT
 2

 3

 4                                    )
    SAFECO INSURANCE COMPANY OF AMERICA )
 5  AND GENERAL INSURANCE COMPANY OF   )
    AMERICA,                           ) Civil Action No.
 6      Plaintiffs,                    ) 3:02CV1966(AVC)
                                       )
 7  VS                                 )
                                       )
 8  LOCAL TOWING, INC., GEORGE GARDELLA, )
    JESSICA HELQUIST and JAMES GARDELLA, )
 9      Defendants/Third-Party Plaintiffs, )
                                       )
10  VS                                 )
                                       )
11  ASSOCIATED INSURANCE AGENCY, INC., )
    FREDERICK J. SMITH, AFNY, INC,     )
12  ASSOCIATED FACILITIES OF AMERICA,  )
    LTD., MELWAIN ENTERPRISES, INC.,   )
13  CHARLES ASSOCIATES, P.C., and CHARLES )
    SAPOCHETTI,                        )
14      Defendants.                    ) Volume 2
                                       )
15

16

17          DEPOSITION OF: GEORGE C. GARDELLA

18      DATE:          APRIL 26, 2004

19      HELD AT:       HUME & ASSOCIATES
                       ONE LANDMARK SQUARE
20                     STAMFORD, CONNECTICUT

21

22

23      Reporter:  JAMES A. SCALLY, RPR, CRR, LSR #80
                   BRANDON SMITH REPORTING SERVICE
24                      44 Capitol Avenue
                   Hartford, Connecticut 06106
25                      (860) 549-1850
```

88

```
 1   APPEARANCES:

 2
     REPRESENTING THE PLAINTIFFS SAFECO INSURANCE
 3   COMPANY OF AMERICA AND GENERAL INSURANCE COMPANY
     OF AMERICA:
 4
         Torre, Lentz, Gamell, Gary & Rittmaster
 5       Suite 309
         100 Jericho Quadrangle
 6       Jericho, New York 11753-2702
         By:  Sean Kelley, Esq.
 7

 8
     REPRESENTING THE THIRD-PARTY PLAINTIFFS LOCAL
 9   TOWING, INC., GEORGE GARDELLA, JESSICA HELQUIST
     and JAMES GARDELLA:
10
         Hume & Associates
11       One Landmark Square
         Stamford, Connecticut 06901
12       By:  Duncan B. Hume, Esq.

13
     REPRESENTING THE THIRD-PARTY DEFENDANT MELWAIN
14   ENTERPRISES:

15       Winget, Spadafora & Schwartzberg, LLP
         45 Broadway, 19th Floor
16       New York, New York 10006
         By:  Dianna D. McCarthy, Esq.
17

18
     REPRESENTING THE THIRD-PARTY DEFENDANT ASSOCIATED
19   INSURANCE AGENCY, INC:

20       Morrison, Mahoney & Miller, LLP
         One Constitution Plaza, 10th Floor
21       Hartford, Connecticut 06103-1810
         By:  James L. Brawley, Esq.
22            Tracey Lane Russo, Esq.

23

24

25
```

89

```
 1                    I N D E X

 2    WITNESS                                      PAGE

 3    George C. Gardella
         Continued Direct Examination by Mr. Brawley    90
 4       Cross-Examination by Mr. Kelley                199

 5

 6

 7    EXHIBITS                                     PAGE
                                                     92
 8    6
                                                     93
 9    7
                                                     95
10    8
                                                    109
11    9
                                                    200
12    10

13    (Exhibits retained by Attorney Brawley)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    (Deposition commenced at 12:11 p.m.)
2
3                    GEORGE C. GARDELLA, Deponent, having
4               been previously duly sworn by James A. Scally,
5               R.P.R., a Notary Public in and for the State
6               of Connecticut, was examined and testified
7               further as follows:
8
9        CONTINUED DIRECT EXAMINATION BY MR. BRAWLEY:
10
11       Q    Mr. Gardella, during our last deposition, we
12   had some discussions about Exhibit No. 3 which you
13   brought to the deposition, which was the -- what you
14   understood to be the indemnity agreement that Francis
15   Empey signed, right?
16       A    Right, one of them, or one of the items
17   required.
18       Q    Prior to the commencement of the work on the
19   Aguadilla project, was Exhibit 3 the only indemnity
20   agreement that you're aware of that Francis Empey had
21   signed at that point in time?
22       A    I had gone through some of this stuff.  I
23   found an indemnity from AFNY requesting Fran's
24   signature, which I believe followed the next day or the
25   same day of the letter from AFNY saying that they would
```

1   not release any bonds without having first received an

2   indemnity from Fran Empey.  And what was in here, yeah,

3   I just found this this morning.  Here we go, right

4   here.  It wasn't from AFNY.

5          Well, the June 26, looks like it came from

6   AFNY, and then went from Associated, and then from my

7   office in Connecticut, and then from one of our offices

8   in Puerto Rico somewhere.  This does not have a

9   signature on it from Fran Empey.  But it follows, I

10  believe, within the day or the same day that the

11  request came from AFNY.  So it leads me to believe

12  that -- this isn't the one that I had in mind.

13         There is another letter in the file around

14  that date, June 26th, 2000, from AFNY saying that the

15  bonds would not be released until there is a signed GIA

16  from Fran Empey and the life insurance policy.

17     Q    There's another letter besides the one you've

18  given me?

19     A    Which was the one?

20     Q    You gave me a June 26, 2000 facsimile to

21  Terry and/or Fred Smith.  I don't know who it's from.

22  Oh.  From Mary Ann Price at AFNY.

23     A    Right.

24     Q    Is there another letter besides this one?

25     A    Yes.  That's what I'm referring to there is

