1    insurance?

2         A    I don't recall that I went to Cleary alone.

3    I thought there was another agent in Connecticut also,

4    and Fran and the company went to Sanfilippo because I

5    believe he was recommended by Wayne Price.  If you have

6    something there from Cleary -- I believe in addition to

7    Cleary, there was an effort to reach out to -- for a

8    policy somewhere here in Connecticut.

9         Q    Did it cause you any concern that leading up

10   to the Aguadilla and the St. Thomas projects that Fran

11   Empey seemed to be avoiding, you know, going for the

12   physical and getting the keyman policy?

13        A    At the time he passed that off as, "It's too

14   much money, you know, it's a lot of money."  That's why

15   we finally came to the point where he did go to get the

16   physical.

17        Q    Who was the driving force behind finally

18   getting Fran Empey to go get the physical at

19   Sanfilippo's office?

20        A    It was probably the -- these documents, the

21   records that we've gone over, Wayne Price, it was

22   really everybody.

23        Q    You had mentioned last time we were here that

24   you could -- strike that -- that Fran Empey could have

25   made a payment after his physical if he passed to bind

1    the coverage, some percentage of the total premium?  Do

2    you remember how much that was supposed to be?

3        A    If I recall properly, it was discussed around

4    that time that if he went to have the physical and made

5    a payment of 10 percent, he'd be bound.

6        Q    Do you know whether he had 10 percent, you

7    know, a check for 10 percent of the premium with him on

8    the day he went for the physical?

9        A    No, I don't.  I don't.

10       Q    He didn't have a check from Local Towing for

11   that amount?

12       A    I don't believe so.

13       Q    Local Towing was going to pay the premium?

14       A    I don't recall, you know, but I'd like to go

15   through my documents to see if there was one there.

16            MR. BRAWLEY:  Can you read back my

17   question and the answer?

18            (Record read.)

19       Q    You haven't a memory of one way or the other

20   who was going to pay the premium for Fran Empey's

21   insurance policy?

22       A    Well, the company, you know, the revenues --

23   the money for the payment was supposed to come out of

24   the projects.  It was just a direct cost to the

25   projects.

```
 1      Q    So Local Towing would have physically cut the

 2   check to Sanfilippo or whoever the carrier was to pay

 3   for Fran Empey's insurance policy?

 4      A    No.  It would have been cut from SICS.  You

 5   know, we had no direct control or access to the monies.

 6      Q    How would that work?  Would somebody have to

 7   submit an invoice to SICS and then they would issue a

 8   check?

 9      A    Yes.  So that's one reason.  Not like we

10   could just open up a checkbook and cut a check for it.

11           If there's a point where we could take a

12   break, I'd like to.

13      Q    We can take a break.

14      A    I don't want to leave between --

15      Q    That's fine.  We can take a break for a

16   minute.

17                 (Recess:  1:21 p.m. to 1:50 p.m.)

18   BY MR. BRAWLEY:

19      Q    Was there any agreement between Local Towing

20   and Fran Empey that if he did secure the keyman

21   insurance and that if he did die, that half a million

22   would go to his family and half a million would go to

23   Local Towing?

24      A    Well, there were -- there were discussions

25   that, you know, if he died, there was a liability, the
```

1    liability would first be paid, and then, you know, you

2    would consider splitting or we would split whatever was

3    left.  It was only fair.

4         Q    I'm sorry, who would split whatever was left?

5    Local Towing and his family?

6         A    Yeah, but then he wanted to get an entirely

7    separate policy.  I remember seeing something in the

8    records there that he wanted an entirely separate

9    policy for his family, which that may have been --

10   trying to figure out if that's what drove the cost up,

11   having an entirely second policy.

12        Q    So in the summer of 2000, the only agreement

13   was if Mr. Empey got the policy and then he died, that

14   the million dollars would go to Local Towing, and Local

15   Towing would use the money in connection with the

16   projects, and if there was monies left over, it would

17   be split between his family and Local Towing?

18        A    Well, there were some discussions to that

19   effect, yeah.

20        Q    But it was never finalized?

21        A    Well --

22        Q    The discussion, the policy never got secured.

23   But the discussions were never finalized?

24        A    That's how it was left.

25        Q    Now, with regard to the indemnification

1    issue, are you aware of any facts that would lead you

2    to believe that if there was a valid indemnity

3    agreement from Fran Empey at the time of his death,

4    that there's monies out there somewhere that could be

5    used to satisfy that obligation?

6         A    Did I see any fact of that?

7              MR. BRAWLEY:  I think I got it right.

8    Why don't you read it back to me and see if I got it

9    right.

10             (Question read.)

11        A    What do you mean by facts?  Like documents

12   showing there's X dollars here or there?

13        Q    When I say facts, I mean information from any

14   source, whether it's documents or conversations with

15   others.

16        A    I didn't see any documents to that, but I

17   know that over the course of a few years we worked

18   together, you know, he did earn considerable amounts of

19   money.  That, you know, Chris Nyselick was managing his

20   account in the name of Sal Tech (phon sp) in

21   Connecticut.

22        Q    I'm sorry, say that, Chris Nyselick was what?

23        A    She controlled an account that he had in

24   Connecticut, you know, with all his money that we paid

25   him went into.  So I know that quite a bit of money had

132

1    gone into that account.

