1        A    I don't believe there was a written question

2    of that nature.

3        Q    Okay.

4        A    It was subject of considerable discussion.

5        Q    Was there a written agreement that any

6    dispute between yourself and Fran would be submitted to

7    Fred Smith?

8        A    Yes.  That's what I was looking for.

9        Q    That was done on some prior project?

10       A    Yes.  And it was acted on --

11       Q    But we can agree that Fred Smith wasn't the

12   person that would answer any difficult business

13   decision on behalf of Local Towing.  That was your job

14   as the president of the company?

15       A    As third party who arbitrates any disputes to

16   be in compliance with the understanding in the

17   agreement, you've got to agree to what the third party

18   said, and if I remember correctly, the decision should

19   not become the subject of legal dispute, something to

20   that effect.

21       Q    But, you know, I understand what an

22   arbitration is.  It's when one partner and another

23   partner in a venture disagree on something and they

24   submit it to a third party.

25            My question is:  Was it your opinion or your

1    desire not to proceed with the St. Thomas project after

2    Fran Empey died?  And was it Michael Empey's desire on

3    behalf of the Empey family to continue with the

4    project?  Was there a dispute or was it simply up in

5    the air in your mind whether to continue?

6         A    There was an ongoing dialogue as to whether

7    or not the company and the agreement, the partnership,

8    should continue the projects.  It wasn't a dispute

9    where we all sat down at an arbitration meeting.  We

10   did go to Fred Smith's office and discussed the issue

11   at one point.  You know, it was an open dialogue to the

12   point where Terry Smith came to San Juan.

13        Q    Okay.  And what I'm driving at is you did not

14   submit to arbitration to Fred Smith the decision of

15   whether to go forward with St. Thomas or not.  It was

16   simply an issue that was an open dialogue discussing

17   whether to do it or not?

18        A    Yes.  It was not presented in an official --

19        Q    You didn't feel that Fred Smith's opinion

20   that you should go forward with St. Thomas was binding

21   on -- on you in some manner.  It was simply more input

22   that you considered in your decision-making process?

23        A    It was -- it was part of the agreement which

24   Fred refers to in a number of letters, Michael refers

25   to in a number of letters.

1        Q    So the decision about whether to go forward

2    with the St. Thomas project, it is your testimony that

3    you submitted that to Fred in his role as arbitrating

4    disputes between you and Michael, and he made a

5    decision on behalf of Local Towing to go forward with

6    the project?  Is that your testimony?

7        A    It was -- I did not make a formal -- I did

8    not present a formal question to any sort of

9    arbitration, but it was the subject of numerous

10   discussions in which Fred Smith essentially acted in

11   accordance with the agreed understanding between myself

12   and Fran Empey and then his estate where he, Fred

13   Smith, was the third party to weigh out any question or

14   dispute.

15       Q    So Fred Smith made the decision for you about

16   whether to go forward with St. Thomas.  That was

17   something you submitted to him, and he decided for the

18   company whether they should go forward.  You can't have

19   it both ways.  Either you submitted it to him or you

20   didn't.

21       A    I didn't submit a written request.

22       Q    Is that how you always did it?  Was it

23   usually done with a request or was it usually done

24   informally?

25       A    Usually done informally.

 1        Q    My question is do you have an agreement

 2    somewhere that says, "Fred Smith arbitrates disputes"?

 3    Formally or informally, did you submit to Fred Smith

 4    the question whether you should go forward with the St.

 5    Thomas project?

 6        A    Yes.

 7        Q    So Fred Smith made the decision for you

 8    whether or not to go forward with the St. Thomas

 9    project, that's the testimony, pursuant to this

10    arbitration agreement?

11        A    Yes.

12        Q    You were acting under that?

13        A    I was acting under those, and for the entire

14    period I operated under that.

15        Q    Fran Empey also resolved to let Fred Smith

16    make decisions on the project?

17        A    There are letters to that effect.

18        Q    Did you disagree with the going-forward of

19    the St. Thomas project at the time the decision was

20    made after Fran Empey's death?

21        A    At the time it seemed like a sensible

22    approach.

23        Q    So you agreed with it?

24        A    I agreed with it.

25        Q    When did you start to disagree with it?

1          A     About the time that I started talking to John

2     Rupich and said, "Hey, look, I don't know what's --

3     there may be some issues here."

4          Q     Okay.

5          A     So that would have been the end of -- you

6     know, beginning of December, somewhere thereabouts.

7     And then --

8          Q     Let me just -- okay.  So when the decision --

9     when you made the decision, or I guess, as you would

10    put it, you followed Fred Smith's opinion about the

11    dispute about whether to go -- well, strike that.

12              Although there's not an actual dispute

13    between you and Michael Empey about whether to go

14    forward, you nevertheless submit the question to Fred

15    Smith informally; you feel bound by his opinion that

16    you should go forward, right?  Am I summarizing that

17    fairly?

18         A     Yes.

19         Q     Okay.  And so it's your testimony in this

20    case that when there's an important decision and

21    there's a dispute between you and Michael Empey or you

22    and Fran Empey, you would submit it to Fred Smith,

23    right?

24         A     Yes.  If you give me a minute, I'll try to --

25         Q     I don't want you to look.  I want to ask a

1    couple more questions, and we can look for the

2    document.

3              Now, at some point in the project, you fire

4    Michael Empey, right?  Need a yes.

5         A    Yes.

6         Q    Was that submitted to Fred Smith whether you

7    should fire Michael Empey?

8         A    No, it was not.

9         Q    Okay.  Did Michael Empey want to be fired?

10        A    I don't believe so.

11        Q    Okay.  So there's an example where there's a

12   disagreement between you and Michael Empey, direct

13   disagreement, right, between you and your business

14   partner?

15        A    Yeah.  But in that agreement, there is Local

16   Towing reserves the right to fire the consultant.

17        Q    To fire -- to fire Fran Empey or his family?

18        A    Yes.

19        Q    That was one thing that wasn't arbitrable, if

20   you will?

