1

```
 1.      UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF CONNECTICUT
 2

 3     ----------------------}
       SAFECO INSURANCE      }
 4     COMPANY OF AMERICA AND }
       GENERAL INSURANCE     }
 5     COMPANY OF AMERICA     }
            Plaintiffs,       } Civil Action No.
 6                           }
                 VS.          } 302CV1966 (AVC)
 7                           }
       LOCAL TOWING, INC.,    }
 8     GEORGE GARDELLA,       }
       JESSICA HELQUIST-      }
 9     GARDELLA, AND JAMES    }
       GARDELLA,              }
10          Defendants/       }
            Third-Party       }
11          Plaintiffs.       }
                             }
12               VS.          }
                             }
13     ASSOCIATED INSURANCE   }
       AGENCY, INC.,          }
14     FREDERICK J. SMITH,    }
       AFNY, INC., ASSOCIATED }
15     FACILITIES OF AMERICA  }
       LTD., MELWAIN          }
16     ENTERPRISES, INC.,     }
       CHARLES ASSOCIATES,    }
17     P.C., AND CHARLES      }
       SAPOCHETTI,            }
18          Third-Party       }
            Defendants.       }
19     ----------------------}

20     DEPOSITION OF:  ANTHONY MASCIA, MD

21     DATE:  OCTOBER 12, 2004

22     HELD AT:  1591 Boston Post Road

23            Suite 100

24            GUILFORD, CONNECTICUT

25
```

BRANDON SMITH REPORTING SERVICE (860) 549-1850

```
 1   APPEARANCES:

 2
     REPRESENTING ASSOCIATED INSURANCE AGENCY,
 3   INC.:
     Morrison, Mahoney, LLP
 4   One Constitution Plaza
     Hartford, CT 06103
 5   By:  Mr. James L. Brawley, Esq.

 6   REPRESENTING LOCAL TOWING AND THE
     GARDELLAS:
 7   Hume & Associates
     One Landmark Square
 8   Stamford, CT 06901
     By:  Mr. Duncan B. Hume, Esq.

 9
     REPRESENTING MELWAIN ENTERPRISES, INC.:
10   Winget, Spadafora & Schwartzberg, LLP
     177 Broad Street
11   Fifth Floor
     Stamford, CT 06901
12   By:  Mr. Richard N. Freeth, Esq.

13

14

15

16

17

18

19

20

21

22   Reporter:
     Vincent J. DeLaria, RPR, LSR #00138
23   Brandon Smith Reporting Service
     44 Capitol Avenue
24   Hartford, CT 06106
     Tel (860) 549-1850
25
```

BRANDON SMITH REPORTING SERVICE (860) 549-1850

3

```
 1                    I N D E X

 2        WITNESS:                           PAGE:

 3
          ANTHONY MASCIA, MD
 4
                  Examination by Brawley      5, 59
 5        Examination by Mr. Freeth              55
          Examination by Mr. Hume                55
 6

 7

 8        EXHIBITS                           PAGE:

 9
          Defendant's Exhibit 1, Blood, urine kit   28
10        authorization consent form,
          Defendant's Exhibit 2, Fax,              28
11        Defendant's Exhibit 3, Airborne Express  29
          receipt,
12        Defendant's Exhibit 4, Portamedic form,  29
          Defendant's Exhibit 5, Lab results,      29
13        Defendant's Exhibit 6, EKG,              29
          Defendant's Exhibit 7, Records request,  29
14        Defendant's Exhibit 8, Doctor's notes,   29
          Defendant's Exhibit 9, Lab report,       29
15        Defendant's Exhibit 10, Doctor's file,   30
          Defendant's Exhibit 11, 2/24/98 blood    54
16        test results,
          Defendant's Exhibit 12, Subpoena,        61
17

18
               (ALL EXHIBITS WERE RETAINED BY COUNSEL)
19

20

21

22

23

24
```

25

BRANDON SMITH REPORTING SERVICE (860) 549-1850

4

```
 1              S T I P U L A T I O N S
 2
 3         It is stipulated by the counsel for
 4    the parties that all objections are
 5    reserved until the time of trial, except
 6    those objections as are directed to the
 7    form of the question.
 8         It is stipulated and agreed between
 9    counsel for the parties that the proof of
10    the authority of the Commissioner before
11    whom this deposition is taken is waived.
12         It is further stipulated that any
13    defects in the notice are waived.
14         It is further stipulated that the
15    reading and signing of the deposition
16    transcript by the witness is waived.
17
18
19
20
21
22
```