```
 1   in the file --
 2              MR. BRAWLEY:  Why don't we mark this
 3   one.
 4       A    There is another letter in the file --
 5              MR. HUME:  Wait.
 6       A    -- which is right around that same time
 7   period, as I've said.
 8              (Exhibit 6 marked.)
 9              THE WITNESS:  It was a letter from AFNY.
10   BY MR. BRAWLEY:
11       Q    To?
12       A    To --
13       Q    May I see the other one?
14       A    See, this is a copy that's more closely in
15   reference to that.  This is from Mary Ann Price on
16   October 25th, 1999, which looks like the origination of
17   the language in this.
18       Q    Okay.  So let's just do one thing at a time
19   because it's going to get confusing.  All right.
20              First you showed me a June 26, 2000 memo from
21   Mary Ann Price of AFNY to Terry and Fred Smith at
22   Associated, and that's -- --
23       A    Yes.
24       Q    -- hold on, one, two, three, four, five,
25   that's six -- it's a seven-page document.
```

```
 1              Then you also referenced an October 25th,
 2    1999 memo from Ms. Price at AFNY to Susan at Local
 3    Towing, right?  That's a -- well, the one we marked has
 4    got three pages to it, but two of those pages are just
 5    fax cover sheets.  Let's just mark that as 7, and I'll
 6    give it back to you so we can refer to it.
 7         A    Let me see that other one on the bottom
 8    there.
 9              (Exhibit 7 marked.)
10         A    Yes.  This is the letter.  This is the letter
11    requesting the signature as well as the bond that they
12    requested to be signed.  "Please have the agreement
13    completed, signed and notarized, returning it to me at
14    your earliest convenience.  As you know, no final bond
15    will release until receipt of the approval of this
16    agreement by Safeco."
17              Took a step back, "Enclosed please find the
18    application for the contract bond and agreement of
19    indemnity for the St. Thomas project awarded by the
20    government of the Virgin Islands."
21              And then what follows is the -- where Fran
22    was supposed to have executed the GIA.
23         Q    All right.  May I see that?
24         A    I would have assumed from that that the GIA
25    was executed by Safeco and released.
```

1         Q    Let's stop and look at Exhibit 6, June 26,

2    2000 memo from Mary Ann Price attaching an indemnity

3    agreement for Fran Empey to sign, generally speaking,

4    right?

5         A    Yeah.

6         Q    Is that right?

7         A    It appears to be, yeah.

8         Q    Okay.  Do you know, did you at the time that

9    you started the Puerto Rico project know whether Fran

10   Empey had signed a document such as the one attached to

11   Exhibit No. 6?

12        A    At the time, I had assumed all the

13   documentation was in order, and this record reaffirms

14   to me that it was in order.

15        Q    Did you ever see an indemnification agreement

16   that had been signed by Fran Empey prior to commencing

17   the work on the Puerto Rico project besides Exhibit No.

18   3?

19        A    The Puerto Rico project meaning Aguadilla?

20        Q    Yes.

21        A    I do not recall.

22        Q    You don't recall seeing that document?

23        A    No.

24        Q    And as we discussed at length last time, by

25   the time the St. Thomas project had started, Fran Empey