2         Q    Some of the profits that Fran Empey made with

3    you were kept in the Local Towing account, right?

4         A    Yeah.  Well, just from Washington, all the

5    money.  We really didn't take much money at all out.

6    We left it all in the company.  That was one reason we

7    thought that the company -- one reason why I thought

8    the company was solvent enough to be standing on its

9    own.  And that's where the discussion and the, you

10   know, copies of the documents that went back and forth

11   showed that, the Empey interest in the company and the

12   ongoing jobs.

13        Q    How much money was in the Local Towing

14   account after the Washington, D.C., job?

15        A    The project made somewhere around nearly

16   $800,000.

17        Q    Was that -- approximately was that 800,000

18   left in the account?

19        A    Yes.  We didn't really --

20        Q    But other than having some general idea that

21   Fran Empey may have some of the monies that Local

22   Towing paid him in an account somewhere, are you aware

23   of any facts as you sit here today that Fran Empey's

24   estate has monies available to satisfy any of the

25   obligations that Fran may have incurred during his

133

1    life?

2        A    At this time or at that time?

3        Q    Now.

4        A    That since -- I saw some financial statement

5    showing that he did have some assets, but I've never

6    seen an account balance for the Sal Tech account or

7    Connecticut.

8        Q    Why don't you find for me the document that

9    you saw that shows what monies Fran Empey's estate has

10   available to pay any obligations that Mr. Empey may

11   have incurred during his lifetime if you can.  Because

12   I think --

13       A    I haven't seen any estate information or

14   accounting of the estate assets.

15       Q    So it's fair to say, then, as you sit here

16   today, you don't know whether there is any money in

17   Fran Empey's estate to pay any obligations he may have

18   incurred during his lifetime?

19       A    At this point in time, whatever was there has

20   probably been liquidated.  I believe his ex-wife bought

21   a house in Ohio, and Chris Nyselick had bought a house

22   somewhere in Connecticut.  So there had to be something

23   somewhere.  Mrs. Empey, as far as I knew, before didn't

24   have any ability to buy a house anywhere.  That's my

25   belief.  You know --

134

 1      Q     How did you become aware that Mrs. Empey had
 2   bought a house in Ohio?
 3      A     She sent us a note from Ohio, and I think
 4   Dick Roland mentioned it in a conversation.
 5      Q     But it's fair to say that you have no
 6   knowledge from any reliable source as to what exactly
 7   was in the Francis Empey estate at the time of his
 8   death and what monies were or were not available to
 9   satisfy his debts?
10      A     As I've stated, I've never seen an accounting
11   of that.
12      Q     I think, as we discussed last time, if
13   there's no monies in Fran Empey's estate, then that
14   indemnity obligation is not worth very much?
15      A     I would like to see some research done to
16   that effect.  What happened to the monies that were in
17   the Sal Tech account and where did the funds come from
18   to buy this house in Ohio and another house in
19   Connecticut?  I'd like to see that, but I don't have
20   the ability to investigate all that stuff.  There's
21   probably something there.
22          It refers to the report that Safeco's
23   investigator did on Fran Empey which I saw a year ago,
24   year and a half ago.  There's many questions that I
25   have there, but I would like to have some assistance in

135

 1    investigating that.

 2        Q    But assuming that there's no money in the

 3    estate and there's no --

 4        A    I think it would be a premature assumption --

 5        Q    Let me ask the question.

 6             Assume that there's no money in the estate

 7    and there were no inappropriate transfers of money to

 8    either Mrs. Empey or Chris Nyselick, just simply was an

 9    estate without any money in it.  Then Fran Empey's

10    indemnity obligations are not worth anything to the

11    Gardella family, right, if he has nothing?

12        A    Or to Safeco.

13        Q    Right.  To either party.

14        A    Again, I feel that that would be a premature

15    assumption.

16        Q    I'm not asking you to answer whether it is

17    premature or it's correct.  I'm asking you to assume it

18    is correct.  Pretty simple question, isn't it?  If Fran

19    Empey has no money and there's been no inappropriate

20    transfers of the money, then the indemnity obligation

21    is not worth anything?

22        A    If you want to make that assumption, yes.

23        Q    Okay.  And that's something that at least

24    your father knew at the time that he signed the general

25    indemnity agreement?  He knew that Mr. Empey was not

1    bondable, right?

2        A    You would be better off asking him that.  I

3    don't want to answer for somebody else.

4        Q    It's fair to say that's something that you

5    were aware of when you entered into the general

6    indemnity agreement, that Mr. Empey was not bondable?

7        A    Well, again, even by that time, he had

8    considerable earnings from the projects that we had

9    done.

10       Q    Who was Charles & Associates?

11       A    That was an accounting firm in Boston that

12   works closely with Fred Smith.

13       Q    What did they -- what was their role in

14   connection with the Aguadilla and St. Thomas projects?

15       A    I would submit to that accounting firm my

16   financial information, and that was the accounting firm

17   that was recommended by AIA to make up the financial

18   statement for submittal to Safeco.

19       Q    Why did you have to submit a financial

20   statement about yourself to Safeco?  What's the purpose

21   of the financial statement?