21        A    No.  No.

22        Q    All right.

23        A    And at the time that I had to fire Michael

24   Empey, I had had to infuse the project with, I forget

25   if it was 225,000 or $250,000 in cash just to keep the

1    thing from going bankrupt.

2        Q    Did you seek advice or an opinion from Fred

3    Smith as to whether you should fire Michael Empey?

4        A    At that point, no, I did not.  It was a

5    pretty bad scene at the time.  Michael Empey's brother

6    was nearly killed, and it was a dangerous situation.

7                MR. KELLEY:  Can we take a break?

8                MR. BRAWLEY:  Yes.

9                (Recess:  3:02 p.m. to 3:18 p.m.)

10   BY MR. BRAWLEY:

11       Q    We've been talking, there was some money in

12   the Local Towing account from prior jobs before we

13   started, before you started Aguadilla and St. Thomas?

14       A    Yes.

15       Q    I think you told me before it was like

16   $800,000 or so?

17       A    That's about the amount of money that came

18   out of the Washington project.

19       Q    At the time that Fran Empey died, how much of

20   that roughly 800,000 was still in the Local Towing

21   account?

22       A    Maybe two or three hundred thousand.  But

23   there was, if I remember correctly, there was about a

24   $600,000 receivable.

25       Q    $600,000 receivable?

173

1        A    Yes.  From the port authority of San Juan,

2    and there may have been a receivable due from the Corps

3    of Engineers.  And there was also a claim against the

4    Corps of Engineers in Wilmington that was pending.

5        Q    There seemed to be some discussion after Fran

6    Empey's death whether the money in the Local Towing

7    account should be used to continue with the St. Thomas

8    project or whether the Empey heirs should get half of

9    that money?  Is that a fair assessment?  Were there

10   discussions like that?

11       A    That could have been a component of the

12   discussions.  I can't remember exactly.  I'm getting

13   tired right now, and this was, you know, three and a

14   half years ago.

15       Q    When that money, when you started Aguadilla

16   and the St. Thomas projects, how was the money the

17   account of Local Towing designated?  Was a certain

18   amount of it really your money and a certain amount

19   Fran Empey's money?  How did you view that money prior

20   to those projects?

21       A    The funds were to remain in the SICS account,

22   and it was really to remain there until, you know, we

23   completed all our work.  And acting under the agreement

24   that we had, it was fifty-fifty.

25       Q    Was that one of the options when Fran Empey

174

1    died?  Could the Empey heirs have taken half the money
2    that was in that account or was that money already
3    committed to St. Thomas and the Aguadilla projects?
4         A    Well, it was committed to the projects.  You
5    know, I was not under the opinion at the time that I
6    could have just gone and taken my portion out.  And I
7    don't know what they were thinking.  It would be better
8    to pose that question to them.
9         Q    How long after Fran Empey's death did you
10   start to become concerned about the supervision on the
11   project provided by Michael Empey?
12        A    Well, shortly after, you know, it was a
13   concern, and I just wanted to make sure that it was
14   okay.  But, again, it did not become very apparent that
15   there may be a problem until right around the first
16   part of December when we talked to John Rupich, you
17   know, I tried to bring in more talent and make sure
18   that everything should proceed the way it should.
19        Q    Did Michael Empey ever sign off on the
20   general indemnity agreement?
21        A    I believe that he -- that's a letter in the
22   file or in this stack saying that he did prepare the
23   documents, they were signed, but he wasn't going to
24   release them until I agreed to some changes that he was
25   trying to make to the agreement that I had been

1    operating under with Fran Empey.

2        Q    So with that answer, did he ever release the

3    agreement that he signed?

4        A    I don't believe he did.

5        Q    Okay.  What changes did he want to make?

6        A    He wanted to bring his entire family in as

7    consultants and a couple other changes to the effect

8    that, you know, he would be off the hook if the thing

9    went bad.  And I couldn't agree to that.

10       Q    There was an agreement that went back and

11   forth, it seemed, a number of times, but the sum and

12   substance of it was that Michael Empey would agree to

13   share losses equally if the project lost money.  Do you

14   know if he ever signed any version of that agreement?

15       A    Again, he may have -- he claimed to have

16   executed that agreement and the GIA, but he did not

17   release them, if I remember correctly.  At which time,

18   looking back from where we sit today, I should have not

19   proceeded.

20       Q    Was there any time after Fran Empey died that

21   either yourself or James Gardella sought to change the

22   agreement, the oral agreement, that you had with Fran

23   Empey about splitting profits at the end of jobs?

24       A    In what way?

25       Q    Well, I was wondering was there any time

1    after Fran Empey's death where either Local Towing,

2    yourself, or James Gardella approached the Empey family

3    about reducing their share of the profits on St. Thomas

4    or on Aguadilla?

5         A    I can't remember specifically, but there was

6    a tremendous amount of discussion going back and forth,

7    you know.  I was trying to cooperate and make the thing

8    work out, and there was a lot of discussion going back

9    and forth.  I don't remember specifics relating to what

10   you just said, but there could have been.

11        Q    When Local Towing bid the St. Thomas job, was

12   there a calculation made of what the profit would be on

13   that job if all went well?

14        A    Yeah, I believe there was.

15        Q    Do you recall how much the profit was

16   estimated to be before the job started?

17        A    The plan was to be somewhere around a million

18   dollars.

19        Q    How about for the Aguadilla job?  What was

20   the estimated profit on that job before it started?

21        A    Somewhere around 250 to 300,000, somewhere in

22   that area.  Approximately.

23        Q    The total contract price for St. Thomas was

24   what, around 3.4 million?

25        A    I think it was 3.7.  3.7 and change.  I think

1    that was on -- on this indemnity that I was looking

2    for.  This document shows 3,773,000.

3        Q    Okay.  Now, Local Towing actually completed

4    the job in St. Thomas, right?