23
24
25

BRANDON SMITH REPORTING SERVICE (860) 549-1850

5

1              (Deposition commenced at 1:12 p.m.)
2
3
4          MR. BRAWLEY:  I need to put on the record
5    that Sean Kelly is the lawyer for SAFECO.  He
6    called me up at my office to let me know he
7    couldn't attend today's deposition but gave me
8    permission to go ahead without him.
9          I don't know whether he wants a copy of the
10   transcript, but I will call and ask him after the
11   deposition, and I will let our court reporter know
12   the answer to that question.
13
14                       -0-
15
16   ANTHONY MASCIA, MD, Deponent, having first been
17   duly sworn, deposes and states as follows:
18
19
20          EXAMINATION BY MR. BRAWLEY:
21

22    Q.  Good afternoon, Doctor.

23    A.  Good afternoon.

24    Q.  Could you tell us your full name, sir.

25    A.  Anthony Andrew Mascia (M-a-s-c-i-a).

BRANDON SMITH REPORTING SERVICE (860) 549-1850

6

1    Q.  And, Dr. Mascia, could you tell us what it

2    is that you do for a living?

3    A.  I'm a family practitioner who practices

4    within the scope of that field, which means seeing

5    both children and adults on a regular basis.

6    Q.  Where is your practice located?

7    A.  1591 Boston Post Road, Guilford,

8    Connecticut, Suite 100.

9    Q.  How long have you been a family

10   practitioner?

11   A.  I've been in practice since 1990, roughly 14

12   years.

13   Q.  Could you tell us, starting with college,

14   about your educational background?

15   A.  Do you want years, as well?

16   Q.  If you can remember.

17   A.  College '79 to '83 Ohio State University;

18   '83 to '87 Ohio State University Medical School;

19   '87 to '90 family practice residency, Middletown,

20    Connecticut; and then in practice here since then.

21    Q.  And what year did you become a licensed

22    physician in Connecticut?

23    A.  I became licensed as a physician I'm pretty

24    sure it's '87 or '88.  Yeah, it's around the first

25    year of residency.  I don't recall, but it's

BRANDON SMITH REPORTING SERVICE (860) 549-1850

7

1    around then.

2    Q.  Do you hold any board certifications?

3    A.  I'm board certified in the American Academy

4    of Family Practice.

5    Q.  What year did you get your board

6    certification?

7    A.  Initially I think '89, but we have to re

8    certify every six to seven years, so I've just re

9    certified most recently, I believe, in 2002.

10    Q.  Any other board certifications?

11    A.  No.

12    Q.  Where specifically did you do your

13    residency?

14    A.  Middlesex Family Practice Residency Program.

15    Q.  Do you have any particular specialties

16    within the field of family practice?

17    A.  Family practice by definition is a general

18    scope of practice.

19    Q.   In the course of your 14 years in family

20    practice, have you had the opportunity to treat

21    adults with liver problems and liver disease?

22    A.   Yes.

23    Q.   Could you give us some idea of the nature

24    and extent of your experience treating adults with

25    liver problems?

BRANDON SMITH REPORTING SERVICE (860) 549-1850

8

1     A.   As early as medical school and then through

2     training, when one would do internal medicine

3     rotations, liver disease was very common.

4          Sequence I would say that routinely we would

5     treat cirrhosis, hepatic encephalopathy,

6     hepatobiliary disease, hepatorenal disease.

7     There's a long scope that I've treated even in my

8     training days.

9          And then, of course, in clinical practice

10    it's very common nowadays and has been to see

11    hepatitis C, alcoholic cirrhosis.  I mean, every

12    practitioner sees a decent amount of that.

13    Q.   And just to help us, recognizing you've been

14    doing this for 14 years on your own, could you

15    just give us some idea of how frequently you

16    encounter liver disease with adult patients in

17   your practice?

18      A.  Newly diagnosed, you mean, or care of them

19   throughout?

20      Q.  Either.  In either capacity would be fine.

21      A.  I've diagnosed two people in the last week

22   with hepatitis C, first time diagnosis.  So I'm

23   seeing liver disease on a fairly regular basis.

24          Now, it's not, of course, going to meet the

25   diabetes or bronchitis or pneumonias, but we see

BRANDON SMITH REPORTING SERVICE (860) 549-1850

9

 1   many cases a year, not just one every five years I

 2   would say.