```
 1    was four months -- had four months passed away at that
 2    point?
 3              MR. HUME:  Maybe you need a calculator.
 4        A    More like two and a half months, October,
 5    November.
 6        Q    Okay.
 7        A    About two and a half months.
 8        Q    During our last day of deposition, you had, I
 9    think, told me that you believed that someone at
10    Accredited had drafted the indemnity language set forth
11    in Exhibit No. 3.
12        A    Who is Accredited?
13        Q    I'm sorry.  What did I say, Accredited?
14              Somebody at Associated had crafted the
15    language in Exhibit 3.  Does Exhibit 7 change your
16    memory of who may have drafted that language?
17        A    Yes, as I stated earlier, this appears to be
18    the origination of this language from AFNY, Exhibit 7.
19              MR. BRAWLEY:  Why don't we mark this.
20              (Exhibit 8 marked.)
21        Q    Let me show you what we've marked as Exhibit
22    8.  It is an October 7, '99 letter from Safeco to AFNY,
23    and, again, it seems to have that same indemnity
24    language that we have in Exhibit 3.
25        A    It appears.  I haven't studied it, compared
```

1    it word for word, but it appears to be the same.

2        Q    Does Exhibit 8 suggest at least that the

3    indemnity language that was in Exhibit 3 signed by Mr.

4    Empey came from Safeco at least at some point?

5        A    Yes.  This is the first time I've seen this.

6    From these papers in front of me, without digesting

7    them word for word, it appears that the chain came from

8    Safeco on October 7th, AFNY on the 25th, and it was

9    executed on the 28th by Fran Empey.

10       Q    So it would be fair to sum up and say that

11   although there appeared to be some efforts to get Fran

12   Empey to sign a more formal indemnification agreement,

13   the only indemnification agreement that you were aware

14   of that existed at the time Aguadilla started was this

15   Exhibit 3 signed by Mr. Empey on October 28th of '99?

16       A    I had assumed that the GIA was executed and

17   all the paperwork was in order.

18       Q    Okay.  So you assumed it was there, but you

19   never saw it?

20       A    Correct.

21       Q    You and Mr. Empey were business partners.

22   Did you ask him if he signed the GIA prior to

23   commencing the Aguadilla project?

24       A    Yes, I did.  There was one day when we were

25   attempting to find a notary in San Juan to have one of

 1    the documents executed.  I honestly do not recall

 2    specifically what it was or which project it related

 3    to.

 4        Q    You were looking for a notary in San Juan to

 5    have -- to witness Mr. Empey's signature on a general

 6    indemnity agreement?

 7        A    I believe that's what it was, yeah.

 8        Q    What time frame was that, do you know?

 9        A    It was probably in May or June of 2000.

10        Q    Were you successful in finding a notary and

11    having a signature done?

12        A    On that occasion, I don't believe so.

13        Q    Okay.  As far as you know, prior to his

14    death, is the only general indemnity agreement --

15    strike that.

16             Is the only indemnity agreement that Mr.

17    Empey signed the one we have in front of us here,

18    Exhibit 3?

19                  MR. KELLEY:  Could we not call it an

20    indemnity agreement?

21                  MR. BRAWLEY:  I tried to strike that.  I

22    don't know what to refer to it as.

23        Q    Let me ask you a new question.  Prior to Mr.

24    Empey's death -- strike that.

25             Have you seen in any of the documents a

1    general indemnity agreement that Mr. Empey signed prior

2    to his death?

3         A    I don't recall seeing it at this time.

4    Again, I've got to go through everything, make sure

5    that nothing was missed, you know, in the documentation

6    that I have, and all that I can say is the -- the

7    record of all the communications suggests that there

8    was something signed.

9         Q    Do you know whether yourself or anyone on

10   behalf of Local Towing ever wrote to Safeco or

11   Accredited and said, you know, "Do not let the bonds

12   issue without having Mr. Empey sign the general

13   indemnity agreement"?

14        A    I don't recall doing that because it was

15   already done with, you know, these letters that we are

16   going over today.  It's already been stated there.

17        Q    Okay.  But as far as you recall today sitting

18   here, there's no letter from yourself or anyone at

19   Local Towing stating affirmatively to Safeco or to

20   Accredited -- excuse me -- to Associated, "Don't issue

21   the bonds unless you have a general indemnity agreement

22   signed by Fran Empey"?

23        A    That's the same question I just answered.

24        Q    I think what you answered was you identified

25   some letters on the table which were not letters from

1    yourself or anyone at Local Towing.

2        My question is whether a letter was generated

3    by yourself or anyone from Local Towing instructing

4    Safeco or Associated not to issue the bonds until a

5    general indemnity agreement was obtained from Fran

6    Empey.

7        A    As I recall, I don't remember sending out a

8    letter like that, justified by the fact that it was

9    already stated in the record.

10       Q    What does it mean in your business not to be

11   bondable?  Have you ever heard that phrase?

12       A    You don't have the wherewithal to be bonded.

13       Q    Okay.  And basically what that's saying is

14   you don't have sufficient financial assets for the

15   bonding company to take a risk on you and issue a bond?

16       A    Or whether it be financial assets or, you

17   know, the experience in similar projects.

18       Q    You're a poor risk for the bonding company

19   for some reason?

20       A    Yes.

21       Q    Prior to the Aguadilla and the St. Thomas

22   projects, do you have any knowledge as to whether Fran

23   Empey was bondable, you know, by himself prior to those

24   projects?

25       A    I -- your question was was Fran Empey

1    bondable or did I have information as to whether Empey

2    was bondable before that step?

3        Q    Before Aguadilla and St. Thomas, right.

4        A    At that point, the nature of the agreement

5    that I had with Fran Empey and the understanding with

6    AIA was that my financials were sufficient combined

7    with Fran Empey's experience and track record.  That's

8    what the understanding was.

9        Q    So at least your understanding as the

10   president of Local Towing was that your financial

11   strength combined with Fran Empey's knowledge and skill

12   was sufficient for Safeco to issue bonds for Aguadilla

13   and St. Thomas?

14       A    Yes.  That's why -- that's -- that was the

15   nature of -- it's one reason why we had gotten

16   together, and Fred Smith put the two parties together.

17       Q    When you say yourself, are you including your

18   father, James Gardella, in that statement?

19       A    At that point, he was to have been not

20   involved.  There's -- this is going back four years

21   now.

22       Q    Do you have an understanding of whether

23   Safeco would have agreed to issue the bonds for St.

24   Thomas and Aguadilla without James Gardella's signature

25   on the indemnity agreement?

1        A       What was the first part of your question?

2                MR. BRAWLEY:  Why don't you read it

3        back.

4                (Question read.)

5        A       At the time there was discussions of not

6        having James Gardella involved, and it is my

7        understanding, as I recall, that after Washington,

8        D.C., there was sufficient capital in the company to do

9        that without his involvement.  As, you know, the

10       project in Washington was very successful, and it

11       generated what I thought was the capital to allow that

12       to happen.

13       Q       Who was involved in the discussions about not

14       having James Gardella on the indemnity agreement for

15       St. Thomas and Aguadilla?

16       A       There was primarily Fred Smith and Fran Empey

17       and myself.  There was probably some correspondence to

18       James.  There were discussions from Fred Smith, you

19       know, trying to get James Gardella to stay involved,

20       but I don't believe he elected to do that.

21       Q       Who elected?  I'm sorry.

22       A       James.  He was under the impression that it

23       was on our own.

24       Q       Did you ever see any confirmation in writing

25       from any entity that James Gardella had been removed as

```
 1    an -- from the indemnity agreement for purposes of the

 2    St. Thomas or the Aguadilla projects?

 3         A    No, I haven't.

 4         Q    Can we agree that prior to Puerto Rico and

 5    Aguadilla, on all the projects where Fran Empey was

 6    involved, that James Gardella was really the person who

 7    signed on the indemnity agreements to provide the

 8    financial backing for the projects?