22       A    That's to show what assets you have, what

23   your standing is.

24       Q    Okay.  Why does Safeco care what your

25   financial status is when they issue the bonds?

1         A    That's what they -- what they make their

2    decision on as to whether or not to issue a bond.

3         Q    They want to see whether people are basically

4    creditworthy before they issue a bond.  They want to

5    make sure that they can collect on their indemnitors?

6         A    Yes.

7         Q    Did James Gardella or Jessica Helquist-

8    Gardella fill out information about themselves and

9    submit it to Charles & Associates before they signed on

10   the indemnity agreements?

11        A    Jessica did not.  She's my wife.  I submitted

12   everything I had from my accountant.  So she did not

13   see any of that.  James Gardella, I believe, submitted

14   information from his accountant.  But we -- nobody saw

15   what Charles & Associates produced.

16        Q    About yourself or James Gardella?

17        A    We submitted our information to them.

18        Q    Do you know, did James Gardella and yourself

19   submit financial information to Charles & Associates

20   after you had all signed the general indemnity

21   agreement, which we've marked as Exhibit No. 2, which

22   was signed in October of 1999?

23        A    There was -- I think it was every six months

24   or so, 12 months, we had to keep something on file.  I

25   believe I submitted stuff, you know, anything from my

138

1    accountant.  I don't know what James Gardella did.  I
2    don't want to answer for somebody else.
3        Q    For how long a period of time did you have to
4    submit or did you submit financial information to
5    Charles & Associates, do you know?
6        A    After that, I think I submitted one other or
7    two others.  I think one or two others after that.
8        Q    I'm sorry.  I'm trying to figure out when did
9    you first submit, what time frame did you first submit
10   financial information to Charles & Associates, and then
11   from there, how often did you submit it?
12       A    Well, it was when we first started -- when I
13   first started getting bonds from AIA, if I remember
14   correctly.  So it was like 1996 or thereabouts.
15       Q    At least your personal memory is that you had
16   to update your financial information --
17       A    Periodically.
18       Q    -- either six months or 12 months?
19       A    Yes.
20       Q    Do you know whether James Gardella updated
21   his financial information with Charles & Associates
22   after October of 1999?
23       A    I don't know.  I don't know what he submitted
24   or --
25       Q    The purpose of submitting your financial

1    information periodically to Charles & Associates was so

2    that they could give the information in a certain

3    format to Safeco so that Safeco was secure that you

4    were still the same risk financially that they signed

5    on to initially?

6         A    Well, just updating the information.

7         Q    I'm just getting at the purpose of that is

8    that Safeco doesn't have the bond signed by someone who

9    has, you know, good financial assets and keep bonds in

10   place for a number of years only to have the financial

11   status of the indemnitor change in a bad way and then,

12   you know, be unable to, you know, have adequate

13   security if it has to pay on a bond?

14        A    Yes.

15        Q    That's something that's well-known in your

16   industry, is that you've got to update the surety about

17   your financial condition when you're an indemnitor on a

18   bond?

19        A    Yes.

20        Q    Do you know -- strike that.

21             Can you tell me, in your complaint you say

22   that the financial statement provided by Charles &

23   Associates was not accurate.  What was not accurate

24   about it?

25        A    In my case, there were properties shown on my

140

1    statement that I did not own at the time, two

2    properties, I think.

3         Q    What were the two properties?

4         A    I think it was a boat slip in Florida and a

5    piece of property in Norwalk.

6         Q    Who owned those properties?

7         A    At one point my dad did own a piece, the boat

8    slip in Florida, and the other property was owned by,

9    you know, my family.  It wasn't mine.  And I didn't

10   discover that until later, you know, after it all

11   transpired.  I got that from Wayne Price's office.

12        Q    So your financial -- when did you see your --

13   strike that.

14            When did you see the financial statement that

15   Charles & Associates prepared about you for Safeco?

16        A    Somewhere around January or February 2002.

17   After the whole thing was -- St. Thomas -- was

18   finished.

19        Q    So your financial picture actually looked

20   better than it should have.  You had extra properties

21   on your financial statement?

22        A    Yeah.

23        Q    Did you ever see the financial disclosure

24   that Charles & Associates prepared on behalf of Fran

25   Empey?

141

1      A     I don't know.  I don't remember if it was

2  part of what I got from Wayne Price in 2002.

3      Q     I think in your third-party complaint you

4  claim that Charles & Associates' preparation of its

5  financial disclosure concerning Fran Empey was not

6  accurate.  Do you have any information about what was

7  not accurate about Fran Empey's financial statement?

8      A     I'd like to see the financial statement.

9      Q     Prior to the Aguadilla and the St. Thomas

10  jobs, what information did Fred Smith have, if any,

11  about Fran Empey's financial condition?

12      A     I don't know what Fred Smith had.  You have

13  to ask him or Terry.

14      Q     Your complaint says that "Associated and Fred

15  Smith advised and guided Local Towing and Gardella."

16           What type of advice and guidance did Fred

17  Smith and Associated give to Local Towing and for

18  yourself and your father?

19      A     Local Towing and what?

20      Q     Local Towing and your father, yourself.

21      A     I don't know that -- in what time period are

22  you asking?