5        A    Yes.

6        Q    Okay.

7        A    It was my obligation to do so.

8        Q    Has Local Towing been paid the total amount

9    of the contract price now?  Have all those monies come

10   in?

11       A    There is a minor balance due that I left

12   there only to leave the contract open so that we could

13   pursue the claim.

14       Q    The delay claim?

15       A    The delay claim, yes.

16       Q    What's due on the contract?

17       A    I think we left it open by about $3,000 or

18   so, and the claim is $572,000.

19       Q    The delay claim is?

20       A    Yeah.  We would love to have assistance in

21   pursuing that.

22       Q    How much money did Local Towing -- well,

23   strike that.

24            How much did Safeco pay on the bond to assist

25   with the completion of St. Thomas, do you know,

1   ballpark?

2          A     550, 560, somewhere around there.  He'd know.

3          Q     I know I can ask their lawyer; you're

4   pointing to him.  But just your general ballpark.

5          A     But in addition to that, I infused about in

6   the neighborhood of seven to eight hundred thousand in

7   cash and trades to suppliers, and there's still

8   probably -- the company probably still owes four or

9   five hundred thousand payables.

10         Q     Local Towing still owes?

11         A     Yes, that did not get to Safeco.  I got --

12  was trying to compile all that information.  The

13  computer that it is on, we entered -- Windows XP

14  Professional, and you've got to enter in a code to get

15  into it.  If you don't renew the code, it locks itself

16  out, and the computer's been in my basement for, like

17  seven months, but I've got it on a disk which is in a

18  file in my basement, but the file's locked, and I've

19  got to bring the file to a locksmith and get it opened.

20         Q     Let me just go back for a minute.  You said

21  Local Towing put in seven or eight hundred thousand in

22  cash to the project.  And I assume you mean that's

23  above the amount of monies that were paid to it, you

24  know, out of the 3.7 million, the company put another

25  800,000 in on top of that?

1        A     The company and myself personally.

2        Q     Okay.  Now, where did that seven or eight

3    hundred thousand dollars come from?  Can you break that

4    down for me?

5        A     I borrowed up to 300,000 bucks from my

6    mother.  I sold at fire sale value the equipment that I

7    had in Connecticut.  That was sold for about 125,000,

8    but it was a fire sale and should have been 250 or

9    more.  I borrowed $100,000 from a friend of mine.

10   Borrowed a hundred thousand dollars from family.  I was

11   going everything, again, I could to finish the job.

12       Q     How about the money that Local Towing had in

13   when -- in the account when it started the job, the

14   800,000, what happened to that money?

15       A     That went into the aggregate of the San Juan

16   projects for the Corps of Engineers, the port

17   authority, and the Aguadilla, and St. Thomas.  In

18   addition to that, I settled a claim with the Corps of

19   Engineers in Wilmington; we settled that out for

20   135,000.  So that went in there too.

21             You know, as I get into this computer and get

22   the CD's that are locked up, I'll try to get more

23   details of that.

24       Q     Let's talk about St. Thomas for a minute.

25   Then we can switch over to Aguadilla.  So you get paid

180

1    roughly $3,770,000, because there's still 3,000 owed on

2    the project roughly?

3         A    Yes.  But we prevailed on a differing site

4    condition claim for $180,000, and that was turned over

5    to Safeco.

6         Q    Okay.  So the contract got probably up near

7    $4 million?

8         A    Somewhere right around there.

9         Q    Okay.

10        A    Without seeing all my files, I can't give you

11   any real, hard specific --

12        Q    Okay.  So what I'm trying to figure out is:

13   Where is the documentation that would exist to show how

14   much monies were paid out by Local Towing to complete

15   the St. Thomas project?  It would be on your home

16   computer that you've been describing for me?

17        A    Well, it's the office computer.  We've since

18   closed the office, and, you know, everything I brought

19   to my basement, basically.

20        Q    So the documents that would show how much

21   Local Towing paid out to complete this project are not

22   in the documents that have been produced so far.  You

23   would have to get into the computer and take a look at

24   them?

25        A    I don't know what Duncan has along those

1    lines.  I don't know what he's given you.  But I'll get

2    you, you know, got no problem, I'll get all the stuff

3    for you.  It's no --

4        Q    But your best memory of it is that you were

5    paid about 4 million for the job and that so far to

6    complete the job, you've paid that money out, some of

7    it to Safeco, you paid -- in addition to the 4 million

8    that you received to complete this job, you also put

9    seven or eight hundred thousand in cash in yourself

10   personally and from Local Towing?

11       A    Yes.

12       Q    Breaking that down from St. Thomas, there was

13   300,000 that you borrowed from your mother, right?

14       A    Right.

15       Q    There was some equipment --

16       A    Well, the monies that went in went into both

17   Aguadilla and St. Thomas.

18       Q    Okay.

19       A    You know?

20       Q    All right.  Is the only way you can talk

21   about the loss by combining the two projects?  Is that

22   an easier way to go through it?

23       A    Yes.

24       Q    Let me tell you what I want to ask you so we

25   can streamline a little bit.

182

1      A    Keep in mind that you're wearing me out a

2    little bit here.

3      Q    This is the easy part.  So let me know if you

4    don't understand my question.

5      A    All right.

6      Q    What I'm going to be asking you, you know,

7    Local Towing gets paid a certain amount of money from

8    the St. Thomas job and the Aguadilla job, and as I

9    understand it, there's a claim that all the monies that

10   were paid were used to complete the projects and there

11   were additional monies put in on top of the money that

12   you received from the owners of the two projects that

13   you had to put in to complete them.  Some of it was

14   your own money and some of it was from Safeco.  Is that

15   fair to say?

16     A    Yes.

17     Q    So do we need to combine the two projects to

18   talk about the cost of completion and what Safeco put

19   in?

20     A    Yes.  I believe Safeco has paid --

21     Q    Okay.  Let me just backtrack a minute, then.

22   The St. Thomas project after the $180,000 adjustment

23   for the site condition was roughly a $4 million project

24   and Aguadilla was roughly a $1 million project?