 3      Q.  And you feel that based on your training,

 4   your education, your experience, you're competent

 5   to both diagnose and treat diseases of the liver

 6   including cirrhosis and hepatitis?

 7      A.  Yes, except that if I determined that it was

 8   complicated in any way, we would refer to a

 9   specialist in that area.

10      Q.  And that's part of being a family

11   practitioner is to identify problems and, when

12   appropriate, refer them out to the appropriate

13   specialist?

14      A.  That's correct.

15      Q.  What percentage of liver disease that you

16   see is as a result of alcoholism?

17      A.   The two major sources of liver disease I see

18   are alcoholism and hepatitis C. To give an exact

19   percentage would just be a guess, but they're both

20   represented.

21           Now, however, in the last four or five

22   years, much more hepatitis C related illness

23   because young, otherwise healthy, people are

24   getting that illness.

25      Q.   How do you get hepatitis C?  I guess there

BRANDON SMITH REPORTING SERVICE (860) 549-1850

10

1    are many ways.

2       A.   Well, there are many ways, but it's

3    essentially hepatitis C used to be called non A,

4    non B hepatitis, and before 1990 they were unable

5    to detect it in tainted blood, so the major mode

6    of transmission was blood transfusions prior to

7    that year.

8            Since then it has-- we've learned how to

9    test for hepatitis C, and it's essentially

10   epidemic.  Routine healthy people come in all the

11   time, have no clue that they're ill in any way and

12   are tested positive for hepatitis C, so that we

13   know it's much more than just all blood

14   transfusions.

15       In fact, it's generally considered kind of

16   an intimate blood, blood contact.  It could be

17   sexual relations.  It could be blood, blood, you

18   know, touching someone who is bleeding or things

19   like that.  But it's not a casual contact.  It's

20   considered more of an intimate contact.

21   Q.  Do you have a measuring stick in terms of

22   the number of drinks per day someone would consume

23   when you would characterize them as someone who

24   had an alcohol problem and had a danger of

25   developing cirrhosis of the liver?

BRANDON SMITH REPORTING SERVICE (860) 549-1850

11

1    A.  Yes.  Essentially every patient that would

2    come to me and would have a physical or some

3    problem, either-- a complete physical exam, that

4    question would be asked to everybody what their

5    alcohol intake is.  And/or somebody who had

6    abdominal related symptoms, we'd ask that

7    question.

8        And though it varies as to what is an

9    alcohol problem, there are no direct guidelines.

10   There would be suggestions, but it's not a direct

11   statement.

12       For instance, we would use it in context.

13    Six drinks twice a week might not be as bad as

14    three drinks seven days a week.  So there are

15    differences.

16         Men are in some cases less susceptible to

17    hepatic injury than women.  This has been

18    documented in studies.

19         But, yes, I address it with every patient.

20    One patient might drink, might have hypertension

21    and other illnesses where alcohol should not be

22    consumed, I might say that one drink a day is too

23    much for that patient.  Where we might say that in

24    another who drinks two or three drinks it might be

25    okay.  So it's really an individual measure.

BRANDON SMITH REPORTING SERVICE (860) 549-1850

1     Q.  In your practice do you conduct examinations

2    of adult patients to allow them to obtain life

3    insurance policies?

4     A.  Yes, on occasion.

5     Q.  And could you give us some idea of the

6    frequency of with which you do that?

7     A.  I'd say in the last few years I don't-- we

8    don't do an awful lot of that.  Earlier in my

9    career it was much more commonplace.  It must mean

10    an insurance change.  I'm not quite sure, but the

11   insurance industry changed.

12       But what happens is, and routinely as we

13   conduct, our regular physicals are always much

14   more in-depth than insurance demands anyway.

15       So what I usually do is just a regular

16   routine physical, and then if a person were to

17   send me paperwork, I would fill it out.  This case

18   looks to me slightly different than that, though.

19   Q.  In the course of your work as a family

20   practitioner did you treat Francis Empey as a

21   patient?

22   A.  Yes.

23   Q.  Can you tell us what year you started to

24   treat Mr. Empey?

25   A.  I'm going to review the chart for all this

BRANDON SMITH REPORTING SERVICE (860) 549-1850

13

1   information.

2   Q.  Sure.

3   A.  I first saw Mr. Empey on 8/3/94.

4   Q.  And can you tell us what brought Mr. Empey

5   to you on that date?