 9         A    Did you say prior to St. Thomas and Puerto

10    Rico?

11         Q    Yes.

12         A    Yes.

13                   MR. HUME:  Which jobs?  I'm --

14    technically I'm going to have an objection to the

15    question.

16                   MR. BRAWLEY:  Yes.

17                   MR. HUME:  The problem I have with the

18    question is --

19                   MR. BRAWLEY:  I didn't specify which

20    job.

21                   MR. HUME:  There were two jobs in Puerto

22    Rico prior to the Aguadilla job.

23                   MR. BRAWLEY:  Okay.

24                   MR. HUME:  There was the -- I'm not

25    testifying at this point, but this is all in the
```

```
 1    record.  There was the hulk raising, and there was a
 2    dredge job, both in San Juan harbor.  It is my
 3    recollection that these preceded the bidding and
 4    construction work on Aguadilla.
 5                  THE WITNESS:  The dredging was in St.
 6    Thomas.
 7                  MR. HUME:  I thought there were two jobs
 8    in San Juan harbor.
 9                  THE WITNESS:  There was a project
10    removing vessels for the Corps of Engineers, and there
11    was an additional contract removing vessels for the
12    port authority.
13    BY MR. BRAWLEY:
14        Q    Let me see if I can clean it up, deal with
15    the objection.
16             When we were last here, I believe that you
17    told me on the prior jobs before Aguadilla and St.
18    Thomas, when Fran Empey was involved, he had signed on
19    these general indemnity agreements to get the bonds
20    issued for those projects.  Was that accurate?
21        A    That Fran Empey had signed on, that was my
22    understanding.
23        Q    Okay.  Forgetting Puerto Rico and St. Thomas,
24    but the jobs you did with Mr. Empey prior to those
25    jobs, I think you told us that he would sign on the
```

1    general indemnity agreement for the bonds for the prior

2    projects he was involved in?

3         A    He was supposed to have, and the agreement

4    that he and I were operating under was that it was, you

5    know, a profitsharing of profit and/or loss, and that

6    was the understanding that we operated under.  But now

7    the details that we're going over now leads to question

8    whether or not he actually did follow through and do as

9    he agreed to do, execute the GIA out of the projects.

10        Q    Can we agree that prior to the Aguadilla and

11   the St. Thomas job, up to that time, Fran Empey was not

12   bondable by himself due to his financial condition?

13        A    I do not know the specifics of what his

14   financial position was.

15        Q    Did you ever discuss with James Gardella,

16   your dad, whether Fran Empey was bondable prior to the

17   Aguadilla and the St. Thomas jobs?

18        A    No, I did not, as I recall.

19        Q    Can we agree that when -- when you're as a

20   businessman signing on to an indemnity agreement, the

21   financial condition of the other parties that are going

22   to sign that indemnity agreement is something you want

23   to be looking at, right?

24        A    Yeah.  I will be now.

25        Q    Have you ever been the only signature on an

1    indemnity agreement for a bond for a project for Local

2    Towing?

3        A    I would execute the bonds themself, and my

4    signature would appear there.

5        Q    My question, though, is whether Chris

6    Gardella has ever been the only signature on a general

7    indemnity agreement for bonds that were issued to Local

8    Towing.

9        A    I would have to look back at the Mountbatten

10    indemnities.  I have got to look back over the

11    documentation.

12        Q    Is there -- is there a project that you

13    believe you may have been the only person on the

14    indemnity agreement when the bond was issued?

15        A    Possibly it was with Mountbatten, the

16    project -- or two or three projects for the city of

17    Mamaroneck, but I -- I have got to look at the --

18        Q    Would that be the only project where you

19    believe that you may have been the only signature on

20    the general indemnity agreement?

21        A    As it stands out, yeah, that's probably true.

22        Q    So it's fair to say that prior to the

23    Aguadilla and the St. Thomas job, that Local Towing was

24    bonded through the majority, if not all the projects,

25    through the financial strength of James Gardella?

1       A     Say that again?

2       Q     Prior to Aguadilla and St. Thomas, the jobs

3    at issue in this case, all the jobs that Local Towing

4    was bonded for was through James Gardella signing the

5    indemnity agreements?

6       A     I just finished telling you that it may have

7    been that the three projects in Mamaroneck could have

8    been on my financial statements and the company's.

9       Q     I thought you just retracted that, though,

10   and told me you didn't think so.  You still think

11   Mamaroneck may be your signature?

12      A     I still think that may be the case.

13      Q     So one project, maybe, was on your financial

14   strength, right?

15      A     Three projects.

16      Q     Three projects, all from Mamaroneck?

17      A     Yes.

18      Q     How many dollars are we talking about on

19   those projects?

20      A     Do you have a calculator?  (Pause.)   The

21   projects in Mamaroneck, there was a series of three, I

22   believe they were done for three different contracts,

23   and, therefore, three different bonds.  They were

24   arranged in that fashion because -- because of permit

25   requirements.  That aggregate should have -- if I

107

1    remember right, would have been about a million

2    dollars.  This is just as I recall over -- this was

3    done about five years ago, now.  So it may not -- it's