23      Q     Why don't we talk about in the time, you

24  know, with regard to the decisions that Local Towing

25  and yourself made with regard to the Aguadilla and the

1    St. Thomas projects because that's the issue in our

2    lawsuit.  What advice and guidance did Fred Smith

3    and/or Terry Smith give you concerning those projects?

4         A    I don't know what advice, if any, he had

5    given my father.  There were discussions -- discussions

6    did take place between Terry and Fred and myself about

7    how to proceed after Fran died.  And they were firmly,

8    were strongly suggesting that, you know, that projects

9    continue, that Michael Empey was qualified, since he

10   had done projects like that, and AIA -- and at the time

11   I had assumed Fred was speaking on behalf of the

12   bonding company, that they were satisfied that the best

13   course of action to take would be to allow things to

14   continue with Michael Empey managing the projects.

15            So to that extent, I even went down to San

16   Juan with Terry and discussed it further with Michael

17   Empey.  They were strongly for continuing operations

18   with Michael Empey managing down there.  I expressed

19   some concerns.

20        Q    Is that the only advice and guidance that

21   Fred Smith and Terry Smith gave to you?  They thought

22   you could continue on with Michael Empey after his

23   father died?

24        A    Primarily, yeah, there was other projects I

25   mentioned, you know, I had a conversation also with

1    Fred that at that time I could have committed to more

2    work in Connecticut or actually in New York for the

3    company up here and that, you know, I said I could

4    commit to, to work and keep going in generating income

5    here or doing work. Fred said, "Keep going like that,"

6    you know. "Keep working. You do what you can do

7    there, and Michael Empey can do the projects down

8    south."

9        And I -- and that's the course of action that

10   was taken. You know, Fred -- there is a couple letters

11   in the file showing that Michael Empey was in Fred's

12   belief capable and able to do that. And, again, you

13   know, I was under the impression that he was

14   representing Safeco also.

15       Q    So you thought that Safeco had an opinion as

16   to whether Michael Empey was or was not qualified to

17   run the projects after Fran Empey's death?

18       A    In that Fred being my contact with Safeco, it

19   was his opinion, and I was under the assumption that,

20   you know, that was okay and acceptable.

21       Q    Was Michael Empey, you know, in your opinion

22   at the time qualified to continue to run Aguadilla and

23   St. Thomas after his father's death?

24       A    I was willing to allow him to try, and I did,

25   you know. There is a resume that he submitted that

144

1    looked good.  It was a very close decision.

2         Q    Now --

3         A    Based -- that decision was based, you know,

4    on the recommendation of the Smiths too.  You know,

5    that was a factor in that.

6         Q    But we can agree that even if Fred Smith

7    said, "Hey, I think Michael Empey is qualified to run

8    the Aguadilla and the St. Thomas jobs," that's not a

9    guarantee from Fred Smith or Associated that the jobs

10   are going to be successful and make a profit, right?

11   That's just their opinion?

12        A    Yes, I have to agree with you.

13        Q    You didn't rely on Fred Smith or Associated's

14   opinion alone in deciding whether Michael Empey should

15   continue on the project.  There were some other things

16   that you considered in making that decision, I assume?

17   One of the things that you considered was your

18   observations of Michael Empey's work prior to his dad

19   dying?

20        A    Yes.  He did the -- the jobs were completed,

21   you know, it appeared that Michael was managing that

22   okay.  At the time it seemed to be okay.

23        Q    Did Michael Empey ever work on projects with

24   Local Towing prior to the St. Thomas and Aguadilla

25   projects?

 1       A      Michael Empey came on board end of May,

 2    beginning of June of that time period.

 3       Q      2000?

 4       A      Yeah.  Just before -- before Aguadilla

 5    started and St. Thomas started.  So in that time

 6    period, he was, call that the final phase of the wreck

 7    removal for the Corps of Engineers, and I believe he

 8    was there for the whole portion of the project for the

 9    port authority.

10       Q      Did you hire -- I'm sorry.  Go ahead.

11       A      Just a continuance of that work.

12       Q      So Michael Empey had worked on a project

13    before Aguadilla for Local Towing and done a good job?

14       A      The projects -- it was the final phases of

15    the San Juan projects, and they finished it and

16    everything worked out.  But at the same time, he had

17    his father really guiding him along.

18       Q      You hired a consultant to go down to the

19    islands after Fran Empey's death?

20       A      Yes.

21       Q      What was the purpose of the consultant?  Was

22    it to take a look at these projects and make a

23    recommendation as to whether Local Towing should

24    continue with the projects?

25       A      By that time, there was no question whether

1    or not we had to continue.  You know, that was probably

2    in January of 2001.  So we were pretty well locked in

3    and loaded.  I was trying to reach out to any sources I

4    could to make sure everything was -- that could be done

5    was done properly.

6              At that point in time, there were some

7    problems cropping up already.  The project in Aguadilla

8    was by that time behind schedule; the submittals for

9    material approvals were not submitted in order to

10   complete the Aguadilla project.  Again, this is after

11   we were already locked and loaded in St. Thomas; we

12   were actually starting to mobilize from San Juan.

13   There were problems that cropped up.

14        Q    Let me -- let me -- I don't want to interrupt

15   you, but I think you're getting far afield from my

16   question.  It is going to take us hours and hours and

17   hours to get through these questions if you're not kind

18   of focusing on it.