25     A    I think the base bid for Aguadilla was 938.

```
 1    For some reason that number sticks in my mind.  We got
 2    some change orders out of that.  We may have gotten
 3    $150,000 in change orders of that.
 4         Q    So roughly speaking, the two projects
 5    combined is a little over $5 million?
 6         A    Yeah.  And depending upon what we prevail in
 7    our claim --
 8         Q    Let's take it step by step.  You have $5
 9    million in projects between St. Thomas and Aguadilla, a
10    little more than that, right?
11         A    Yeah, maybe five million.
12         Q    One of the claims you're pursuing against the
13    owner of the St. Thomas project is that he delayed the
14    commencement of the project and that cost your company
15    some money, right?
16         A    $572,000.
17         Q    That claim is pending in the United States
18    District Court in the Virgin Islands?  You're pointing
19    to your lawyer because he knows the legal things.
20    That's your understanding?
21         A    Yes.  Duncan knows the details better than I
22    do.
23         Q    We can agree that the delay in the project
24    was not caused by any of the defendants in this case?
25         A    Correct.
```

1      Q     Or third-party defendants.  Okay.

2            Now, the total amount of monies paid by

3      Safeco to complete both projects, was that the 550 or

4      the 560, to your understanding?

5      A     That's my understanding.

6      Q     Then the seven or eight hundred thousand that

7      was put in in cash that you were describing to me a

8      little while ago, that was put into both projects.  You

9      don't know the exact breakdown?

10     A     Yes.  Like, for example, I had Moody Brothers

11     from Jacksonville, Florida, provided the tugboat and

12     one of the barges and the crane that finished St.

13     Thomas.  I had bought a barge from him before, projects

14     that I did on my own, and the barge is worth 350,000

15     bucks, and I gave that back to him for somewhere around

16     200,000 in relief from our bills.  So, you know, there

17     was -- it wasn't all just cash, you know, there was

18     some trading done.

19     Q     Let's just break it down for a minute.  You

20     put $300,000 -- well, strike that.

21           The $800,000 that was in the Local Towing

22     account, that was used to --

23     A     That also went between all the projects we

24     did down there.

25     Q     Was it between St. Thomas and Aguadilla, the

1    800,000, or were there other projects that it was used

2    on?

3          A    Without seeing the cost accounting, I can't

4    give you an exact number.  I know we spent nearly 350

5    or $400,000 building an A-frame that we used on the San

6    Juan projects.  And I traded that off to the diving

7    subcontractor that Michael Empey engaged to perform the

8    first bit of the St. Thomas project.  I think they

9    credited me $130,000 for that.

10          Q    The 800,000 that was in the Local Towing

11    account, 350 went to -- went for the building of the

12    A-frame on the San Juan project?  That's initially

13    where it went, right?

14          A    Correct.

15          Q    Then you got some money back for selling the

16    A-frame to somebody else?

17          A    For one of the subcontractors on the St.

18    Thomas project.

19          Q    Okay.

20          A    So we were in 130,000, that's what the bill

21    was, and --

22          Q    Okay.  Any of the other monies in the Local

23    Towing account used for St. Thomas or the Aguadilla

24    project?

25          A    Whatever monies were there in the SICS

186

1     account generated from the previous jobs, that was

2     absorbed by the two projects.

3          Q    So there's 800,000 or approximately 800,000

4     in the Local Towing account, you told me when you

5     started the two projects. So was that --

6          A    That all stayed down there.

7          Q    That's all gone?

8          A    Yeah.  That all, everything went.

9          Q    Was any of that 800,000 used for projects

10    other than St. Thomas or Aguadilla?

11         A    Well, the San Juan project for the Corps of

12    Engineers and the San Juan project for the port

13    authority.  Anything that was down there stayed.  It

14    did not come out and go into my pocket.

15         Q    Is Aguadilla, are there different projects in

16    Puerto Rico besides the Aguadilla project?  You said

17    the port authority.  Is that a different project?

18         A    Yes.  I think we said the other day there was

19    a total of three projects or so down in Puerto Rico.

20         Q    Okay.  I guess my question, is there any way

21    for you sitting here today to break down for me what

22    portion in the 800,000 in the Local Towing account went

23    to Aguadilla as opposed to any other Puerto Rico

24    projects?

25         A    As I said, I'd have to get in and see the

1    cost accounting.  I don't have exact numbers off the
2    top of my head.

3         Q    How about the $300,000 that you borrowed from
4    your mother?  Did that go to Aguadilla and St. Thomas
5    or did it go to the other projects in Puerto Rico as
6    well?

7         A    No.  No.  By that time those projects were
8    completed.  I think maybe 75,000 of that went to
9    Aguadilla, the Aguadilla account, of which 200,000 --
10   somewhere around that, a third went to Aguadilla, and
11   two-thirds went to St. Thomas.  We really should have
12   the cost accounting.  It's kind of a waste of time to
13   try to --

14        Q    I'm just trying to get ballpark.  Then you
15   had the 125,000 from the equipment sale in Connecticut,
16   the 100,000 from the friend, the 100,000 from the
17   family, and the settlement from the Corps of Engineers
18   on another project.  Was all of that money put into St.
19   Thomas and Aguadilla?

20        A    Yes.  There was no other need than those.
21        Q    Okay.  So in order to finish Aguadilla and
22   St. Thomas, there's the money paid by Safeco, and the
23   seven or eight hundred thousand that we've been
24   discussing, that was put in by yourself and Local
25   Towing, right?

1        A    Yes.  And there's still -- Local Towing still

2    owes bills that were not -- that did not get to Safeco.

3        Q    So Local Towing still has four or five

4    hundred thousand in payables that have not made their

5    way to Safeco?

6        A    Yes.  Somewhere in that magnitude.  There

7    was, I believe I made Ben Lentz and the guys in New

8    Jersey aware of that.  There was some outstanding

9    number there.