6   A.  I have written down he's a new patient

7   complaining of shortness of breath and swollen

8   stomach for the past few months only.  Some slight

9   mental status changes means he felt slower in his

10   mentation.  And I diagnosed him that day with

11   ascites, which is abnormal fluid accumulation

12   within the abdomen, and cirrhosis as well that

13   day.

14     Q.  Did you have an opportunity to review Mr.

15   Empey's records at all before today's deposition?

16     A.  Just five minutes beforehand I just looked

17   back at things at like what day I first met him

18   and things like that.

19     Q.  My review of the records seem to suggest

20   that Mr. Empey, in that time frame that you're

21   talking about, '94 and thereafter, had a very

22   serious liver problem.  Do you recall that?

23     A.  Yes.

24     Q.  Can you tell us about that?  What was the

25   problem that was diagnosed, and what treatment

BRANDON SMITH REPORTING SERVICE (860) 549-1850

14

1   options were considered?

2     A.  Mr. Empey was diagnosed on the first day

3   that I see him, 8/3/94.  I'm not sure that he came

4   with any information.  I believe that it was he

5   just came with complaints.  I don't think he

6   brought me blood tests or anything, for instance.

7   Though, that could have been because he often

8    brought me blood tests from other states like

9    Missouri or Florida or wherever he may be.  He

10   did.

11        And I do see what looks to me like almost

12   maybe a fax.  This looks like a fax paper -- it

13   doesn't look like anything else, like a copy paper

14   -- that's dated 7/12/94, and that would have been

15   before the first day I saw him.  So he either

16   brought it to me or he had it faxed to me after

17   the fact, maybe, at my request.

18        And indeed, those numbers it shows that day

19   that he had abnormal liver function tests across

20   the board.  It does not give a formal diagnosis,

21   but that liver injury was occurring even a month

22   prior to when I saw him.

23        Over the next month to month and a half

24   there were phone calls to Mr. Empey, the patient

25   calling me on 8/24/94 from New Orleans -- I

1    believe he had a home in New Orleans, if I

2    remember correctly -- saying he'll come to see me

3    when he's in Connecticut.  We're recommending he

4    get follow-up with a doctor in New Orleans

5    immediately.

6        Another phone call, no answer 9/2/94, in my

7    handwriting, "Tried to reach by phone yesterday
8    and today.  Patient not reachable.  Patient was
9    informed very clearly that I did not recommend
10   travel due to his severe medical condition.  If he
11   returns the call, I will tell him to seek medical
12   attention at once."

13        In reviewing these notes, I know the day I
14   saw him I was very, very worried about his health.
15   I believe he had a very series medical condition.
16   Q.  Tell us why?  What was the problem that he
17   had, and what was your prognosis for him at that
18   point?

19   A.  To have ascites, actually fluid accumulation
20   in the abdomen, signifies a very serious amount of
21   liver disease at that point.

22        For instance, ascites, the old saying is--
23   whether this is 100 percent accurate, is that you
24   don't start to see symptoms of liver disease till
25   90 percent of the liver is gone.  Such that my

BRANDON SMITH REPORTING SERVICE (860) 549-1850

16

1    assumption that day would be that ten percent or
2    less, and this is just a rough estimate, of his
3    liver is actually functioning.  So I knew it was
4    an extensive disease.

 5    Q.  And what was the basis for the diagnosis of

 6   cirrhosis?  Was it lab tests or exam or both?

 7    A.  It was both.  Well, I can't say that it was

 8   lab tests because I'm not sure if I had those

 9   tests in front of me.

10        But clearly exam was consistent with

11   ascites, and I assumed from his history that it

12   was based on cirrhosis.  That was an assumption.

13   I did not have a biopsy of the liver or anything

14   like that to go by at that time.

15    Q.  What about the history that led you to the

16   diagnosis of cirrhosis?

17    A.  A past history of alcohol use.

18    Q.  And do your notes quantify what Mr. Empey

19   reported his alcohol use to be?

20    A.  I have written in the 8/3/94 note that he

21   has-- as of that day, has had no alcohol for a

22   three-month period, but prior to that drank

23   greater than or equal to five drinks per day.

24    Q.  At some point did you conduct a hepatitis C

25   test on Mr. Empey?

BRANDON SMITH REPORTING SERVICE (860) 549-1850

17

 1    A.  Yes, I believe probably right around that

 2   day.