4    probably not an exact number.

5         Q    As I understand it, we'd have to go back and

6    look who signed the indemnity agreement.  You're just

7    not sure in those instances?

8         A    Right.  I believe I may have been the only

9    one on there.

10        Q    Was Fran Empey involved in the Mamaroneck

11   projects?

12        A    No.

13        Q    How many projects was Local Towing involved

14   in where James Gardella signed the indemnity agreements

15   to get the bonds issued, approximately?

16        A    I have -- the most accurate way to do this

17   would be to go back over the record.  These projects

18   are stretched out since 1995.

19        Q    Okay.  We can agree, aside from Mamaroneck,

20   that James Gardella's signature would have appeared on

21   all of the indemnity agreements for all the bonds

22   issued on behalf of Local Towing?

23        A    There were other projects that were done with

24   Mountbatten.  It really -- I really would feel more

25   comfortable going back over the records.  I feel like

1     I'm trying -- you're trying to lead me into a response.
2          Q    Well, you took over as president of the
3     company, right, in what year?
4          A    I've acted as president probably since 1995.
5          Q    Okay.  One of the things you need to know as
6     the president --
7          A    I'm saying acting as far as operating it.
8          Q    Okay.
9          A    I don't know if the actual transaction took
10    place at that time.  We went over some of those papers
11    the other day.
12         Q    Was James Gardella involved in the day-to-day
13    operations of the business after you took over as
14    president, you know, get involved at all?
15         A    Not really.
16         Q    He's your dad, right?
17         A    Yeah.
18         Q    You guys would talk about the different
19    projects that were going on?
20         A    Not a really lot.  You know, he wasn't
21    involved in everything that was going on.
22         Q    Would you be surprised to learn that your dad
23    knew in April of 2001 that up to that point that Fran
24    Empey was not bondable?  Is that news to you?
25         A    April of 2001, that was after, quote, you

109

1    know, I'll say the shit was hitting the fan.  A lot of

2    information came out at that point.

3        Q    Do you know whether your dad -- April 2001,

4    whether he knew about Fran Empey's financial history

5    and whether or not he was bondable?

6        A    Again, a lot of information was coming out by

7    that time.

8                 MR. BRAWLEY:  Would you mark that.

9                 (Exhibit 9 marked.)

10       Q    Exhibit No. 9 is a two-page letter from James

11   Gardella to Fred Smith dated April 25th of 2001.  Let

12   me just direct your attention to the second paragraph

13   of that letter.  I'll read over your shoulder because

14   I've only got one copy.  (Pause.)

15                Let me know when you read through the second

16   paragraph.  I have some questions for you.

17       A    (Pause.)  Okay.

18       Q    Okay.  This is your father, James Gardella,

19   writing to Fred Smith in April 2001.  I'm quoting:  "I

20   did know some things about Fran's past, and obviously

21   he was not bondable for various reasons."

22                I've read that correctly, right?

23       A    Yeah.

24       Q    Now, he is not saying in April of 2001, "I

25   just learned some things about Fran Empey's past"; he's

110

1    saying, "I knew them," right?

2        A    Okay.  You should direct those questions to

3    James Gardella.

4        Q    Well, you're the president of the company.

5    What I'm getting at is when you folks were approaching

6    the Aguadilla and St. Thomas projects, did you also

7    know about Fran Empey's financial past, that he had not

8    been bondable for various reasons?

9        A    Again, I don't know the specifics of Fran's

10   previous dealings.  I've heard stories and hearsay.

11   There's a letter in the file where Fred Smith states

12   that in Fran's other dealings, he did not owe any

13   bonding companies money.  There was obviously some

14   reason he was dealing with us.  As to specifics, I

15   don't know.

16       Q    Well, tell me what in the stories and hearsay

17   you had heard about Fran Empey's financial past prior

18   to the Puerto Rico and St. Thomas projects.

19       A    After that time, I've heard a lot of stories.

20       Q    Why don't we start with what stories you

21   heard prior to Puerto Rico and St. Thomas.  Then we'll

22   go to any stories you heard after that time.

23       A    I can't -- you know, I was aware that for

24   whatever reason, his company went out of business.

25       Q    You were aware of that when?  Prior to

1    Aguadilla and St. Thomas or after?

2         A    Yeah, prior to that.

3         Q    What company was that, do you know?

4         A    Hydro-Dredge.

5         Q    Fran Empey had had a company called Hydro-

6    Dredge that basically did the same types of projects as

7    Aguadilla and St. Thomas that he was involved in prior

8    to getting involved with your family?

9         A    With me, yeah.

10        Q    Okay.  The reason that Fran Empey got

11   involved with the Gardella family was he wasn't

12   bondable by himself; he couldn't continue to do the

13   projects.  He needed financial backing, right?

14        A    You could say, you know, part of that.  The

15   other reason, as he would say, he didn't want to own a

16   company and have the responsibility of iron and

17   equipment, and he just wanted to approach jobs, pick

18   and choose a job that he liked.

19        Q    But we can agree that at least part of the

20   reason that Fran Empey left Hydro-Dredge and joined up

21   with the Gardella family was he wasn't bondable.  He