19             My question was:  Was the purpose of the

20   consultant going down to take a look at the way the St.

21   Thomas and Aguadilla projects were being run and make

22   recommendations about the further handling and

23   supervision of the projects?

24        A    He really didn't have much input.  That

25   was -- his name was Norm Van Pelt.  He was more of a

1    pipeline type, diving pipeline specialist.  He had done

2    a tremendous amount of that work.  He really didn't

3    have much or any input in the Aguadilla project.  I

4    had -- I hired another employee to go to the Aguadilla

5    project and get things straightened out there because,

6    again --

7         Q    Let me stop you there.  Who was the employee

8    that you hired to go to Aguadilla?

9         A    Larry Genner.

10        Q    Larry what?

11        A    L-a-r-r-y.

12        Q    Yes.  I got that one.  Last name?

13        A    G-e-n-n-e-r.

14        Q    Okay.

15        A    And what he accomplished in short order was a

16   correction of the submittals to the Corps of Engineers

17   for the Aguadilla project so that the job could get

18   started again.  There were submittals that were

19   rejected; there was material that was procured that was

20   not in compliance with the submittals.

21        Q    Let me just stop you there.  When did you

22   send Larry Genner down to Aguadilla?

23        A    Probably in February of 2001.

24        Q    Okay.

25        A    You know, it was a little later.  You know, I

148

 1    had to find the guy and get him and get him down there.

 2    The job in Aguadilla was at a standstill for over a

 3    month at that point.

 4         Q    Now, who was the consultant who went to St.

 5    Thomas?

 6         A    Norm Van Pelt.

 7         Q    Was he someone that had worked for Local

 8    Towing on prior jobs?

 9         A    No.

10         Q    Who recommended Mr. Van Pelt?

11         A    Norm was recommended by a gentleman by the

12    name of John Rupich.  I had started discussing things

13    with John late November, early December when one of the

14    guys in Aguadilla called me up, said, "Look, there's a

15    problem here.  The submittals are not in on time."

16              So to correct that problem, I started

17    discussing -- discussions with John Rupich who

18    graduated engineering 1959.  Through the '60s, he

19    worked for Kiewit Construction, and through the '70s

20    and '80s, I believe he was vice president of Gates

21    Construction in New Jersey.  For contractual issues,

22    stating, very qualified.

23              And he -- I explained everything to him, and

24    he said, "Look, you've really got to speak with Norm

25    Van Pelt, Fred Hannon, and Larry Genner," which I did.

149

1        Q    Okay.  Did Mr. Van Pelt physically go to St.
2    Thomas, I assume?
3        A    Yes.
4        Q    How long was he there?
5        A    Oh, we were in St. Thomas, I think we were
6    there for two days or so walking over the site.
7        Q    You were with Mr. Van Pelt?
8        A    Yes.  We went back to St. Thomas.  I'm sorry.
9    Back to San Juan.  And tried to come to a plan.
10       Q    When you say "we," you and Mr. Van Pelt went
11   back to San Juan?
12       A    Me and Michael Empey, together, I was trying
13   to cooperate with just make the thing work.
14       Q    Did Mr. Van Pelt make any recommendations as
15   to whether to keep Michael Empey as a supervisor of the
16   St. Thomas project?
17       A    Yes.  He said -- he didn't make any
18   recommendations to relieve Michael Empey.  You know, we
19   went over the work plan.  He had some questions with
20   the dimension of the concrete blocks that were secured
21   to the pipe to sink it down, and he raised some
22   concerns about the operation of transporting the stone
23   out, you know, bedding stone and armor stone.  You
24   know, at that point actual construction hadn't begun.
25   Just by that time I really just -- the phase was --

1    with the coral transplant aspects and the preliminary
2    work.
3        Q    So Mr. Van Pelt didn't recommend that you
4    take Michael Empey off as project manager.  He just
5    made suggestions about how the project might best be
6    accomplished?
7        A    Yes.
8        Q    Now, after Fran Empey died, how much time did
9    you spend in either St. Thomas or in Aguadilla working
10   on the projects?
11       A    St. Thomas didn't start until right after
12   Thanksgiving with the commencement of the coral
13   transplant program.  Work hadn't begun.  In
14   Aguadilla --
15       Q    Let's just start with St. Thomas.  So St.
16   Thomas, the work started Thanksgiving, which is a
17   couple months after Mr. Empey has died, right?
18       A    Yes.
19       Q    From the time that the St. Thomas project
20   starts until the time it's completed, how many days do
21   you spend actually in St. Thomas working on that
22   project?
23       A    I did not go there full time until somewhere
24   around the last week in February, the first week in
25   March.

151

1        Q    Of what year?

2        A    That would have been 2001, I believe.  You

3    know, right at the beginning phases of that project.

4        Q    Okay.  So you get out to St. Thomas on a

5    full-time basis sometime February 2001, early March,

6    2001?

7        A    Yes.

8        Q    Now, how long did you spend in St. Thomas

9    full-time after your arrival in either late February or

10    early March of 2001?

11        A    Damn near 12 months.

12        Q    Twelve months.  So is that seven days a week,

13    12 hours a day?