10        Q    When were those -- strike that.

11             When were the St. Thomas and Aguadilla

12    projects finished?  What date?

13        A    The actual work in St. Thomas was right in

14    the beginning of -- completed right in the beginning of

15    December 2001.  Then there was a tremendous

16    demobilization effort just getting everything back up

17    to the States.  I think we finished demobilizing the

18    end of mid to late January, and it was two weeks or so

19    towed back up to Jacksonville.

20        Q    I'm sorry, I missed what you said.  Was that

21    Aguadilla and St. Thomas?

22        A    No.  That was St. Thomas.

23        Q    Okay.

24        A    And Aguadilla was pretty much completed in

25    May or April of 2002.  There was a subcontractor there

1    who was just dragging and dragging, and I finally -- at

2    this point all the monies were assigned to Safeco.  And

3    I finally went down myself and took over the

4    subcontractor's crew and finished everything.

5            Then there was a few punch list items that

6    they wanted corrected, and I went back down there in

7    October, November, 2002, and addressed all those

8    concerns through the court down there.

9        Q    Okay.  What was the total -- well, strike

10   that.

11           What damages are you claiming that Fred Smith

12   and Associated Insurance caused in your third-party

13   claim?  Can you quantify that at all for me?

14       A    I really have to review that claim right now

15   and to give you a serious answer, I don't feel

16   comfortable doing that sitting here right now.  You

17   know, the aggregate is right around $3 million of the

18   entire effect.

19       Q    Well, let's say that the keyman life

20   insurance was in place for Fran Empey, right, that

21   would have resulted in a payment to Local Towing of $1

22   million, right?

23       A    That would have relieved Safeco and paid back

24   some of the other bills.

25       Q    But it would have totaled a million dollars,

1    right?

2         A    Yes.

3         Q    Okay.  How is it that Fred Smith will be

4    responsible for -- let's just, you know, assume that

5    somehow he was responsible for getting keyman insurance

6    for Fran Empey.  How would he be responsible for any

7    damages to Local Towing beyond the keyman insurance?

8    Was there some type of a connection between him and any

9    other damages?

10        A    Well, the entire effect for purposes of this

11   conversation, let's call it $3 million.  Taking into

12   account the position that Fred took as third-party

13   mediator and the obligation that he took to try to

14   resolve these issues as we discussed before the break.

15        Q    So it is your claim that the company lost a

16   total of $3 million and Fred Smith and Associates is

17   responsible for that entire $3 million?

18        A    I believe the claim is that's what the entire

19   effect was.

20        Q    Right.  What I'm asking is what part of the

21   effect to attribute to Fred Smith?  What part of the

22   damages is he responsible for?

23        A    I can't give you a hard number right now.

24        Q    If --

25        A    Why, do you want to sit here and make a deal

191

1    of some sort?

2        Q    No, thank you.  Is -- if Local Towing had

3    made its million dollars on the St. Thomas project and

4    its $250,000 on the Puerto Rico project, the Aguadilla

5    project, we can agree that Fred Smith and Associated

6    wouldn't have received a check for any portion of those

7    profits, right?

8        A    Yeah.

9             MR. BRAWLEY:  I'm going to do a couple

10   of questions that are just summarizing.  Then I'm going

11   to turn it over to Sean.

12            (Discussion off the record.)

13       Q    You never saw a fully executed general

14   indemnity agreement of Fran Empey in favor of Safeco,

15   correct?

16       A    Yes.

17       Q    Neither yourself nor anyone at Local Towing

18   ever instructed Safeco not to release the bonds without

19   the general agreement of indemnity from Fran Empey,

20   correct?

21       A    There was no need to do that because that was

22   already done.

23       Q    But my question is simply, you know, whether

24   you or anyone at local -- strike that.

25            Neither yourself nor anyone at Local Towing

1    ever instructed Safeco, either in writing or verbally,

2    not to release the bonds without the general agreement

3    of indemnity from Fran Empey, correct?

4        A    Correct.

5        Q    Okay.  You were told by Fred Smith why keyman

6    life insurance was important for yourself and Fran

7    Empey, right?

8        A    Well, it was -- it was really due to the fact

9    that it was a requirement, and it was probably, "By the

10   way, you know, if anything does happen, you're going to

11   want it."

12       Q    But Fred Smith -- strike that.

13            Is it fair to say that Fred Smith explained

14   to you why keyman insurance was important in the event

15   that yourself or Fran Empey died during the project?

16       A    Yeah.

17       Q    Okay.  I think I forgot to follow up with

18   you, but you had told me that you had heard some

19   stories and hearsay about Fran Empey prior to starting

20   St. Thomas or Aguadilla.  I think you were talking

21   about his financial condition.  Do you remember those

22   questions from earlier?

23       A    Yeah.

24       Q    Okay.  What were the stories and the hearsay?

25       A    That he had gone bankrupt, you know, that

1    jobs went bad, that he had gone bankrupt.

2         Q    I think we agreed that if there's no money in

3    the Empey estate and there was no inappropriate

4    transfer of monies that were in that estate, then the

5    indemnity agreement or any indemnity agreement that

6    Fran Empey may have signed or may not have signed would

7    not be enforceable if there's no money there?

8         A    There may have been funds that were not in

9    any estate per se, you know.  Somebody's got to

10   investigate this.

11        Q    But my question is, it's just a simple one,

12   is, you know, if we assume that there is no money in

13   the Empey estate, then it doesn't matter whether he

14   signed or didn't sign an indemnity agreement because

15   there is no money to pay the indemnity, right?

16        A    Yes, I would consider that.

17        Q    If the -- strike that.

18             If Fran Empey's heirs had demanded, you know,

19   half the money in the Local Towing accounts at the time

20   of his death, could Local Towing have continued with

21   the St. Thomas and Aguadilla projects?