 3    Q.  What was the result of that exam?

4    A.    That test was positive for hepatitis C.

5    Q.    And is there significance to a combination

6    of both extensive alcohol use and hepatitis C in

7    terms of the damage that will be done to a liver?

8    A.    Yes.

9    Q.    Tell us about that?

10    A.    Alcohol or any liver toxin is known to

11    accelerate the effects of hepatitis C on the liver

12    such that if I were to diagnose a patient this

13    week with hepatitis C, as I did, I would tell them

14    to remain alcohol free for the rest of his life.

15    Q.    Do you know whether that was the first time

16    Mr. Empey had learned that he had hepatitis C was

17    from your testing?

18    A.    I do not know that answer.  My assumption

19    is, yes, though.

20    Q.    And when you're a physician looking at blood

21    or urine tests, are there certain tests that

22    relate to liver function that you're looking at in

23    a patient like this?

24    A.    Yes.

25    Q.    Could you tell us what those are, please?

BRANDON SMITH REPORTING SERVICE (860) 549-1850

18

1    A.    On any regular, what we now call, complete

2   metabolic panel, in the old days it used to be
3   called an S-M-A-C or SMAC.  It includes --
4      Q.  Which test is this for the blood or the
5   urine?
6      A.  Blood.  This is blood.  It includes
7   historically about 20 different lab tests.  About
8   five of them are directly related to the liver.
9   Most significantly are what used to be called --
10  I'm going to go by the old tests because some of
11  these have changed names now, they're the same
12  tests, however --  SGPT, SGOT, LDH, bilirubin,
13  alkaline phosphatase.  Those are tests commonly
14  looked at to-- directly related, to the liver.
15       Then there are some other tests we look at,
16  when we would consider if someone might have
17  advanced liver disease enough to affect other
18  portions of their body, including their albumen,
19  and this test I'm looking at, and globulins, which
20  are basically proteins that the liver would
21  normally make that might be altered in someone who
22  doesn't have normal liver function.
23       In the urine people can spill bilirubin,
24  which is a normal liver protein, and that would be
25  in a urine dipstick that would pick up bilirubin.

1      Whether that was done that day-- that's

2   clearly not of consequence to me when I have blood

3   work.  The blood work takes priority.

4    Q.  And the blood work, whether you received it

5   in August of '94 or thereafter, was there some

6   blood work from July of '94?

7    A.  Yes.

8    Q.  And what were the significant findings from

9   that blood work related to Mr. Empey's liver

10  function?

11      And if you could, if you could help us

12  understand, if you cite, say, SGPT, if you could

13  tell us what it is and whether it's outside of the

14  norm or inside?

15   A.  Let me make sure these are both dated the

16  same because they're on different headings.

17      Okay, this is, looks like, a fax

18  transmittal.  I think we had faxes in '94.

19   Q.  Yes.

20   A.  They weren't commonplace, but we did have

21  them, I think.  Maybe a little sooner than that.

22  This one is dated June 2, '94, so there are two

23  separate blood tests I have on fax paper.

24      June 2, '94, these are all liver related

25  tests which are abnormal.  Bilirubin -- I'll

BRANDON SMITH REPORTING SERVICE (860) 549-1850

20

1    summarize at the end -- GGTP, AST, ALT, are all

2    elevated, which would signify direct liver injury.

3         Albumen is actually low, which would signify

4    that the liver is injured enough to stop making

5    its normal amount of proteins.

6         There are also two other-- one other-- two

7    other abnormal tests in a different level of tests

8    called an MCV and MCH, which actually are blood

9    cell sizes, which are elevated.  And one of the

10   criteria for blood cell size elevation is liver

11   injury.  So there's a pretty clear pattern here of

12   liver disease on this test.

13        And then there's a reading on 7/12/94.  Both

14   of these are dates before I'd ever met Mr. Empey.

15   Liver tests remain abnormal.  Not as many were

16   checked as the first time, but three liver tests

17   also remain abnormal.  And just for the record,

18   that would be AST, total bilirubin and alkaline

19   phosphatase.  If you need me to spell, let me

20   know.

21   Q.  Now, the type of liver disease that you

22   diagnosed Mr. Empey with in the summer of 1994,

23   can that get better with treatment, excluding

24   transplant surgery which we will get to later?

25   A.  It can get symptomatically better, meaning

BRANDON SMITH REPORTING SERVICE (860) 549-1850

1    there's no reversal of hepatocellular damage,

2    damage directly due to the liver.  You cannot

3    reverse that process.