22   needed some financial backing to do the projects?

23        A    Well, apparently Hydro-Dredge went out of

24   business ten years before we got involved.  I don't

25   know what the exact dates are.  It's not like he just

1    closed up shop there and came to work with me.

2        Q    That would be bad for your third-party claims

3    here if in fact Fran Empey came to you folks for the

4    sole reason that he needed financial backing for these

5    projects, right?  We can at least agree on that?

6        A    I don't know the technicalities of your

7    business, what is involved there.

8        Q    You don't seem to want to answer the

9    question.  It's a pretty simple question:  You didn't

10    bring any technical expertise to Fran Empey's jobs in

11    Aguadilla and St. Thomas, right, you yourself?

12        A    I didn't bring any?

13        Q    Right.

14        A    I feel I would not agree with that.

15        Q    Can we agree that Fran Empey had sufficient

16    technical expertise to handle the supervision of the

17    Aguadilla and the St. Thomas job on his own?

18        A    I believe so.  As far as Aguadilla, I've done

19    a number of projects setting stone and trucking stone,

20    and a number of projects installing docks and piers and

21    drainage structures.  I was fully comfortable with

22    that.

23            St. Thomas, although I had never done the job

24    specific to installing a sewer outfall, you know, I

25    have a technical understanding of what was involved.

113

1      On my own, I would not have gone out and taken that

2      project.  You know, each task involved in St. Thomas I

3      had done as far as working with high-density

4      polyethylene pipe, dredging, digging trenches, and

5      setting stone, I've done, even at the time I feel I've

6      got a good technical -- I had a good technical

7      understanding of that type of work.  But I never had

8      done it all while we were installing the sewer outfall.

9          Q     We can agree that whether you had some

10     experience with the type of job done on Aguadilla, that

11     Fran Empey had a great deal more experience than you

12     did and was certainly from a technical standpoint

13     capable of managing Aguadilla and St. Thomas on his

14     own?

15         A     Yeah, that was part of the component of the

16     relationship.

17         Q     Okay.

18         A     But as far as, you know, your statement from

19     before about me having absolutely no technical

20     experience or abilities is wrong.

21         Q     Can we agree that in order to supervise and

22     run a project, it's important to be physically located

23     where the project is going on, or at least be there on

24     a daily basis?

25         A     Yes.

114

1      Q      Did you ever hear Fred Smith use the phrase

2   that Local Towing and Fran Empey would be a, quote, a

3   good match?

4      A      Yes, that's what I -- yes.

5      Q      And we can agree that at least one of the

6   reasons that they would be a good match is that Local

7   Towing, through James Gardella and potentially through

8   yourself, could provide the financial backing to get

9   the bonds issued for the projects that Fran Empey could

10  then provide the supervision on?

11     A      And as far as there has to be a corporation

12  with a track record in doing that.  It's not solely

13  based on anybody's financial statements.  You know,

14  there has to be continuity the whole way through.

15  Again, you're leading back to the same point where

16  you're trying to lead me into a situation where James

17  Gardella was bonding those projects.

18     Q      Well, you weren't going to St. Thomas to be

19  there on a daily basis, correct?  That wasn't the plan

20  before Fran Empey died?

21     A      Before Fran died, no.  You know, before that

22  there was projects in New York that I could have

23  committed to, and we decided that I would commit to

24  these jobs.  In addition to that work going down there,

25  there was a company with a market and with equipment

1    that I had to be responsible to.

2        Q    And the -- you weren't also going -- you were

3    staying in the States.  You also weren't -- well, not

4    States.  You weren't going out to Puerto Rico, either?

5    You were going to stay put in Connecticut and do the

6    jobs that were local?

7        A    At the time of bidding Aguadilla, the plan

8    was for me to work in Aguadilla and manage that

9    project.

10       Q    That was abandoned at some point, though?

11       A    In the interim, Michael Empey, Fran's son,

12   got involved, and Fran and Fred were really trying to

13   push Michael Empey to run Aguadilla, one or the other

14   of those projects.  And with the more people around, I

15   could have then been able to do some of the other work.

16   I had a number of pieces of equipment that would have

17   been sitting idle.

18       Q    So the only contribution that Local Towing is

19   making to that project out in Aguadilla and St. Thomas

20   is whatever support you can provide from your offices

21   here in Connecticut, right?

22       A    Well, there was, you know, personnel; there

23   was labor that had worked with us and with the company.

24   And there's federal projects, there's a tremendous

25   amount of paperwork and management that has to be done,

1    submittals and just tracking.  It's the nature of the

2    business, you know.  It's not like -- it's not like a

3    local project, local company putting windows in around

4    the town.  In all of the projects that were done, were

5    done on that basis.  Whether I was myself working in

6    Rhode Island or New York or Washington, D.C., or

7    Florida.

8                    MR. BRAWLEY:  Can you read that back to