14        A    I think I was gone for five days in June,

15    about a week in August.  At that period in the fall, as

16    I mentioned, I made a commitment for projects in New

17    York which I completed.

18        Q    What projects were going on back in New York

19    while these were going on?

20        A    That was the dredging the Larchmont Yacht

21    Club.

22        Q    How big --

23        A    I think it was dredging Larchmont Yacht Club

24    and Grecian Point Club.

25        Q    How big were those jobs?

1        A    I don't know, I think about 30,000 yards.

2    And I just finished up a section in Mamaroneck from the

3    previous Mamaroneck projects.  I think there was

4    somewhere around 30,000 yards of maintenance dredging.

5        Q    How does that translate into dollars?

6        A    (Pause.)  Probably somewhere around $300,000.

7    I have got, you know, that's an estimate that was three

8    years ago.

9        Q    Did you make it down to the Caribbean at all

10   in the fall of 2000 other than trip down with Mr. Van

11   Pelt?

12       A    The trip with Mr. Van Pelt was, as I said, I

13   think it was in January.  Right around the beginning of

14   October, end of September, I made a trip down there

15   with Terry Smith, as I said.  I may have gotten down

16   there for a couple of days between that.

17       Q    Did you have any conversations with Terry

18   Smith about whether you maybe ought to get down there

19   immediately after Fran Empey had passed away to get

20   control over the project and to be there to see things

21   firsthand?

22       A    If there were conversations to that effect,

23   it would have been after I had committed to the work in

24   New York, which I had made both Terry and Fred fully

25   aware of my intentions at that time.

1      Q    What was your -- what was your intentions?

2      A    As to whether or not to commit to these

3    projects in New York because of what was going on down

4    south.  And Fred Smith said, "Go get the work.  Do the

5    work.  It will be fine with Michael down there."

6      Q    So Fred Smith suggested to you that you do

7    work up here on a $300,000 project while you had $4

8    million worth of work in the Caribbean where the

9    supervisor just died?

10      A    Yes.

11      Q    Did that sound like a sound business judgment

12    to you?

13      A    It was a tough call.  It was a big decision

14    to make.  I made my bonding agent aware of what was

15    going on, and I was concerned whether or not I should

16    do that.

17      Q    I'm just asking you -- forget Fred Smith for

18    a minute.  Just asking you like the president of the

19    company at that time, does that seem like a good

20    decision for you to make?  You have got a four-million-

21    dollar project, one in a foreign country, out at sea,

22    and you have a $300,000 job here in the States and you

23    supervise that, instead of going to the project where

24    the supervisor had just died?

25      A    At the time the decision was made, the

154

1    project in St. Thomas was being delayed by the
2    government of the Virgin Islands for which we have got
3    a construction claim against the owner for that delay
4    in that time period.  It was really no activity in St.
5    Thomas on site.

6              And Aguadilla, before I left San Juan in
7    August, which would have been about a month before
8    Fran's death, I had gone through and done a
9    considerable amount of work and material research,
10   supplier research, in getting the preliminary
11   information together for the submittals.  At the time I
12   felt that there was adequate personnel there with the
13   ability to handle that.

14             In addition to Michael Empey, there was Dick
15   Roland, who was -- we had -- who had a quality control
16   certificate.  With Dick Roland was Jerry Story who was
17   fully capable of carrying out the tasks in Aguadilla.
18   And in San Juan preparing for the St. Thomas project
19   with Michael Empey was Lawrence Van Tassel, and I
20   believe by that time, Joe Parmalee was back there with
21   them getting all of the preliminary work or was
22   supposed to be getting it done.

23        Q    Based on what you just told me, it sounds
24   like you had reasons independent of anything that Fred
25   Smith said that led you to conclude that your presence

 1    was not required, you know, full time down in the
 2    Caribbean, you know, in the months following Fran
 3    Empey's death.
 4         A    What did you call the reasons?
 5                   MR. BRAWLEY:  You will have to read it
 6    back for him.
 7                   (Record read.)
 8         A    You said "independent."  I say in addition to
 9    with what I've just stated and in addition to the
10    bonding agent saying that it would be okay, seems to
11    make sense, commit to the work in New York.  I wouldn't
12    say independent.  I'd say in addition to.
13         Q    Did you go to Fred Smith to ask him whether
14    you should bid on projects too?  Was that one of his
15    decision-making functions for Local Towing?
16         A    There were times when Fred would encourage us
17    to bid projects, encourage me.  There were some
18    projects that I did not want to bid with Fran Empey;
19    there was definite encouragement, and the salvage
20    projects in San Juan was one of them.  The first time
21    that the project came out, I refused to bid it because
22    by that time Washington, D.C., was just in its
23    beginning stages.  It was not clear that the thing was
24    going to be a smashing success.  So I did not bid it.
25                   For whatever reasons, the bid was thrown out

1      in San Juan, came back up to bid about a month and a

2      half later, and, you know, both Fran and Fred got me on

3      the phone one day said, "Look, this is a good job.  You

4      guys ought to bid it.  It's going to be well.  Bid,

5      bid, bid."  Of course, Fred's in the business of

6      selling bonds, looking back on it, that is.  There was

7      definite, you know, encouragement to carry on with

8      these.