22        A    If they wanted out right at that time?

23        Q    Yes.

24        A    I would have canceled at the very least the

25   St. Thomas project.  Would have been fine.  If that's

194

1    what you want, no problem.

2        Q    Is part of the reason that you would have

3    taken the money out is, you know, you would have just

4    given them their money and not have done St. Thomas

5    because -- if you were going to go forward with St.

6    Thomas, you needed to have all the money committed to

7    the project?

8        A    Well, that -- well, that was the intent in

9    doing the -- going ahead and doing that.  The monies

10   that were previously generated were to be the working

11   capital for the project.  Had we not gone ahead with

12   the project, you know, we could have backed out, would

13   have had to have held some monies for any liability

14   under the bid bond, if anything came of that, and after

15   everything was cleared up, they could have taken their

16   money and done whatever, you know.  I wasn't going to

17   steal or take what wasn't mine.

18       Q    What would the process have been at Fran

19   Empey's death if Local Towing had decided not to do the

20   St. Thomas project?  How do you extricate yourself from

21   that?

22       A    I've never backed out on a job.  Looking

23   back, do you want to know what I know right now or at

24   that time?

25       Q    Sure.  You can tell me now, what you know now

195

1    and what you knew at the time.

2        A    Looking back on it, we could have probably

3    gotten out of it because the government of the Virgin

4    Islands was technically in default of their bid

5    specification.  They were supposed to start the job

6    within 60 days of the bid date.  We probably could have

7    just walked and split the money and the Empeys could

8    have enjoyed themselves, and so could I.

9            At the time it wasn't so black and white like

10   that, you know.  It was not entirely clear that we

11   could have taken that approach based upon the bid

12   specifications.  And at the time, there was no question

13   in Michael Empey's mind that we would even consider

14   backing out.  You know, in cooperation with the

15   agreement that I was working under and cooperating

16   with, you know, it wasn't just me.

17       Q    Was any financial information of yours

18   released by Associated to anyone without your

19   permission?

20       A    There were financial statements that I got

21   from Wayne Price that only after everything was done I

22   saw, and they weren't true to what was my situation.  I

23   knew that there were financial statements released to

24   Safeco, but I thought they were based on what I

25   supplied the accountant with, and unfortunately I did

196

1    not -- I did not send them from my office.  I did not

2    see them before they went on to Safeco.

3           You know, I can't really say that information

4    was released without my permission.  There were certain

5    aspects of it that I didn't have knowledge of.

6       Q    So you -- you did give Charles Sapochetti's

7    company permission to release the information that you

8    gave to them on to Safeco; it's just that there was

9    some inaccurate information sent on to Safeco that you

10   take issue with?

11      A    Yes.

12      Q    Are you saying that information was forwarded

13   on by Fred Smith?  Is that why you say he released your

14   information without your permission?

15      A    I didn't say that he released the information

16   without my permission.  I said there was information

17   that was inaccurate that was released.  Now, if Fred

18   Smith had that made up, I would assume that would be

19   done by the accountant.  But I don't know what went on.

20   You know, I wasn't there.

21      Q    Okay.  So with regard to the -- there is an

22   allegation in your complaint that financial information

23   was released by AIA without your permission.  The

24   information you're talking about is the information

25   contained on a financial statement that was sent to

 1    Safeco that showed you owned two pieces of property
 2    that you didn't.  Is that the -- that's the inaccurate
 3    information, right?
 4         A    That's what's most outstanding and most
 5    clear.
 6         Q    Okay.
 7         A    I don't have the thing in front of me.  I --
 8         Q    But you don't know -- you don't know whether
 9    that was Fred Smith that provided that information or
10    whether it was just the accountant somehow made a
11    mistake and put that down?
12         A    The information came out of Fred's office.  I
13    don't know what they did.
14         Q    The information didn't come from the
15    accountant's office?
16         A    I believe it came out of Fred's office.
17    There was a time when I did go to Wayne Price's office
18    finally to try to figure out what the heck had happened
19    after the job was completed.  I went to Wayne's office
20    after calling him for a week and said, "Wayne, let me
21    see what's going on here.  What's this information?"
22    Put it off, put it off.
23              Finally after about a week, I just went to
24    Wayne's office, and he had statements, and he said,
25    "Okay.  I'll copy them."

1              It was taking a long time.  I go back to the
2    copy room, and Wayne's cutting a fax number, which I
3    think was Fred's, cutting a fax number off the top of
4    the paper.
5              I said, "Wayne what are you doing?  What's
6    this? "
7              "Oh, it's the nature of the business.  We
8    never disclose where we get our information from."
9              MR. BRAWLEY:  What I'd like to do, I
10   don't know if it's all right with you, to turn the
11   questioning over to Sean.  I would like to suspend my
12   questioning until we get more copies.  Mr. Gardella
13   brought a big bag of documents; I know we are making
14   every effort to go through them.  I would like to copy
15   them and also take a look at the damages information
16   all seems to be on a computer that needs to be accessed
17   and I guess printed out or downloaded in some form or
18   fashion.
19             So with those, you know, stipulations in
20   mind, I'll suspend and turn it over to Sean because he
21   may have limited questions that he doesn't need that
22   information for.
23             (Discussion off the record.)
24
25

1           CROSS-EXAMINATION BY MR. KELLEY:

2

3       Q    Mr. Gardella, as you know, my name is Sean

4    Kelley.  I represent Safeco Insurance Company of

5    America and General Insurance Company of America in

6    this matter.  We're going to operate under the same

7    guidelines as you've been answering Mr. Brawley's

8    questions.

9           If I ask you a question and you don't

10   understand it, tell me.  If I ask a question and you

11   answer it, I'll assume that you understood it.

12           With that in mind, I'd like to start off by

13   going back to Exhibit 2, the general agreement of

14   indemnity.  I believe you've testified that the purpose

15   of executing this by yourself and James Gardella and

16   Jessica Gardella was as consideration for Safeco to

17   issue bonds on behalf of Local Towing for the projects

18   which Local Towing was undertaking; is that correct?