4         But symptomatically people can get better.

5    Meaning the ascites or fluid can be sometimes

6    handled with medication and life-style and fluid

7    restriction and treatments like that.

8         So the answer to your question is you can

9    feel better, but the disease won't go away.

10   Q.  Could you characterize the degree of illness

11   here?  I mean, is this something that over time

12   you would have expected to be fatal?

13   A.  Yes.

14   Q.  And did you have a prognosis in 1994 about

15   how long Mr. Empey could expect to live with this

16   problem?

17   A.  Am I allowed to speak through a recollection

18   as opposed to with the chart?

19   Q.  Absolutely, sure.

20   A.  I know very clearly that when Mr. Empey

21   traveled south, and I do think it was New Orleans

22   or Saint Thomas or something like that, I felt

23   strongly, when I didn't hear from him for a period

24   of time after this initial diagnosis, that he was

25   probably dead.

BRANDON SMITH REPORTING SERVICE (860) 549-1850

22

```
 1    Q.  So you thought he might only have a matter
 2    of months to live?
 3    A.  Months to a year depending on how well it
 4    was maintained, but I thought it was at that point
 5    terminal.
 6    Q.  You used the word ascites?
 7    A.  Ascites (a-s-c-i-t-e-s).
 8    Q.  Now, did you drain the ascites?
 9    A.  I did not personally, no.
10    Q.  In November of '94 he has a consult, it
11    looks like at your recommendation, with the
12    transplant team at Yale-New Haven Hospital?
13    A.  Yes.
14    Q.  And there's a November 14, '94, letter in
15    the file from the head of the transplant team at
16    Yale-New Haven, Dr. Amy Friedman.  If you could
17    find that.  That's what it looks like.
18    A.  Give me a second.  This should be
19    chronological.  I think the chart must have been
20    copied because it never gets put back into its
21    exact sequence unfortunately.  What is the date
22    you have?
23    Q.  November 14, '94.  It has a Yale letterhead
24    at the top.
```

25    A.  I know I've seen that, and I remember that

BRANDON SMITH REPORTING SERVICE (860) 549-1850

23

 1    letter, so it's in here somewhere.

 2         MR. HUME:  It's about the middle of the

 3    chart, at least in my copy.

 4    A.  November 23rd, now.

 5    Q.  (BY MR. BRAWLEY)           There's two.  It

 6    might be right after that or right before it.

 7    There you go.

 8    A.  Okay.

 9    Q.  Could you just take a minute to read that.

10    A.  Yes.

11    Q.  Is it fair to say that Dr. Friedman, who is

12    the head of the liver transplantation team at

13    Yale/New Haven, recommended in November of 1994

14    that Mr. Empey be put on the list for a liver

15    transplant?

16    A.  Yes.

17    Q.  In fact, I think she says at the bottom of

18    her letter to you on November 14th, the very last

19    paragraph, first lines, "In summary, Mr. Empey is

20    an excellent candidate for a liver

21    transplantation, a procedure he is clearly in need

22    of."

23    A.  Yes.

24    Q.  In her letter, in the second paragraph, Dr.

25    Friedman says, "His laboratory values are

BRANDON SMITH REPORTING SERVICE (860) 549-1850

24

1    consistent with ESLD."  What is that?

2    A.  Endstage liver disease.

3    Q.  And do you know what the clinical definition

4    of endstage liver disease would be?

5    A.  We use the term endstage for many different

6    diseases in the medical field.  It means incurable

7    disease that would put someone near the end of

8    their life.

9    Q.  And Dr. Friedman says, "A prothrombin time

10   in the range of 13.9 and an albumen in the range

11   of 2.5."  Do you see that?

12   A.  Correct.

13   Q.  What is the significance of those figures?

14   Why is the doctor putting those in?  Do you know?

15   A.  Yes, similar to what I mentioned earlier,

16   the liver has, as its function, to produce or

17   manufacture certain proteins, and if the liver

18   does not manufacture those proteins properly, the

19   albumen would be low, and the prothrombin time

20   would be slightly high.  And that's what both of

21   those are showing, signifying.  That's consistent

22   with a liver not producing the normal amount of

23   its proteins.

24      Q.  Do you know how old was Mr. Empey in the

25   summer of '94 when you were evaluating him?

25

1      A.  He was born in '37, so that would have made

2   him 57, I believe.  Oh, it's right in there, I'm

3   sorry.  I didn't see that.