9    me, the question and answer?

10                   (Record read.)

11        Q    How many laborers that had previously worked

12   for -- or personnel that had previously worked for

13   Local Towing were physically present working on the St.

14   Thomas or the Aguadilla jobs, do you know?

15        A    The lead people were Joe Parmalee, Jerry

16   Story, one of the fellows that came -- that we met from

17   Washington, Lawrence Van Tassel.  They were like the

18   foremen-supervisors.  Lawrence Van Tassel came, he was

19   introduced to the company in Washington, D.C., there

20   was a project, as you go along, you pick up people.

21                   At one point in time, one of the people from

22   Connecticut, Mark Haslow (phon sp), went to Aguadilla.

23   Jerry Story was really a working foreman who originally

24   I got to meet him through Fran, but he had worked with

25   the company, projects that Fran has done, and projects

117

1    for me where Fran wasn't involved.  The same with Joe

2    Parmalee.

3         Q    So there were four people working out in St.

4    Thomas and Aguadilla that had previously done at least

5    some projects with Local Towing?

6         A    Yeah.

7         Q    You also told me you provided paperwork

8    support.  I imagine there is a great deal of paperwork

9    generated by large construction projects like these?

10        A    Yes.

11        Q    Wasn't there a financial control company of

12   some sort that was in charge of disbursing certain

13   monies on these projects?

14        A    Yes, there was.

15        Q    Who was that?

16        A    That was SICS.

17        Q    Okay.  So they handled some of the paperwork,

18   and then what did they do, generate reports for you?

19        A    They handled the disbursement of cash, and my

20   office in Connecticut would compile all the payables

21   and keep track of it there and submit to SICS what was

22   due and payable.

23        Q    Okay.  The arrangement between Fran Empey and

24   Local Towing was that there would be a fifty-fifty

25   split of profits at the end of St. Thomas and

1  Aguadilla?

2      A    Or you're responsible for 50 percent of the
3  loss.

4      Q    Okay.  Fifty-fifty partners whether for good
5  or for bad; is that what was the agreement?

6      A    Yes.

7      Q    Typically -- typically in your industry,
8  would providing, you know, four or so laborers and
9  doing the paperwork be sufficient to have a company
10  like Local Towing get 50 percent of the profit from a
11  project?

12      A    There's ongoing -- the corporation itself has
13  to be maintained, insurance, liability insurance; there
14  has to be a policy in effect all the time.  How do you
15  explain?  You have got to keep the lights on and the
16  doors open.  There's a lot more to it than just doing
17  some of these jobs.

18      Q    But my question is whether insurance, you
19  know, like you're saying liability insurance, did you
20  guys buy workers' comp for the jobs too?

21      A    Yeah.

22      Q    So providing the insurance -- would Fran
23  Empey be charged -- he'd be charged for the insurance
24  policy for the job as a partner or as a fifty-fifty
25  person, right?  Whatever that expense was, it would

119

1    come out of the profit and it would be split fifty-

2    fifty, right?

3         A    Yeah.

4         Q    My question is in your industry, is it

5    typical for a company like Local Towing to provide four

6    or so laborers, the insurance, the proposals, then be

7    cut in for 50 percent of the profit?

8         A    I don't know how other people have operated.

9    That's what we have done.  That's what -- I really

10   don't know how anybody else does their business.

11        Q    Isn't it true, part of what you're signing on

12   is the risk?  The project could go well and you could

13   split the profit fifty-fifty with Mr. Empey or the

14   project could go poorly?

15        A    Or you could split the loss fifty-fifty.

16   Very clear.

17        Q    Does it trouble you at all your father saying

18   in April of 2001, "I did know some things about Fran's

19   past, and obviously he was not bondable for various

20   reasons," the statement we are talking about in Exhibit

21   9, did that trouble you at all?  Is that different than

22   what your understanding was?

23        A    I had no specific information.  Even now I

24   don't know the specifics of his past.  Although I know

25   more specifics now of his past, but I don't know what

1    to tell you.  It's troubling me now because we're

2    sitting here doing this.

3       Q    Well, let me ask you this:  Exhibit 9, April

4    of 2001, your father is saying he knows about Fran

5    Empey's past and he knows he's not bondable for various

6    reasons.  When you were doing the Puerto Rico and the

7    Aguadilla projects, did you have a different

8    understanding that Fran did have enough assets so that

9    if things went south, he could pay off?

10       A    I assumed that he had some cash or assets

11   squirreled away somewhere.  When he was in business for

12   himself, he did a tremendous amount of work and went

13   through a tremendous amount of money.

14       Q    How do you know that?

15       A    Just the few people that I know in the

16   industry, you know, said, "Wow, he did a lot of work,

17   you know.  He made a lot of money."  And he did.  He

18   did do considerable.  I would have to assume that he

19   was able to squirrel something away somewhere.

20       Q    We can agree, though, as a general principle,

21   that someone's signature on an indemnity agreement

22   isn't worth much if they don't have the money to back

23   up that signature, right?

24       A    Yeah.

25       Q    So one of the things as president of Local