9          Q    So your claim is that your insurance agent

10     wanted to sell you bonds, so he encouraged you to bid

11     on projects that you shouldn't have bid on because they

12     weren't going to be profitable?  Is that your claim?

13         A    No, that's not what I said.

14         Q    I think it is.  What's your claim?  That you

15     as the president of Local Towing would rely on Fred

16     Smith's advice on whether or not to bid a project?

17         A    When did I say it?

18         Q    I think you said it four times.  The question

19     is yes or no:  Did you rely on Fred Smith's advice when

20     you decided to bid Aguadilla and St. Thomas?

21         A    On Aguadilla and St. Thomas, no.

22         Q    Okay.  Let me ask the other question:  Did

23     you rely on Fred Smith's advice when you decided to

24     continue with the St. Thomas project after Fran Empey

25     died?

1          A     Yes, I did.

2          Q     Why would you rely on your insurance agent's

3     advice -- as a president of a company, why do you rely

4     on your insurance agent's advice whether to continue

5     the project?  Fred Smith wasn't going to run the

6     project, right?

7          A     Right.

8          Q     You were, right?

9          A     Michael Empey was.

10          Q     But you were the president of the company.

11     You're the guy in charge.  You're ultimately

12     responsible for all the decisions of Local Towing,

13     right?

14          A     Right.

15          Q     So Fred Smith is not going to run the

16     project, right?  And Fred Smith is not going to lose 50

17     percent if the project goes south, right?

18          A     In doing that, it is my opinion and still my

19     opinion, your bonding agent should be informed as to

20     what is happening, what the -- what the ongoing

21     projects are.  You've got to submit reports of what

22     your projects are.  And he --

23          Q     But it sounds to me like you're just trying

24     to create this expanded role for your insurance agent

25     which is he's somehow the guarantor that any project

158

1    that he bonds you on is going to be profitable.  That's
2    not your claim, is it?
3         A    I'm not trying to create this scenario as
4    you're saying.  My statement was that, for instance,
5    when we bid the salvage project, the wreck removal
6    project in San Juan, the agent called me and suggested
7    that this would be a good project to pursue.
8         Q    Let me stop you there for a second.  Let's
9    say that he was wrong.  Let's say that you lost all
10   kinds of money on the project.  Would that be the
11   agent's fault?
12        A    No.
13        Q    Okay.  This is just my point, is that at any
14   time you could accept Fred Smith's advice whether to
15   bid or carry on with a project or you could reject it.
16   You're the decision-maker for Local Towing?  You're the
17   president, right?
18        A    At the time you've got to keep in mind that
19   the funds for Local Towing and all these projects were
20   on deposit with SICS, the escrow firm for Safeco, for
21   Empey, for Gardella, which Fred Smith essentially
22   exerted a considerable amount of control over.  He
23   could have -- it was my belief at the time that he
24   could have taken, you know, under the bonding company,
25   could take control of those accounts.  And as we've

1    said before, there was at that time an interest of the

2    Empeys in the projects and in the account at SICS.

3         Q    Well, let me just stop you there.  These are

4    all issues that the president of a dredging company

5    involved in multimillion-dollar projects in the

6    Caribbean has to deal with, right, in there's often a

7    company that holds the money and exercises financial

8    controls on big projects, right?

9         A    I don't know how any other large companies do

10   their business.

11        Q    Right.  But my point is this SICS issue,

12   that's a business issue that confronts someone like

13   yourself who is the president of a big dredging company

14   doing multimillion-dollar projects, right?  Fred Smith

15   didn't create SICS?

16        A    It was a requirement of Fred Smith to have

17   SICS in place.

18        Q    Wait a minute.  It was Fred Smith's

19   requirement or it was Safeco's requirement?

20        A    As it turns out, it was not a requirement of

21   Safeco, but if you look through the documents, it was a

22   requirement of my bonding -- in the contract with SICS,

23   it is shown that it is a requirement of the surety.  As

24   it turns out, Safeco did not know anything about it and

25   did not require it.

160

1      Q     What's the basis for that statement?  How do
2   you know that, that Safeco didn't know anything about
3   it or didn't require it?  Where does that come from?
4      A     After all this entire situation unfolded, in
5   discussions with Joe Mallory, you know, just the way
6   the whole situation unfolded.  Not any one --
7      Q     So that's just your interpretation of
8   something someone said from Safeco?  Someone from
9   Safeco said, "We didn't acquire the SICS account or we
10  didn't want it"?
11     A     It's my belief that's what happened.  Now,
12  whether -- I forget the exact information that makes me
13  believe that; it's just the way the situation unfolded.
14     Q     But I still get back to my question.  If at
15  any time as the president of this company involved in
16  these multimillion-dollar projects, you could have
17  followed Fred Smith's advice or you could have rejected
18  it.  He is just one person whose opinion you might
19  value or consider as the president of your company,
20  right?
21     A     I was not -- I had a partner in the project,
22  and that was Michael Empey at that time before -- Fred
23  Smith -- Fran Empey.  And there was interest -- the
24  estate did have interest in the project.  There was an
25  investment from the previous projects.  In a sense it

1   was not my sole decision.