19       A    It was a -- yeah.

20       Q    Were there any other contracts between

21   Safeco -- and when I say Safeco, I'm referring to

22   Safeco and General -- between Safeco and yourself or

23   James Gardella?

24       A    Well, there was the bond itself that I

25   executed.

1          Q       You executed the bond?

2          A       Well, the final bond, you know, the bid bond

3     that I signed.

4          Q       Is that between you and Safeco?

5          A       It's a General -- if I remember correctly,

6     the bonds were made on General Insurance paper, and

7     it's something that I signed and executed.

8          Q       As far as the issuance of bonds, is there any

9     other agreement between yourself and Safeco?  In other

10    words, the bonds may be a contract between several

11    parties.  I'm wondering if there's a contract between

12    yourself and Safeco for the issuance of bonds other

13    than this Exhibit 2.

14         A       No.  Now, some of that stuff may have been

15    mine.

16                  MR. BRAWLEY:  I think it's all marked.

17    But take a look.  We'll copy it at the end.

18                  MR. KELLEY:  I don't know if you want to

19    mark Local Towing's -- the defendant's answer in this

20    as an exhibit, but I'm going to be referring to some of

21    the affirmative defenses and counterclaims therein.

22                  (Discussion off the record.)

23                  (Exhibit 10 marked.)

24    BY MR. KELLEY:

25         Q       The first affirmative defense on behalf of

```
1    James Gardella asserts that there is some original

2    contract between Safeco and James Gardella for the

3    issuance of bonds on behalf of Local Towing. Do you

4    know to what that's referring?

5         A    I would have to defer that question to my

6    attorney. At this time there may be some other --

7                   MR. HUME: Are you talking about the

8    first affirmative defense?

9                   MR. KELLEY: On behalf of James

10   Gardella, yes.

11                  MR. HUME: I don't think that the

12   witness can answer that question.

13                  MR. KELLEY: Okay. It's paragraph 32.

14   BY MR. KELLEY:

15        Q    Are there any provisions in the general

16   agreement of indemnity executed by your father and

17   Jessica and you on October 6, '99, regarding the

18   issuance or the obtaining of keyman life insurance on

19   the life of Francis Empey? Is there any obligation

20   thereunder for Safeco to obtain a keyman policy?

21        A    I'd have to read the entire --

22                  MR. BRAWLEY: I think it's in front of

23   you there somewhere, Exhibit 2. I think it's in this

24   stack here. Exhibit 2. There it is.

25        A    Right now I don't think I can clearly read
```

```
 1    this entire document and disseminate it and answer your

 2    question.  It may be better that we get together

 3    another day.

 4                    MR. KELLEY:  I submit this:  We're going

 5    to be here next Wednesday; is that correct?  10:00

 6    a.m.?

 7                    THE WITNESS:  Try to do it after lunch

 8    so I can work in the morning.

 9                    MR. BRAWLEY:  Can we get the financial

10    documents?

11                    MS. McCARTHY:  Are we still on the

12    record?

13                    MR. BRAWLEY:  Yes.  Is it possible to

14    get the financial records that Mr. Gardella referred

15    to, the ones that are on the computer?  It is a two-

16    phase inquiry.  First you have got to get to the

17    computer; someone has to look at it and see if they're

18    retrievable.

19                    THE WITNESS:  I want to make sure the

20    guy doesn't screw it up.

21                    MR. BRAWLEY:  I don't know.  We may not

22    know sitting here now.  Can we endeavor to do that

23    before next week because that way we can finish up, you

24    know, that day?

25                    MR. HUME:  Can you get it this week to
```

1    somebody?

2                    THE WITNESS:  Yes.  Is there somebody

3    that you know that's really good at this stuff?  I

4    don't want to bring it to Joe Blow.

5                    MR. BRAWLEY:  Can we do James Gardella

6    next Wednesday morning --

7                    MR. HUME:  Yes.

8                    MR. BRAWLEY:  -- at 10:00, be able to

9    reserve some time at the end for Chris and see where we

10   are with the documents, because, you know, it may be

11   that once we see those documents, it eliminates the

12   need for questioning.  The problem would be if we get a

13   big stack immediately before, it's hard to digest

14   what's there, et cetera.

15                   So what Chris Gardella is saying now,

16   you're too tired to continue, asking if we can start

17   another day?

18                   THE WITNESS:  Yes, I would feel more

19   comfortable doing that.

20                   MR. BRAWLEY:  We are going to be here

21   Wednesday, May 5th.  We're going to start at ten

22   o'clock with James Gardella, and then we will probably

23   go to completion.  If you could be available through

24   your attorney after James Gardella's done that day,

25   that might --

```
 1                    THE WITNESS:  I'd like to be able to
 2    get, you know, half a day in in the morning so I don't
 3    have a --
 4                    MR. BRAWLEY:  Well, I would think that
 5    we will be at least until two o'clock, three o'clock
 6    with James Gardella.
 7                    MR. HUME:  Right.
 8                    MR. BRAWLEY:  So why don't we -- with
 9    that agreement, do you want to suspend at this time
10    with the agreement that we're going to do James
11    Gardella next Wednesday at 10:00, then we will try to
12    finish your deposition in the late afternoon of the
13    5th, and you're going to attempt to get the information
14    concerning damages off the computer by that time, then
15    give it to your lawyer and he'll contact us?
16                    Duncan, could you copy for me what Mr.
17    Gardella brought today, that big bag of documents?
18                    MR. HUME:  Yes.
19                    MR. BRAWLEY:  I'd like to look at that
20    and copy that and see what's in there.
21                    THE WITNESS:  If there's information
22    that you want, you know, tell me.
23                    MR. KELLEY:  Basically in reviewing that
24    document, I want you to tell me if there's something in
25    there that obligates Safeco to get a keyman policy, to
```

1    obligate them to have this policy to the benefit of

2    Local Towing.

3                    THE WITNESS:  Is there any other

4    questions that you may have that I may need to get a

5    piece of paper from --

6                    MR. KELLEY:  I'm sure I've got a few

7    pages here.