4      Q.  What's a pilonidal cyst?

5      A.  Pilonidal cyst.  That's not of any

6   consequence.

7      Q.  It's not part of liver disease?

8      A.  It's not part of liver disease.

9      Q.  And going to the November 23rd letter, they

10   talk about --

11      A.  Yes.

12      Q.  -- about the fourth paragraph down, the

13   second or third sentence, the third sentence says,

14   "Since that time we have performed a four to five

15   liter large volume paracentesis"?

16      A.  Yes.

17      Q.  What is that?

18      A.  Paracentesis is the draining of abdominal

19   fluid, of the ascitic fluid.  They took four to

20   five liters off.

21     Q.  Is that a significant amount, clinically

22   significant?

23     A.  Yes, it is.

24     Q.  Now, after this consult with Yale, up until

25   the time of the exam at issue in our case, which

BRANDON SMITH REPORTING SERVICE (860) 549-1850

26

1   is the September 11, 2000, insurance exam, did Mr.

2   Empey continue to consult with you about his

3   condition?

4     A.  You're asking prior to that note?

5     Q.  I'm sorry, going forward.

6     A.  Subsequent?

7     Q.  Yes, subsequent, excuse me.

8     A.  It looks like that note is November 23, '94,

9   and I actually saw him on November-- no, I

10   apologize.  That's August 28th, so I have to

11   review the chart.

12       On 12/2/94 he came in discussing his

13   evaluation for, I write, "Question of a liver

14   trans," which means possible liver

15   transplantation.  He needed some testing done

16   prior to that.

17       We did an EKG, which was normal.  Pulmonary

18   function testing, which was not normal.  And I

19   scheduled a cardiac echo.

20     Q.  Do you know whether Mr. Empey ever had the

21   liver transplant?

22     A.  To the best of my knowledge, he did not.

23     Q.  And it appears that he saw you, what I would

24   characterize is, off and on from the '94 time

25   frame we've been talking about until you saw him

BRANDON SMITH REPORTING SERVICE (860) 549-1850

27

1    in September of 2000?

2      A.  Yes, there were long lapses in his care

3    because I believed him either to be expired or

4    living elsewhere because he routinely just came up

5    to Connecticut for a weekend or something or a

6    week.  I believe he had children up here.

7      Q.  You didn't see Mr. Empey in September of

8    2000 when he came to your office for an exam?

9        MR. BRAWLEY:  Off the record a second.

10

11                        (Off record conference.)

12

13     A.  In answer to your question, he was examined

14   that day by a nurse practitioner, Marylou Fusi,

15   and I do recall that the reason he saw Marylou

16   instead of me is that he needed an insurance form

17    filled out, and I didn't have the time to do it,

18    meaning that would take months of pre scheduling

19    to fit in with me.

20      Q.  Let me just stop you there for a minute.

21    Marylou Fusi, how do you spell that?

22      A.  F-u-s-i.

23      Q.  Let me just stop you there for a minute.

24    Were you surprised that Mr. Empey had survived

25    this long without a liver transplant?  Was that

BRANDON SMITH REPORTING SERVICE (860) 549-1850

28

1    unusual?

2      A.  I will admit I was surprised.

3      Q.  To what would you attribute that to?

4      A.  Well, there's a couple of possibilities.

5    One would be -- now, this is all based on

6    assumption -- proper medical care, meaning there

7    are some medicines that can help delay some of the

8    damage of cirrhosis, specifically which are beta

9    blockers.  And I don't have listed that he was on

10    that to the best of my knowledge.

11      But then possibly stopping other insulting

12    events to the liver, like alcohol intake, could

13    potentially surprise us.  And if we see a rapidly

14    declining course, and you take out the offending

15    agent, people can sometimes be stable for a while.

```
16          MR. BRAWLEY:   Why don't we just take a

17    break, and I'm going to mark some documents.

18

19                                   (A recess was taken.)

20    (Defendant's Exhibit 1, Blood, urine kit

21    authorization consent form, marked for

22    identification.)

23

24    (Defendant's Exhibit 2, Fax, marked for

25    identification.)


          BRANDON SMITH REPORTING SERVICE (860) 549-1850
```