```
 1    Towing, one of the things you would want to be looking
 2    at, if Fran Empey had ever signed an indemnity
 3    agreement, you would want to take a look at his
 4    finances to see --
 5         A    To find out the facts?
 6         Q    Yes.
 7         A    I know that now.
 8         Q    That's something that you learned as a result
 9    of the failure of these projects and the monies now
10    being owed?
11         A    As a result of the -- I wouldn't say these
12    projects failed.  They were completed.  I completed
13    them.
14         Q    When I say failed, I mean they didn't make
15    money.
16         A    Okay.  It was really more a result of Fran's
17    passing without having had the proper insurance policy
18    in place.  Had the proper insurance policy been in
19    place, it wouldn't -- as disastrous effect.  I'm not in
20    the business of -- or I was not in the business of
21    knowing what the risks of not having that were.  That's
22    why there are insurance professionals.
23         Q    You didn't understand that dying without
24    keyman life insurance in place would mean that there
25    would be no payment upon Fran Empey's death?
```

1      A    In simplest terms, that's understandable.

2   But as far as the chain of reaction and chain of

3   effects that come into place after somebody dies, I

4   didn't know the extent of that that I know now.  You

5   know, that's why there are insurance agents and

6   professionals who know about that.

7      Q    How much was your keyman life insurance

8   policy?

9      A    It was for a million dollars.

10     Q    I'm sorry.  How much was the premium?

11     A    Somewhere around $6,000.

12     Q    At some point, did Mr. Sanfilippo make a

13  quote for how much it would be for Fran Empey's keyman

14  life insurance policy?

15     A    Yes.

16     Q    How much was that?

17     A    Like 60 or 70,000 bucks.

18     Q    And did that strike you as a lot of money for

19  a life insurance policy, 60 or 70,000?

20     A    Yeah.

21     Q    Okay.

22     A    We -- my office tried to procure quotes from

23  elsewhere, and she was -- Susie was trying to get that.

24  It was all going down at that time.

25     Q    Was Mr. Sanfilippo the lowest quote or the

1    only quote for Fran Empey?

2         A    We were just getting information back from

3    another agent right around that time.

4         Q    Who was the other agent?

5         A    It was local in Connecticut.  I don't recall

6    his name.  But there was efforts to find another

7    source.

8         Q    But the only source where Mr. Empey ever went

9    to get the physical or do the things necessary to

10   actually obtain a policy would have been the Sanfilippo

11   policy?

12        A    Yes.

13        Q    Did you have any understanding of why the

14   insurance company was charging such a high premium for

15   Fran Empey's policy, you know, compared to your own?

16        A    I was 30 years old or so at the time, and he

17   was 62 or 3.  You know, as you get older, it's more

18   expensive.

19        Q    Did you ever ask anybody why it was, you

20   know, so expensive for Mr. Empey?

21        A    I don't recall.

22        Q    Did you ever --

23        A    That's why we went, "Okay.  That's a lot of

24   money.  Let's also look for something else."

25             There is some discrepancy in the records that

124

1      show that that 60 or 70,000 may have been for $2

2      million worth of insurance, which I uncovered, and

3      there was some discussion about Fran not wanting to get

4      insurance for the company without getting any insurance

5      for his family.  And it could have been that it was not

6      1 million, but it was 2 million.

7          Q     I saw that.  There seemed to be some

8      references to getting 2 million, and ultimately the

9      quote was for a million?

10         A     Show me what you've got.  It's about three

11     years ago now.

12         Q     Did you ever have any discussions with anyone

13     that the reason that Fran Empey's premium for the

14     keyman life insurance was going to be so high was that

15     he had had prior health problems?

16         A     There could very well have been.  I think I

17     mentioned the other day that I did know that he was

18     sick back in 1991, there was some sort of issue.  But I

19     thought that that was -- he was recovered from.

20         Q     You had mentioned that he -- strike that --

21     that Fran Empey got sick in the early '90s and had

22     taken a period of ten years or so off from doing this

23     type of work and then started up again with Local

24     Towing.  Does that sound right?

25         A     I don't know if it was ten years.  I started

1    talking with him in 1995 or '96.  So maybe there was a

2    five-year period there.  But I know he was doing other

3    projects before our involvement.  He was doing some

4    sort of salvage work or -- I don't think the period was

5    like ten years.  But I do know that he was sick at one

6    time, but I thought that he recovered from it.  He

7    appeared healthy.

8         Q    Did you ever have any conversations with Fran

9    Empey about his health in the month or years leading up

10   to the Aguadilla and St. Thomas projects?

11        A    I don't recall.  Again, you know, he appeared

12   healthy.  He didn't demonstrate to me that he was in a

13   bad way.

14        Q    Did you ever hear that prior to the Aguadilla

15   or St. Thomas projects, that Fran Empey had had

16   problems with his liver, liver disease?

17        A     Prior to his death, I don't -- I know that

18   after I found out what had happened, after he died,

19   Dick Roland, who was a longtime friend of Fran's, who

20   was also involved with the projects in Puerto Rico, he

21   said that, yeah, this was after Fran died, he said that

22   the doctor told Fran ten years -- or whatever that

23   other illness was, that if he continued to drink

24   anything, he would die.

25              And I did not know that specific information

1    until after he had died, and then there were times when
2    I saw him drink.  Had I known that before he died, I
3    would have said, "Fran, knock it off."
4          But before he died, I did not know the
5    specific detail of what had actually happened.  You
6    know, as far as I understood, it was he just was
7    exhausted.
8          Q    Local Towing was willing to pay $70,000, in
9    fact, you on behalf of local towing were willing to pay
10   $70,000 for the keyman for Fran Empey with no real
11   knowledge of his health history other than he had been
12   sick many years before then, before the projects?
13         A    Well, that's one reason we went to try to get
14   a second quote also.  And if that's what was required,
15   we were willing to meet the requirement.
16         Q    Was there a real concern on your part, Local
17   Towing's part, that Fran Empey's health was such that
18   there was some question in your mind as to whether he
19   would make it through the St. Thomas or the Puerto Rico
20   projects?
21         A    Not at that time, no.  It wasn't -- he
22   appeared to be in good health.  He didn't demonstrate
23   any -- not like he was passing out on the job or --
24         Q    Do you know why you went to Cleary but then
25   Fran Empey went to Sanfilippo for the same type of