2       Q    All right.  But I'm just talking for now.  I
3   understand you have a business partner, Fran Empey, and
4   you may have over time considered his input into
5   decisions that you would make as president.  That would
6   be a rational, reasonable thing to do.

7           My question is simply:  With regard to your
8   insurance agent's opinions on different aspects of your
9   business dealings, I'm asking you can we agree that at
10  any time as the president of Local Towing you could
11  accept an opinion or some advice from Fred Smith or you
12  could reject it?  The decisions were really yours to
13  make or yours and your business partners'?

14      A    With respect to St. Thomas, it was mine and
15  my business partners'.  So it wasn't --

16      Q    Right.

17      A    -- I wasn't in the position of me having to
18  have the sole last word.  I had partners to consider.

19      Q    Sure.  But I'm just saying with regard to
20  Fred -- any opinions that Fred Smith may have expressed
21  to you, you and your business partners could either
22  take those opinions and follow them or you could reject
23  them.  The business decisions were to be made by you
24  and your business partners?

25      A    I was not going to do anything without the

162

1     approval of the bonding agent.  The bonding agent is,

2     has been the go-between between Safeco and the company.

3     If I was going to go and bid a project, somewhere, we

4     first have to submit a bid bond request form.  I can't

5     just go out and produce a bond out of the air and bid a

6     job.

7          Q     Well, why don't I make it easier for you.

8     Why don't you tell me the advice that Fred Smith gave

9     you as the president of Local Towing you had no choice

10    but to follow, you had to do.

11         A     Did I have no choice to do but what the

12    bonding agent --

13         Q     What Fred Smith told you to do.  Are there

14    any examples of that?

15         A     Well, depositing the funds in the SICS

16    accounts --

17         Q     Let's start with that one.  So Fred Smith

18    told you that you had to put the funds in the SICS

19    account, which is the control account, and you did

20    that?

21         A     Yeah.

22         Q     Anything else?

23         A     You asked for one case where there was

24    something that I had to do.

25         Q     Actually, hopefully I asked it this way:  I

1    was wondering if you could give me every example of

2    when Fred Smith told you to do something that you felt

3    that you had no choice but to do as the president of

4    Local Towing.  One was the SICS, the control account.

5        A    Right.

6        Q    Okay.  That was one.  We can agree that we

7    would have to ask Safeco directly perhaps in a

8    deposition or something whether that was their

9    requirement or whether that was someone else's, whether

10   that was Fred Smith's requirement.  Your understanding

11   was that that was not a Safeco requirement?

12       A    At the time I was under the impression, I

13   believed that it was a requirement of Safeco.

14       Q    And now you believe it's not?

15       A    As things developed, it appears that it was

16   not.

17       Q    What else?  Anything else that Fred Smith

18   told you that you should do in connection with the St.

19   Thomas or the Aguadilla project that you felt that you

20   had to do as the president of Local Towing?

21       A    Allow the project to continue with Michael

22   Empey managing it because, as per our agreement that we

23   were operating under, Fred Smith was the third party,

24   the mediator between myself and Empey.

25       Q    Let me just break that down.  We are talking

164

1    about the St. Thomas project now?

2        A    And Aguadilla.

3        Q    So after Fran Empey died, Fred Smith told you

4    that you had to continue the St. Thomas project?  Let's

5    start with that one.

6        A    Continue the St. Thomas project with

7    Michael --

8        Q    Michael running it?

9        A    Running it.

10       Q    Let me just stop you there.  You felt as the

11   president of Local Towing, that was your insurance

12   agent's, Fred Smith's decision to make, not yours?

13       A    But he was also the third party, the agreed-

14   to third party that would -- that would negotiate any

15   disagreements or discrepancies between myself and Fran

16   or at the time Michael.

17       Q    I thought you told me when we met last time

18   that it was your decision to go forward with St. Thomas

19   after Fran Empey dies.

20       A    That was, I believe, that was about 15

21   minutes of discussion.  We could probably see if we

22   look at what was the transcription.

23       Q    Do you want to change that testimony today?

24       A    To be honest with you, I forget exactly what

25   the testimony was.  I'd like to see a copy of it.  But,

1       you know, I don't believe that I'm changing anything by

2       making this statement right now.  I believe, if I

3       remember at the time trying to explain to you that Fred

4       Smith and AIA was the third party --

5           Q    So Fred Smith had the right to arbitrate any

6       disagreement you had with your business partner Fran

7       Empey, and Fred Smith's decision on anything that came

8       up between you was binding?  That's your testimony?

9           A    That was what we had agreed to --

10          Q    Let's start with the decision about after

11      Fran Empey dies, the decision about whether to continue

12      with the St. Thomas project.  Did you -- did you not

13      want to continue with the St. Thomas project?  Did you

14      have a disagreement with Michael Empey where he wanted

15      to continue and you did not?

16          A    I can't say that we had -- it was -- it was

17      an open question, and I did have some concerns --

18          Q    Let me -- but let's say Fred Smith, let's

19      even say that he is the person that settles disputes

20      between yourself and Fran Empey.  My question is not

21      was there an open question, but was there a dispute

22      between yourself and Michael Empey where you didn't

23      want to continue with St. Thomas but Michael Empey did

24      want to continue and that question was presented to

25      Fred Smith, should the company continue --