8                    THE WITNESS:  So I can try to pull that

9    all out so we can get it over with?

10                   MR. KELLEY:  If there's any contract

11   agreement, correspondence, that you believe would

12   obligate Safeco to get a keyman policy or to have Fran

13   Empey's -- him to execute a general agreement of

14   indemnity, I would like to see that.

15                   THE WITNESS:  All right.  I'll try to

16   find everything.

17                   MR. HUME:  We'll see if we can locate

18   everything in response to that request.

19                   (Discussion off the record.)

20                   (Deposition adjourned:  4:14 p.m.)

21

22

23

24

25

206

```
 1                        JURAT

 2

 3          I, GEORGE C. GARDELLA, do hereby certify that

 4    the foregoing testimony taken on April 26, 2004, is

 5    true and accurate, including any corrections noted on

 6    the corrections page, to the best of my knowledge and

 7    belief.

 8

 9

10

11
                        GEORGE C. GARDELLA
12

13

14

15

16

17        At              in said county of            ,

18    this      day of          , 2004, personally appeared

19    GEORGE C. GARDELLA, and he made oath to the truth of

20    the foregoing corrections by him subscribed.

21

22

23    Before me,                          , Notary Public

24    My commission expires:

25
```

207

```
 1                      TRANSCRIPT CORRECTIONS

 2
         REPORTER:    JAMES A. SCALLY
 3
         CASE STYLE:  SAFECO INSURANCE COMPANY OF AMERICA, ET AL
 4                    VS
                      LOCAL TOWING, INC., ET AL
 5                    VS
                      ASSOCIATED INSURANCE AGENCY, INC., ET AL
 6
         PAGE    LINE   CORRECTION
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                   NAME:

24
                                     DATE:
25
```

208

1                         STATE OF CONNECTICUT

2

3          I, JAMES A. SCALLY, a Registered Professional
        Reporter/Commissioner within and for the State of
4       Connecticut, do hereby certify that I took the
        deposition of GEORGE C. GARDELLA on April 26, 2004, at
5       the offices of Hume & Associates, One Landmark Square,
        Stamford, Connecticut.

6
           I further certify that the above-named deponent
7       was by me first duly sworn to testify to the truth, the
        whole truth, and nothing but the truth concerning his
8       knowledge in the matter of the case of SAFECO INSURANCE
        COMPANY OF AMERICA AND GENERAL INSURANCE COMPANY OF
9       AMERICA VS LOCAL TOWING, INC., GEORGE GARDELLA, JESSICA
        HELQUIST and JAMES GARDELLA, VS ASSOCIATED INSURANCE
10      AGENCY, INC., FREDERICK J. SMITH, AFNY, INC, ASSOCIATED
        FACILITIES OF AMERICA, LTD., MELWAIN ENTERPRISES, INC.,
11      CHARLES ASSOCIATES, P.C., and CHARLES SAPOCHETTI now
        pending in the United States District Court, District
12      of Connecticut.

13         I further certify that the within testimony was
        taken by me stenographically and reduced to typewritten
14      form under my direction by means of COMPUTER ASSISTED
        TRANSCRIPTION; and I further certify that said
15      deposition is a true record of the testimony given by
        said witness.

16
           I further certify that I am neither counsel for,
17      related to, nor employed by any of the parties to the
        action in which this deposition is taken; and further,
18      that I am not a relative or employee of any attorney or
        counsel employed by the parties hereto, nor financially
19      or otherwise interested in the outcome of the action.

20         WITNESS my hand and affixed my seal this 6th day
        of May, 2004.

21

22

23                         James A. Scally, RPR, CRR
                           Commissioner

24

25      My commission expires
        May 31, 2004

209

```
 1

 2
                          James A. Scally, RPR, CRR
 3                      Brandon Smith Reporting Service
                              44 Capitol Avenue
 4                          Hartford, CT 06106

 5

 6

 7

 8
        May 6, 2004
 9

10
        Duncan B. Hume, Esq.
11      Hume & Associates
        One Landmark Square
12      Stamford, Connecticut 06901

13      Dear Mr. Hume:

14      The transcript of George C. Gardella taken on April 26,
        2004, has been prepared.
15
        Please call our office to make arrangements for Mr.
16      Gardella to read and sign the transcript.

17      Sincerely yours,

18

19      James A. Scally, RPR, CRR, LSR #80
        Court Reporter
20

21

22

23

24

25
```

210

1                    Brandon Smith Reporting Services
                              44 Capitol Avenue
2                       Hartford, Connecticut 06106
                              (860) 549-1850
3
      May 6, 2004
4

5     In re:                Safeco Insurance Company of America
                            and General Insurance Company of
6                           America vs. Local Towing, Inc.,
                            George Gardella, Jessica Helquist,
7                           and James Gardella vs. Associated
                            Insurance Agency, Inc., Frederick J.
8                           Smith, AFNY, Inc, Associated
                            Facilities of America, Ltd., Melwain
9                           Enterprises, Inc., Charles
                            Associates, P.C., and Charles
10                          Sapochetti
      Deposition of:        George C. Gardella
11    Date:                 April 26, 2004

12

13
      The following items checked pertain to the above
14    captioned case:

15          ORIGINAL TRANSCRIPT enclosed in protective,
            sealed white envelope.
16
            EXHIBITS attached to ORIGINAL TRANSCRIPT.
17
            READING/SIGNING WAIVED          NOT WAIVED
18

19    When you receive the notarized JURAT and ERRATA SHEETS
      from the deponent, DO NOT open the sealed envelope.
20    Just attach the notarized sheets to the outside of said
      envelope and properly retain for the Court.
21

22
                        Signed
23                            James A. Scally
                         Brandon Smith Reporting
24

25                       Date sealed