29

```
1    (Defendant's Exhibit 3, Airborne Express receipt,

2    marked for identification.)

3

4    (Defendant's Exhibit 4, Portamedic form, marked

5    for identification.)

6

7    (Defendant's Exhibit 5, Lab results, marked for

8    identification.)

9

10    (Defendant's Exhibit 6, EKG, marked for

11    identification.)

12

13    (Defendant's Exhibit 7, Records request, marked
```

```
14   for identification.)

15

16   (Defendant's Exhibit 8, Doctor's notes, marked for

17   identification.)

18

19   (Defendant's Exhibit 9, Lab report, marked for

20   identification.)

21

22   Q.   (BY MR. BRAWLEY)              Doctor, do you

23   have in front of you your entire medical file

24   concerning Mr. Empey?

25   A.   I do.
```

BRANDON SMITH REPORTING SERVICE (860) 549-1850

30

```
 1   Q.   I'm going to mark that as Exhibit 10.  I'm

 2   going to put it on the front.

 3        MR. FREETH:  Do you want to use my copy?

 4   Do you want to just take the marked ones and just

 5   send me what you used later and make copies?

 6        MR. BRAWLEY:  Let's do that.

 7        MR. FREETH:  I'm guessing that it's going

 8   to be a pain to make copies here.

 9        MR. BRAWLEY:  How about this, can we

10   stipulate --

11        MR. HUME:  I'll stipulate that that's a

12   copy of the original.
```

13   Q.  (BY MR. BRAWLEY)          I'm going to mark

14   as Exhibit No. 10 what is a complete copy of your

15   medical file for Mr. Empey, and I'm just going to

16   ask you to look at that Exhibit 10 and just

17   confirm for me that that's a complete copy of your

18   file?

19   A.  Yes, that appears to be a complete copy.

20   Q.  Thank you.

21

22   (Defendant's Exhibit 10, Doctor's file, marked for

23   identification.)

24

25          MR. BRAWLEY:  Richard, I'll get you another

BRANDON SMITH REPORTING SERVICE (860) 549-1850

31

1   set.

2          MR. FREETH:  Perfect.

3   Q.  (BY MR. BRAWLEY)          Doctor, Exhibit

4   No. 1 appears to be a document from an insurance

5   company called Fidelity Security, and it is

6   concerning Mr. Empey, and it is dated-- well,

7   there's some dates on the top of it from a fax

8   sheet.  It suggests that came here on September

9   11, 2000?

10   A.  Yes.

11    Q.  Now, this appears to be a document from the

12    insurance company indicating that Mr. Empey is

13    applying for a life insurance policy, and it has

14    on it some tests that are going to be required of

15    Mr. Empey?

16    A.  Yes.

17    Q.  And those tests include blood tests, urine

18    tests, and, in fact, there's a space on the form

19    where you have to fill in the exact time that

20    those tests were done, the date and the time?

21    A.  Yes.

22    Q.  And then on the bottom it says "Special Test

23    Requests," and it says "All liver function enzyme

24    tests"?

25    A.  Yes.

BRANDON SMITH REPORTING SERVICE (860) 549-1850

32

1    Q.  And at the bottom there's a signature.  Is

2    that Marylou Fusi?

3    A.  Yes, it is.

4    Q.  She was an APRN at your office?

5    A.  APRN.

6    Q.  Does she continue to be employed here?

7    A.  No.

8    Q.  Do you know where she is now?

9    A.  I believe she's still local, but I don't

10    know specifically.

11      Q.  And at least according to Exhibit No. 1,

12    your office took a urine and a blood specimen from

13    Mr. Empey on September 11, 2000, and it appears to

14    be that one was taken at one o'clock, and one was

15    taken at 2:30?

16      A.  Yes, that's what it says.

17      Q.  Liver function enzyme tests are those

18    performed on blood work?

19      A.  Yes.

20      Q.  Going to Exhibit No. 2, that's just a fax

21    from R. Sanfilippo Associates to Donna.  Is that

22    your office manager?

23      A.  I have no idea who Donna is.

24          MR. FREETH:  Is that Exhibit 2 or Page 2?

25          MR. BRAWLEY:  Exhibit 2.  I marked it as 2.

BRANDON SMITH REPORTING SERVICE (860) 549-1850

33

1      Q.  (BY MR. BRAWLEY)          Exhibit 2 is a

2    fax from R. Sanfilippo dated 9/11/00.  You don't

3    know who Donna is?

4      A.  To the best of my recollection, we have

5    never had a Donna here.  That happens all the

6    time.

7      Q.  Exhibit No. 3 is a photocopy of what appears