1

```
1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT
2

3

4                                          )
     SAFECO INSURANCE COMPANY OF AMERICA    )
5    AND GENERAL INSURANCE COMPANY OF       )
     AMERICA,                               )  Civil Action No.
6        Plaintiffs,                        )  3:02CV1966(AVC)
                                            )
7    VS                                     )
                                            )
8    LOCAL TOWING, INC., GEORGE GARDELLA,   )
     JESSICA HELQUIST and JAMES GARDELLA,   )
9        Defendants/Third-Party Plaintiffs, )
                                            )
10   VS                                     )
                                            )
11   ASSOCIATED INSURANCE AGENCY, INC.,     )
     FREDERICK J. SMITH, AFNY, INC,         )
12   ASSOCIATED FACILITIES OF AMERICA,      )
     LTD., MELWAIN ENTERPRISES, INC.,       )
13   CHARLES ASSOCIATES, P.C., and CHARLES  )
     SAPOCHETTI,                            )
14       Defendants.                        )
                                            )
15

16

17           DEPOSITION OF: JAMES R. GARDELLA

18        DATE:        MAY 5, 2004

19        HELD AT:       HUME & ASSOCIATES
                         ONE LANDMARK SQUARE
20                       STAMFORD, CONNECTICUT

21

22

23     Reporter:  JAMES A. SCALLY, RPR, CRR, LSR #80
                 BRANDON SMITH REPORTING SERVICE
24                    44 Capitol Avenue
                 Hartford, Connecticut 06106
25                     (860) 549-1850
```

```
 1  APPEARANCES:

 2
        REPRESENTING THE PLAINTIFFS SAFECO INSURANCE
 3      COMPANY OF AMERICA AND GENERAL INSURANCE COMPANY
        OF AMERICA:
 4
            Torre, Lentz, Gamell, Gary & Rittmaster
 5          Suite 309
            100 Jericho Quadrangle
 6          Jericho, New York 11753-2702
            By:  Sean Kelley, Esq.
 7

 8
        REPRESENTING THE THIRD-PARTY PLAINTIFFS LOCAL
 9      TOWING, INC., GEORGE GARDELLA, JESSICA HELQUIST
        and JAMES GARDELLA:
10
            Hume & Associates
11          One Landmark Square
            Stamford, Connecticut 06901
12          By:  Duncan B. Hume, Esq.

13
        REPRESENTING THE THIRD-PARTY DEFENDANT MELWAIN
14      ENTERPRISES:

15          Winget, Spadafora & Schwartzberg, LLP
            45 Broadway, 19th Floor
16          New York, New York 10006
            By:  Dianna D. McCarthy, Esq.
17

18
        REPRESENTING THE THIRD-PARTY DEFENDANT ASSOCIATED
19      INSURANCE AGENCY, INC:

20          Morrison, Mahoney & Miller, LLP
            One Constitution Plaza, 10th Floor
21          Hartford, Connecticut 06103-1810
            By:  James L. Brawley, Esq.
22               Tracey Lane Russo, Esq.

23

24

25
```

3

```
 1                      I N D E X

 2    WITNESS                                    PAGE

 3   James R. Gardella

 4      Direct Examination by Mr. Kelley            4
        Cross-Examination by Mr. Brawley           25
 5      Cross-Examination by Ms. McCarthy:         75
        Further Cross-Examination by Mr. Brawley   85
 6

 7

 8
      EXHIBITS                                   PAGE
 9                                                 57
      11      May 1, 2001 letter to Jim Gardella from
10              Fred Smith
                                                   68
11      12      May 17, 2001 letter to Mr. Smith from
                James Gardella
12                                                 74
        13      Notice of deposition
13
      (Exhibits retained by Attorneys Kelley and Brawley)
14

15

16

17

18

19

20

21

22

23                                                .

24

25
```

```
1                    (Deposition commenced at 10:25 a.m.)
2
3                    JAMES R. GARDELLA, Deponent, having been
4               first duly sworn by James A. Scally, R.P.R., a
5               Notary Public in and for the State of
6               Connecticut, was examined and testified as
7               follows:
8
9                    DIRECT EXAMINATION BY MR. KELLEY:
10
11        Q    Good morning, Mr. Gardella.  My name is Sean
12   Kelley, and I represent Safeco Insurance Company of
13   America and General Insurance Company of America.
14                    Just a few preliminary things:  If I ask you
15   a question and you don't understand it, please tell me.
16   Please keep your responses verbal.  If you shake your
17   head, the court reporter can't pick it up.  If I ask
18   you a question and you answer it, I'll assume you
19   understood it.  If you want to take a break, let us
20   know.
21                    What is your current address?
22        A    19 Shorehaven Road, Norwalk.
23        Q    How long have you lived at that address?
24        A    Six years.
25        Q    And where did you live before that?
```

```
 1          A     A couple of different addresses, so I'm
 2     trying to figure which one.  Lived on 48 Beach Road at
 3     the marina.
 4          Q     That's in Norwalk also?
 5          A     On my boat, yes.
 6          Q     Okay.  Do you remember how long --
 7          A     I always lived in Norwalk all my life.
 8          Q     Do you remember how long you lived there?
 9          A     About a year.  I lived in -- for six months
10     in Darien in a rented house.  I forget the address.
11     About three years before that in another rented house
12     in South Norwalk.
13          Q     Could you give us your educational
14     background, please?
15          A     Graduated from Fairfield University in 1957,
16     Fairfield Prep, '53, and that's the extent of my formal
17     education.
18          Q     As you may or may not know, this case was
19     commenced by Safeco and General Insurance Company of
20     America -- when I say Safeco, I'm referring to both
21     Safeco and General -- to recover on its indemnity
22     agreement, and I will show you a copy of what's been
23     marked as Exhibit 2.  If you could take a look at that
24     and tell me if it's your signature at the end of
25     agreement.
```

```
 1        A    This is the 1999 agreement that I signed in

 2   1999.

 3        Q    Dated October --

 4        A    Dated October 1999, yes.

 5        Q    Can you tell us what, if any, your current

 6   position with Local Towing, Incorporated, is?

 7        A    I don't have any position with Local Towing.

 8        Q    In October 1999, did you have a position with

 9   Local Towing?

10        A    Chris made me secretary then just to help my

11   son with his business.

12        Q    Were you an owner of Local Towing?

13        A    No.

14        Q    Prior to 1999, at some point were you an

15   owner?

16        A    Yes.  Yes.  I did own the company.  I founded

17   the company.

18        Q    Until what date did you own or were you a

19   part owner of the company?

20        A    I can't remember the exact date, but it was

21   probably around '97 I turned it over to my son, Chris

22   Gardella.

23        Q    And did you turn full ownership of the

24   company over to your son?

25        A    Yes.
```

1       Q     When you were the secretary during 1999 and
2   subsequent, what was your role with Local Towing?
3       A     It was only to help him with his bonding on
4   particular jobs.
5       Q     So you executed the general agreement of
6   indemnity in your capacity as secretary of Local
7   Towing?
8       A     That's what it says here.  I believe we
9   issued this for a particular job, which was the
10  Washington, D.C., job.
11      Q     And do you have an understanding of what that
12  general agreement of indemnity obligates, obligations
13  are?
14      A     I think I do know.  I didn't really know then
15  what the extent of it was.  It's a pretty long
16  agreement.
17      Q     You said you formed Local Towing.  In what
18  year did you form Local Towing?
19      A     In the mid-'80s, maybe 1985 or so.
20      Q     And it was primarily in what business?
21      A     Marine contracting, dredging business.
22      Q     Did you typically, when you were a successful
23  bidder on a particular contract, did you have to also
24  get bonds for those contracts?
25      A     Yes.

1      Q    And as a requirement of or a precedent to

2    issuing bonds, did the surety company require you to

3    execute indemnity agreements?

4      A    For each job, job by job is the way I always

5    signed bonds.

6      Q    I'd like to show you what has been marked as

7    Exhibit 10 in this deposition.  It's the answer that

8    was served on behalf of the defendant and third-party

9    plaintiffs Local Towing, George Gardella, Jessica

10   Helquist-Gardella, and James Gardella.  Have you ever

11   seen that document?

12     A    No.

13     Q    All right.  Who was Francis Empey?

14     A    He was a man who was of my era, a failed

15   contractor who -- who the bonding company got involved

16   with my son together to do jobs.  Since he was

17   unbondable, whatever the word is, he and my son did

18   jobs together.  He was a partner or a manager for Local

19   Towing for George, who I call Chris.  George is my son.

20     Q    Okay.  When you say the bonding company got

21   George involved with --

22     A    Yes.

23     Q    -- how did that occur?

24     A    Well, Mr. Smith is the bonding company, and

25   he's the one who knew Empey for years before and had

 1    done a lot of business with him in the past, and I knew
 2    Empey also for maybe 25 years.  He's from
 3    Massachusetts.  He was a marine contractor who did a
 4    lot of big jobs in his time.
 5        Q    Did you have a business relationship?  Is
 6    that how you knew him?
 7        A    I never had a business relationship with him
 8    before.  He and my son, through the bonding agent,
 9    worked together getting these jobs.
10        Q    So Fred Smith introduced them and suggested
11    they get into business together?
12        A    I assume, yes.
13        Q    When you say Francis Empey was unbondable,
14    how -- what do you base that on?
15        A    It's hearsay, and I guess it's pretty
16    obvious, he failed on some jobs in the past, maybe 10,
17    15 years before, and he did not have the ability to get
18    bonds because he -- he got into trouble.
19        Q    You don't know specifically what the trouble
20    was?
21        A    No.  If he was able to get the bonds with my
22    son, he wouldn't need me or he wouldn't even need my
23    son.  But he needed us through Smith.
24        Q    And do you know what the working relationship
25    was intended to be between your son and Francis Empey?

1        A    I thought they worked like a partnership even

2    though Empey --

3        Q    Were there certain tasks that each was to be

4    assigned and perform?

5        A    I was not involved in the business with them.

6    They did it all.

7        Q    Okay.  So Francis Empey was employed by Local

8    Towing.  What was his position?

9        A    I really don't know.  I thought they were

10   partners, but, on the other hand, I hear he's supposed

11   to have been manager.

12       Q    Well, who was the president of Local Towing?

13       A    George, Chris, my son.

14       Q    Was there a formal partnership agreement that

15   you were aware of?

16       A    I don't know.  It was between them.

17       Q    Do you know what the purpose of executing the

18   general agreement of indemnity, what the purpose of

19   that was for?

20       A    I think I know now.  I didn't know then when

21   I signed it.  I assumed I was signing for a job.

22       Q    Can you clarify that what you mean when you

23   say --

24       A    Well, when you're signing a general indemnity

25   agreement, you are signing for everything, even today,

```
 1    which is ridiculous.  Signed an indemnity for the
 2    Washington job.  I didn't sign for every job from then
 3    on.
 4         Q    When you executed this October '99 GAI --
 5         A    Yes.
 6         Q    -- it was during a period when you were
 7    trying to obtain a contract on the Washington job?
 8         A    Yes.
 9         Q    What other jobs were going on during that
10    period, if any?
11         A    I don't know.  That's the only job that I was
12    presented with.  I signed an indemnity for other jobs
13    through Fred Smith with another contractor the same
14    way, only on going and looking at the job and talking
15    to the contractor.
16         Q    What other contractor?
17         A    A guy named Sandy -- Sandy Key from Rhode
18    Island.  He had a job in eastern Connecticut to put a
19    sewer line through the -- through the Army camp,
20    Connecticut Army camp, Camp Rowland now they call it.
21    Fred Smith got me involved with him, and I signed the
22    indemnity on the job with him; I looked at the job.  In
23    my own head, if he dropped dead, I could have finished
24    the job myself, which wasn't my intention, but I signed
25    the bond for --
```

```
 1        Q    Was Local Towing or yourself --

 2        A    No.

 3        Q    -- involved in that job?

 4        A    No.

 5        Q    Why did you execute a GAI on a job that you

 6   had no interest in?

 7        A    Well, because he paid me.  We had a figure

 8   and he gave me a fee for doing it.  And it worked out

 9   and it was finished, and I bid another job with Sandy

10   Key also.  But I never signed a GAI with Sandy Key for

11   every job he was going to do forever in the future

12   because I don't think anybody in their right mind would

13   do that.  I wouldn't even do it with my own son.  I

14   wouldn't sign a GAI for every job they're going to do

15   in the future.  I think it would be a ridiculous

16   assumption by the bonding company to assume that

17   anybody would do that.

18        Q    Would you turn to page 3 of Exhibit 2.  It is

19   the GAI.  The paragraph entitled "Termination."

20             MR. BRAWLEY:  One more page.

21        A    Three.

22        Q    Do you see under "Termination," it says,

23   "This agreement is a continuing obligation of

24   undersigned unless terminated as provided in this

25   paragraph.  Undersigned desiring to terminate liability
```

1    as to future bonds of contracts must," and then it

2    lists several items.

3        A    I assume this applied to this job.  I mean

4    halfway through the job you can't write and say you

5    want to get out of it.

6        Q    At some point subsequent to the job, you

7    could write and terminate; is that correct?

8        A    Subsequent to the job --

9        Q    Well, just for a hypothetical --

10       A    Yes.

11       Q    -- you indicated that you executed this

12   agreement solely for the Washington job.

13       A    That's right, exactly.

14       Q    After that job was concluded, if you decided

15   to terminate the agreement, could you have written a

16   letter doing so?

17       A    Well, I probably should have done that.  I

18   didn't do that, but it was beyond my imagination that

19   they would use that as a indemnification for every job

20   they did in the future.  I signed a lot of contracts,

21   and there's a lot of fine print when you sign things.

22   You assume you're dealing with people who --

23       Q    If you turn to the answer to Exhibit 10,

24   there's a paragraph that indicates that Safeco is

25   somehow obligated to obtain keyman life insurance on

1    Francis Empey?

2                    MR. BRAWLEY:  Is that paragraph 26,

3    Sean?

4                    MR. HUME:  What paragraph are you on?

5                    MR. KELLEY:  I believe it's 26.  Sorry.

6    BY MR. KELLEY:

7        Q    Do you know what that obligation is based on

8    or where that comes from?

9        A    Do I know where this comes from is your

10   question?

11       Q    What is that based on?  Where do you think

12   the obligation from Safeco to obtain life insurance on

13   the life of Fran Empey originates?  Is it in some

14   contract provision?

15       A    I have no idea.

16       Q    Well, let me ask you this:  The GAI, the

17   October 6th, '99, is there any other contract or

18   agreement between yourself and Safeco with regard to

19   the issuance of bonds on behalf of Local Towing?

20       A    I don't recall any.

21       Q    To your knowledge, are there any documents

22   that would obligate Safeco to obtain keyman life

23   insurance on the life of Fran Empey?

24       A    I really don't know.  I was not involved in

25   the operation of the business.

1          Q     You indicated that you had some relationship

2     with Fran Empey. Were you aware of his health

3     condition at any time during his life?

4          A     No.

5          Q     In 1999 -- strike that.

6                When George and Fran Empey were allegedly

7     introduced by Fred Smith -- strike that.

8                I'll direct you to paragraph 27 of the

9     answer. Paragraph 27 asserts that the United States

10    Virgin Islands has a notorious reputation for

11    performing its contracts in a commercially unreasonable

12    fashion and that Safeco failed to warn the indemnitors,

13    yourself, Local Towing, George, of this notorious

14    reputation and therefore that the surety allegedly

15    breached an obligation to act in good faith and fair

16    dealing with the indemnitors.

17                Can you tell me what reputation that that's

18    referring to?

19         A     Well, I found out after, you know, really.  I

20    had nothing to do with the bidding or anything on that,

21    but after they were involved and I was just trying to

22    help my son out down there, that they are very well-

23    known for not paying their bills.

24         Q     When did you become aware of this reputation?

25         A     I went down there to visit him somewhere in

1    the middle of the job after the job was started, and I

2    have another friend who owns a motel there, who owned a

3    motel there for years, has a boat.  I know him through

4    his boat.  We were in the boat business now.  He told

5    me that the government, he says, "I pity you dealing

6    with this government because they can't even pay their

7    own employees sometimes."

8         Q    So this was subsequent --

9         A    The stories down there, it's unbelievable the

10   way they run the country there.

11        Q    So this was subsequent to October 6, '99,

12   when the GAI was executed?

13        A    This was somewhere in the January, February,

14   around February, I think, I went down.

15        Q    Of 2000?

16        A    Yes.  There's a big -- there's a big water --

17              MR. HUME:  If you want to correct the

18   record.  The contract wasn't issued -- the contract

19   wasn't awarded until June of 2000; the work didn't

20   start until December or January of 2001, so it would

21   have been 2001 when he was down there.

22              MR. BRAWLEY:  The contract was awarded

23   when?  Can you repeat that?

24              MR. HUME:  June twenty something or

25   other.

```
 1                    MR. BRAWLEY:  Of 2000?
 2                    MR. HUME:  Right.
 3                    MR. BRAWLEY:  For St. Thomas?
 4                    MR. HUME:  Right.
 5                    MR. BRAWLEY:  It started the next year
 6     or January?
 7                    MR. HUME:  The notice to proceed was
 8     issued on November 4th.  Empey died September whatever
 9     it was, 6th, or something.
10                    THE WITNESS:  There's a big desalination
11     plant down there, multimillion-dollar desalination
12     plant, and it's owed millions of dollars by the
13     government, and they're shutting it off because they
14     just don't pay for their own water.  There's stories
15     like that down there just go on and on.
16     BY MR. KELLEY:
17          Q    How do you know that Safeco was aware of this
18     reputation?
19          A    I don't know anything about that.
20          Q    To your knowledge, Safeco has no knowledge of
21     that; is that correct?
22          A    I really don't know.
23          Q    If you look at paragraph 28 of the answer, it
24     asserts that "Claims made by subcontractors and
25     suppliers on the bonds in this case could have been
```

```
 1    settled by Safeco for less than Safeco paid, and this
 2    amounts to improper claims handling, releasing the
 3    defendants from any obligations under the GAI."
 4         Do you know which claims, if any, could have
 5    been settled for less?
 6         A    Well, I got involved with my son when he was
 7    trying to solve these problems, correct the problems
 8    near the end of the job.  And just listening to him,
 9    and he had a -- somebody in Safeco who was
10    communicating with him, and they were solving the
11    problems.
12         Apparently that guy changed jobs.  Whoever
13    took that job over had no idea what was going on down
14    there, and it cost a lot more money to settle things
15    because the communication broke down between Chris and
16    the Safeco person he was dealing with.
17         Q    You don't remember the person's name?
18         A    My son would know it.  I don't.  I just
19    overheard the stories from him.
20         Q    Would Safeco typically notify yourself,
21    George, Local Towing that it was settling claims
22    associated with the Aguadilla and the St. Thomas
23    projects?
24         A    I really had nothing to do with it.  My son
25    can tell you more; George, Chris could tell you more.
```

1    I know he had a lot of frustrating --

2         Q    So you are not aware of the day-to-day

3    information that was going back and forth?

4         A    Right.

5         Q    If you will look at paragraphs 31 and 32 of

6    the answer, the first affirmative defense on behalf of

7    James Gardella alleges that there was an original

8    contract between Safeco and yourself for the issuance

9    of bonds by the surety on behalf of Local Towing that

10   was altered by Safeco.

11              Can you tell me what original contract that's

12   referring to?

13        A    Which paragraph?  Thirty-one?

14        Q    Thirty-one and thirty-two.

15        A    Prior to the issuance of bonds in question --

16        Q    Basically I'm wondering if there's any other

17   contract other than the October 6, '99 GAI that you're

18   referring to or that you know of.

19        A    Well, they did a job in Wilmington which I

20   did; I believe I was on that one.  I looked at that

21   job.  That was with the Army Corps of Engineers.  That

22   was a successful job.  Then they did another job in New

23   Orleans which I did not agree to be indemnitor for, had

24   nothing to do with it; they went down to New Orleans.

25   I think they failed in that job raising a sunken ship.

1              MR. HUME:  Could we go off the record

2    for a moment?

3              MR. KELLEY:  Sure.

4              (Discussion off the record.)

5    BY MR. KELLEY:

6         Q    If we could direct your attention to

7    paragraphs 33 through 36 of the answer, these basically

8    deal with you somehow eliminating your obligations

9    under the October 6, '99 GAI.  Is there any

10   documentation or provision in the GAI that indicates

11   you've limited your obligations under that agreement?

12        A    I don't understand your question.

13        Q    You stated that you've only executed this

14   agreement with respect to the Washington job, I

15   believe?

16        A    Correct.

17        Q    Is there any record or document that

18   indicates that you limited your obligations to the

19   Washington job?

20        A    No.

21        Q    Had Safeco issued bonds on behalf of Local

22   Towing prior to the Safeco and -- I apologize -- the

23   St. Thomas and Aguadilla jobs?

24        A    Yes.

25        Q    Did you have to approve the issuance of those

1    bonds?

2         A    I had nothing to do with those bonds.

3         Q    No.  I apologize.  Prior to the Aguadilla and

4    St. Thomas projects where Safeco issued bonds, did you

5    have to approve the issuance of those bonds?  For

6    instance, the Washington project.

7         A    I approved the issuance of bonds when I was

8    asked to on a particular job, yes.

9         Q    How would you go about approving the issuance

10   of the bonds?

11        A    By signing some big, long thing like this.

12        Q    On the Aguadilla and St. Thomas projects, who

13   requested those bonds be issued by Safeco?

14        A    I don't know.  I was not involved in those

15   bonds.

16        Q    You would not likewise know who approved the

17   issuance of them, then; is that correct?

18        A    I don't know.  There was another job also.

19   There was a San Juan job that was done after the

20   Washington job which I was totally out of the picture,

21   unaware of job sites, conditions, anything like that.

22        Q    Other than the general agreement of indemnity

23   which you executed prior to the issuance of bonds, is

24   there any other document that would reflect your

25   approval of a bond?

1          A       No, I don't recall any other, no.

2          Q       Paragraph 37 of the answer asserts that the

3     issuance of bonds by Safeco on behalf of Local Towing

4     on these two projects, Aguadilla and St. Thomas, based

5     on your indemnity obligations was a unilateral mistake

6     because they had no permission.

7          A       I --

8          Q       Did you ever notify Safeco that you were

9     revoking your permission to issue bonds based on your

10    obligations under that agreement?

11         A       I never agreed that I gave them permission,

12    so I never had anything to revoke because I never gave

13    my permission to bond.

14         Q       Well, as we discussed previously, you

15    executed the October 6, '99 GAI; is that correct?

16         A       Yes.

17         Q       And there's an obligation under that

18    agreement that you terminate in order to remove your

19    obligations thereunder; is that correct?

20         A       I assumed that termination was for that

21    particular job.

22         Q       So it was your belief that --

23         A       I didn't have to terminate because the job

24    was finished successfully.

25         Q       Your belief was that the obligations ceased

1    as soon as the job was over?

2        A    Yes.

3        Q    Paragraph 38 of the answer asserts that you

4    weren't a compensated indemnitor with respect to the

5    issuance of the bonds, and therefore you owed no

6    indemnity under the GAI due to this failure of your

7    being compensated.  You stated that you weren't an

8    owner of Local Towing at the time that these jobs was

9    going on; is that correct?

10       A    Correct.

11       Q    You were, however, the secretary, I believe

12   you said?

13       A    It says I was secretary when I signed this

14   indemnity agreement, but I had no interest in the

15   company.

16       Q    Do you know if there's a requirement that an

17   indemnitor under that agreement be compensated in order

18   for the obligations to be valid?

19       A    State it again, please?

20       Q    Is there a requirement under that agreement

21   that you be compensated, paid, in order for your

22   obligations under it to be valid?

23       A    I don't know if -- I don't know the answer to

24   that.

25       Q    Paragraph 39 of the answer states that Safeco

```
 1      was obligated to notify you of the issuance of bonds on

 2      behalf of Local Towing based on your obligations under

 3      that GAI.  Is there a provision in the GAI that

 4      requires, or anywhere else, that requires Safeco to

 5      give you notice that they're issuing bonds based on

 6      your obligations under that?

 7           A    I think there should have been.  I don't know

 8      if there was or not, but -- sorry.  My phone is on.

 9      I'll turn it off.  Excuse me.

10                    (Discussion off the record.)

11           Q    In your course of business before Aguadilla

12      and St. Thomas, did Safeco typically give you notice

13      that they were issuing bonds based on your obligations

14      under the GAI?

15           A    Through Fred Smith, yes.  I verbally knew

16      that I was obligated because we talked about it.

17                    MR. KELLEY:  That's all I have as far as

18      questions right now.  I'd like to reserve the right,

19      maybe, to re-call him if we get the documents that we

20      requested last time when George was here.  I'll turn it

21      over to Mr. Brawley, if that's acceptable.

22                    MR. BRAWLEY:  That's okay with me.  Do

23      you want to take a break, Duncan?

24                    MR. HUME:  Yes, if you want.

25                    MR. BRAWLEY:  Did you want to talk to us
```

1    about something?

2                    MR. HUME:  Yes.

3                    (Recess:  11:09 a.m. to 11:38 a.m.)

4                                                  .

5                    CROSS-EXAMINATION BY MR. BRAWLEY:

6

7        Q    Mr. Gardella, I'm Jim Brawley.  I represent

8    Associated.  Let me start by asking you a few questions

9    about your prior testimony today.

10                   Your testimony is that Exhibit No. 2, the

11   general agreement of indemnity, your understanding of

12   Exhibit 2 was that applied only to the Washington,

13   D.C., job, correct?

14       A    Yes.

15       Q    So it was your belief and understanding at

16   the time that the Washington, D.C., job was completed

17   that you would have no further indemnity obligation on

18   any bonds that would have been issued on any future

19   projects, correct?

20       A    Correct.

21       Q    That was your firm belief and understanding

22   at that time?

23       A    Absolutely, yes.

24       Q    Now, you -- you're in agreement that these

25   are your signatures both individually and as secretary

1    on Exhibit 2, correct?

2         A    Yes.

3         Q    You're also in agreement that you didn't

4    terminate your obligations as an indemnitor in any form

5    of a writing as required by the termination section of

6    that agreement, correct?

7         A    I did it verbally with Mr. Smith.

8         Q    You did it verbally.  Why would you do it

9    verbally and not follow the written contract?

10        A    I didn't think I had to.

11        Q    Why?

12        A    Because I had a verbal relationship with Fred

13   Smith who was the bonding company, and my --

14        Q    Why did you -- what did you -- tell me about

15   your oral conversation with Fred Smith about your

16   indemnity obligation.

17        A    Well, when I finished the Washington job,

18   they loaded all the equipment on the barge to leave the

19   country.  I went like this, "Fred, I don't want to be

20   involved out of the country anymore on any of the jobs

21   down there.  It's too far away."

22             And he even had a response.  He said, "That's

23   fine.  They don't need you anyway."

24        Q    Well, was the St. Thomas and the Puerto Rico

25   job the first jobs that Local Towing had done outside

1    the country?

2         A    I don't know.  I think so, but I'm not sure.

3         Q    So when you would say to Fred Smith, "I don't

4    want to be involved in any more jobs out of the

5    country," your last testimony would be inaccurate

6    because there hadn't been any jobs outside the country,

7    right?

8         A    Correct.

9         Q    So where did this conversation with Fred

10   Smith take place?

11        A    I don't recall where it was.  I know I did

12   talk to him about it.

13        Q    Okay.  But what did you talk about him about?

14   You said you didn't want to be involved in projects

15   anymore?

16        A    In projects that they are going to do when

17   they take all the equipment out of the country down to

18   St. Thomas -- it first went to San Juan; there was a

19   job in San Juan.

20        Q    How long after -- this was at the end of the

21   Washington job that you had the conversation?

22        A    Yes.

23        Q    Was it on the phone or in person?

24        A    Probably on the phone.

25        Q    And you just said to him, "I don't want to be

1      involved in any more of the jobs outside the country"?

2          A    Yes.

3          Q    How much did you personally make on the

4      Washington job?

5          A    $100,000.

6          Q    How much did Chris Gardella make?

7          A    I don't know.  Fred only, from what he told

8      me, that they had $800,000 in the bank, and they didn't

9      need my indemnification therefore.

10         Q    Would you be talking to Fred Smith about

11     whether or not you would be on future jobs if your

12     understanding of Exhibit 2, the indemnity agreement,

13     was either ended with the Washington, D.C., there was

14     no need for that conversation in your mind, would there

15     be?

16         A    No.

17         Q    Is there any writing between yourself and

18     Associated, Fred Smith, that confirms that yourself,

19     James Gardella, will not be an indemnitor on any

20     further projects?

21         A    I don't think so, no.

22         Q    Now, earlier when you were being questioned,

23     you talked about Fred Smith, I believe, introducing

24     Fran Empey and yourself and Chris Gardella, right?

25     That was how that connection was made?

 1          A    No.   I wasn't involved.   Fran Empey
 2    introduced -- Fred Smith introduced Fran Empey to my
 3    son.
 4          Q    At the time that introduction was made, you
 5    had told us that you understood that Fran Empey was
 6    unbondable.
 7          A    No.   I didn't know that at the time.
 8          Q    I think your testimony earlier this morning
 9    was that the reason that Fran Empey needed you guys was
10    that he failed on some prior jobs and he was
11    unbondable.
12          A    I learned that later.
13          Q    Okay.
14          A    At the time he got involved with my son, I
15    didn't know that he had --
16          Q    You need to be real careful with your
17    testimony because as I understood your testimony in
18    response to Safeco's counsel was this was something
19    that you understood at the time that you were
20    introduced to Fran Empey.   Is that not your testimony?
21          A    I don't know how the words went.   At the time
22    that Fred Smith introduced my son to Empey, I wasn't
23    involved.   I just learned later that they -- that Empey
24    was unbondable.   But at the time they were introduced,
25    I don't know.   I wasn't involved there.

1        Q    At some point after Fran Empey and your son

2    were introduced, you became aware that Fran Empey was

3    unbondable?

4        A    Yes.

5        Q    You became aware of that prior to the St.

6    Thomas and Aguadilla jobs?

7        A    I believe so, yes.

8        Q    That's a term of art, isn't it, to be

9    unbondable?  What does that mean in your business?

10       A    Well, I think of it as someone who failed on

11   the job and the bonding company won't bond them anymore

12   because they already got hurt, hurt once by them.

13       Q    They're not a good financial risk to the

14   surety company?

15       A    Yes.

16       Q    Because signing on as an indemnitor is kind

17   of like being a guarantor in the event that the company

18   doesn't complete the job within the budget that they've

19   agreed to?

20       A    Yes.

21       Q    The bonding company will have to pony up

22   monies under its bond, and then the indemnitor has got

23   to pay the bonding company back?

24       A    I believe so, yes.

25       Q    It's kind of a credit assessment that they

1    do?

2         A    Yes.

3         Q    Is it fair to say that prior to the Puerto

4    Rico and the Aguadilla job, you understood that the

5    reason that Fran Empey had teamed up with Local Towing,

6    he couldn't get bonded by himself?

7         A    Yes.

8         Q    Because we can agree that prior to the

9    Aguadilla and the St. Thomas jobs, you understood that

10   Fran Empey had a lot of technical expertise in how to

11   run jobs.  That was his value to Local Towing, right?

12        A    I believe so, yes.

13        Q    And Local Towing's value to Fran Empey was

14   that with the power of your signature and perhaps

15   Chris's and Jessica's, you could get bonds issued for

16   the jobs?

17        A    I believe so, yes.

18        Q    Do you know, Mr. Gardella, whether Fran Empey

19   signed as an indemnitor on any of the projects prior to

20   Aguadilla or St. Thomas?

21        A    I don't know.

22        Q    But is it fair to say that was not something

23   that Local Towing was relying on Fran Empey for, you

24   know, his financial -- strike the question.

25             Local Towing was relying on Fran Empey for

 1    his technical expertise and his ability to run jobs,

 2    not his financial backing; is that fair to say?

 3         A    I had nothing to do with the company.  I

 4    really don't know.

 5         Q    But you knew he was unbondable?

 6         A    I found out later, but I didn't know before.

 7         Q    You found out before, at least before St.

 8    Thomas and Aguadilla, that he was unbondable?

 9         A    Well, probably before that, yes.  In

10    Washington.  In Washington, yes.

11         Q    Around the Washington job, you knew he was

12    unbondable?

13         A    Yes.

14         Q    That's something that Chris knew as well?

15         A    Yes.

16         Q    Really, the combination was, to summarize it,

17    Fran Empey brought the technical expertise on how to do

18    these big dredging jobs, and Local Towing provided the

19    financial backing and the -- some administrative

20    services?

21         A    Not totally.  He was an on-site manager who

22    got the job done.  I believe Chris Gardella had some

23    technical knowledge and equipment and was able to do

24    the jobs also.

25         Q    Who had more, you know, in your opinion, who

```
 1    was a better site man for jobs like St. Thomas and

 2    Aguadilla, Fran Empey or Chris Gardella?

 3         A    Well, Fran Empey was.

 4         Q    He had more experience?

 5         A    He's older and more experienced and out in

 6    the field.

 7         Q    People also said about him that he was very

 8    good at working the foreign jobs, you know, keeping

 9    crews busy and keeping people busy with side contracts

10    in the event of a work stoppage or, you know, downtime;

11    is that fair to say?

12         A    I don't know.  Probably, yes.

13         Q    Now, earlier you were testifying and you

14    talked about you had transferred your interest in Local

15    Towing to Chris Gardella.

16         A    Yes.

17         Q    Do you recall that?  You retained some

18    interest, ownership interest, in Local Towing, right,

19    10 percent?

20         A    No.

21         Q    No?

22         A    No.

23         Q    I saw some documents that seemed to indicate

24    that you still held 10 percent of Local Towing.  That's

25    not correct?
```

1      A    It may have been for certain reasons, like to
2   be involved with the bond, to help him in his career.
3   But I didn't feel that I owned any of it.  He wanted to
4   do it all himself.
5      Q    So on paper there may be documents that
6   indicate that you owned 10 percent?
7      A    There may be.  I'm not sure of that.
8      Q    But you didn't get 10 percent of the profits
9   after the transfer?
10     A    No.
11     Q    Earlier we were talking about you had a
12  conversation with Fred Smith after the Washington,
13  D.C., job where you said, "I don't want to be involved
14  in any of the foreign projects."
15     A    Yes.
16     Q    What did Fred Smith say?
17     A    He said, "They don't need you anyway."  They
18  made enough money on the Washington job where they
19  didn't need my backing.
20     Q    Is that all you can remember about that
21  conversation?
22     A    Yes.  In so many words.
23     Q    You're just telling me generally that's what
24  you recall?
25     A    Generally that's what he said, yes.

1          Q     Is that the only conversation that you had

2     with Fred Smith about your indemnity obligations to

3     Safeco?

4          A     No.  He later on somewhere after the San Juan

5     job or before the St. Thomas job, he tried to get me

6     involved again, and I did talk to him about the

7     possibility of signing another indemnification for

8     another job down there, but only on the condition that

9     I would go down and look at it and learn more about the

10    job.  And nothing ever came of it.

11         Q     So is your testimony that you had a

12    conversation with Fred Smith about signing on as an

13    indemnitor -- let me finish -- for Aguadilla and St.

14    Thomas?

15         A     About possibly doing that, yes.

16         Q     He said to you, "Would you like to sign an

17    agreement for these projects?"

18         A     He also said that I would make X amount of

19    dollars if I'd do that.  And we never did come to an

20    agreement, and I never did agree to be responsible for

21    anything there down in the islands.  The only way I

22    would, I would have to take a trip down and look at the

23    job and what it was all about before I went to

24    guarantee any job.

25         Q     Where did that conversation take place?

1       A     Over the phone.

2       Q     But is it fair to say that there's no

3    documents, no correspondence or anything in writing

4    between yourself and Fred Smith that talks about you

5    wanting to be either removed as an indemnitor or not

6    being an indemnitor any further?

7       A     Right.

8       Q     Did you have any conversations with Fred

9    Smith during the Aguadilla and St. Thomas jobs about

10   being taken off the indemnity agreement?

11      A     No.

12      Q     Who did you think was the indemnitor for the

13   bonds that were issued for St. Thomas and Aguadilla?

14      A     I don't know.  I wasn't involved there.

15      Q     You understood -- St. Thomas, that was the

16   biggest job that Local Towing had ever been involved

17   with?

18      A     I don't know.  Was it?

19      Q     I'm asking you.

20      A     I really don't know.  I don't know what the

21   numbers were on the other jobs.

22      Q     Did you read the general indemnity agreement,

23   Exhibit 2, before you signed it?

24      A     I just skipped through it.  I didn't

25   really -- I sign a lot of papers, contracts, in the

1    business, you know, a lot of fine print I don't read.

2         Q    Even when you sign on your personal signature

3    for an indemnity agreement?

4         A    Yeah.  At the time I signed it, I didn't

5    really feel I was, you know, that we were verbally

6    talking that this was an indemnity for the Washington

7    job.

8         Q    Safeco issued the bonds for the Washington

9    job?

10        A    I believe so.

11        Q    Did Safeco issue the bonds for any other

12   jobs, you know, after you signed Exhibit 2 between St.

13   Thomas and Aguadilla?

14        A    I don't know.  I don't think so.

15        Q    What was the Florida corps job?

16        A    Florida Army Corps job?

17        Q    Yes.

18        A    That is a bonded job that happened before

19   Washington.

20        Q    How about Wilmington corps?

21        A    Same thing.

22        Q    So you had two conversations with Fred Smith:

23   One after Washington, D.C., saying that you didn't want

24   to be involved; then a second one leading up to

25   Aguadilla and St. Thomas about whether you wanted to be

1    involved in that job, right?

2        A    Yes.

3        Q    When did you first learn that you were on the

4    indemnity agreement for the bonds for St. Thomas and

5    Puerto Rico?

6        A    I first learned that Safeco thought I was an

7    indemnitor after it was all over when we had that

8    meeting in New Jersey.  My son asked me to go with him

9    to the meeting.

10       Q    Do you know what time frame that was?

11       A    That was after the job was over, after it was

12   all over, but when the bills were being paid.  I don't

13   remember the date.

14               MR. HUME:  Do you want a date suggested?

15               MR. BRAWLEY:  Yes.

16               MR. HUME:  February of 2002.

17               MR. BRAWLEY:  Thank you.

18       Q    So were you assuming during the St. Thomas

19   job that they had issued the bonds on the power of

20   Chris and Jessica's signatures?

21       A    I don't know how they issued them, but I know

22   it was not on my power.

23       Q    Did you go down to St. Thomas at all during

24   those jobs?

25       A    Well, I never visited the San Juan or the

1    Aguadilla job; but after the St. Thomas job started,

2    because it was February and it was nice to go to St.

3    Thomas in February, I went down to see what he was

4    doing there.

5         Q    Did you discuss with Chris, "Hey, who's on

6    the bonds?  Who's on the indemnity agreement for St.

7    Thomas and Puerto Rico?"

8         A    No.

9         Q    Did Chris ever represent to you that you had

10   been taken off the indemnity agreement and that he and

11   Jessica had issued new ones, "So, hey, don't worry,

12   Dad.  We're all set"?

13        A    No.

14        Q    After Fran Empey died, Chris Gardella told us

15   that he had to decide whether to go forward with the

16   St. Thomas job or not because it, you know, hadn't

17   started yet.  Do you recall that?

18        A    Yes.

19        Q    Okay.  Because my memory is that Mr. Empey

20   dies in September of 2000 and that there's some delays

21   at St. Thomas, so the job doesn't start until December

22   or January of that year.

23             Were you involved in the discussions with

24   Chris Gardella about whether Local Towing should go

25   forward without Fran Empey?

```
 1        A    No.
 2        Q    Were you concerned having been in the
 3   business yourself about Local Towing undertaking a job
 4   of that magnitude in a foreign country without Mr.
 5   Empey at the helm?
 6        A    Yes, I was.  I felt for my son, yes.
 7        Q    Did you discuss at all with him whether, you
 8   know, it would be smart to back off of it or to go
 9   forward with it?
10        A    I don't recall me having anything to say
11   about it.
12        Q    Who has more expertise running a dredging
13   job, yourself or Chris Gardella?
14        A    Dredging is a particular part of contracting,
15   and I did do that myself for maybe 12, 15 years before
16   he took over.
17        Q    So do you have more experience than he does?
18        A    Just on dredging, yes.
19        Q    How about on a job like St. Thomas?  If you
20   were to evaluate who would be better suited to
21   supervise a job like that in terms of qualifications
22   and background, would it be yourself or Chris Gardella?
23        A    I never did a job like that.  I had no idea
24   what they were doing or how.
25        Q    Do you know if Chris had ever done a job like
```

1    St. Thomas?

2         A    No, he never did one exactly like that.  But

3    he did more variety of contracting jobs than I did in

4    the short time that he was doing them with Empey and a

5    couple of them on his own without Empey.

6         Q    Chris Gardella told us that he could have

7    walked away from the St. Thomas job due to the delay

8    after Mr. Empey's death.  Are you aware of that?

9         A    Well, it's easy to Monday morning

10   quarterback.  He should have, yes.

11        Q    Well, he told me he was aware at the time

12   that when Mr. Empey died, due to the delay, he was

13   aware that he could have walked away from that job.

14   Did you have any of those types of discussions with

15   him?

16        A    No.

17        Q    Were you concerned for Chris Gardella and

18   Local Towing that they had this three-, four-million-

19   dollar project and Chris Gardella had never run one of

20   that size before and the foreman dies?

21        A    I was concerned.  He is my son, you know.

22        Q    But the two of you didn't discuss who was on

23   the hook if the job failed?

24        A    No.

25        Q    But you assumed Chris would be on the hook if

1    the job failed, right?

2         A    He and Fred Smith and all of those people

3    down there and Empey's son.  They were all playing --

4    doing the job.  I had nothing really to say about it.

5         Q    Why would Fred Smith be on the hook, so to

6    speak, for a failed job of Local Towing?

7         A    Well, he was the bonding company.

8         Q    But he doesn't guarantee a job to be a profit

9    or not, right?

10        A    Well, I assumed he would have some liability

11   with the bonding company that he's --

12        Q    Because the bonding company had to pay, do

13   you mean?

14        A    Yes.

15        Q    So are these the only two conversations that

16   you had with Fred Smith about your indemnity

17   obligations:  The one after the Washington, D.C., job

18   that you described for me and then the telephone call

19   about whether you wanted to be involved in Puerto Rico

20   and St. Thomas?

21        A    Well, I might have had two or three

22   conversations with him about trying to get me involved

23   down at St. Thomas and Puerto Rico, but we never came

24   to any conclusion there.

25        Q    Would it be fair to say that you took an

1    active interest in the day-to-day operations at St.

2    Thomas and Aguadilla after Fran Empey's death?

3        A    No.

4        Q    Did you personally guarantee the financing of

5    an excavator for one of the projects?

6        A    Yes.

7        Q    Did you review the books at all for the

8    projects in St. Thomas or Aguadilla while they were

9    ongoing?

10       A    No.

11       Q    Do you know how much the bond cost for the

12   St. Thomas job?

13       A    I have no idea.

14       Q    Do you know who paid for that?

15       A    No.

16       Q    Chris Gardella didn't know that Fran Empey

17   was not bondable.  Was that something that you did --

18   that you kept from Chris Gardella?  Was he in the dark

19   on that issue?

20       A    I thought I heard it from him.

21       Q    I think you said during your testimony that

22   if Fran Empey were bondable, he wouldn't have needed

23   Local Towing because he had all the capabilities of

24   doing the job himself, right?

25       A    I would assume that would be the case

44

1    logically.

2        Q    Did Fred Smith ever say to you affirmatively,

3    "Jim, you're not -- you're not on as a guarantor for

4    the bonds for St. Thomas and Aguadilla"?  Or "You're

5    not on the indemnity agreement"?  Did he ever say those

6    words or words to that effect?

7        A    No.  He had no incentive to tell me that.

8        Q    But whether he had incentive or not, he

9    didn't say those words?

10       A    No.

11       Q    Now, as it's setting up right now, of the

12   three people that signed the indemnity agreement,

13   yourself, Chris Gardella, his wife Jessica Gardella,

14   you're the only one that hasn't been discharged from

15   that obligation in bankruptcy, right?

16       A    I'm not in bankruptcy.

17       Q    Right.  You understand that Chris Gardella

18   and Jessica Helquist-Gardella went through bankruptcy?

19       A    Yes.

20       Q    Their obligation to Safeco was discharged, as

21   I understand it, through those bankruptcy proceedings,

22   which would mean the only person who signed the

23   indemnity agreement --

24       A    I didn't sign it for those jobs.

25       Q    But you're the only person on Exhibit No. 2

```
 1   that we can --
 2        A     That they thought was on it.  Fred Smith
 3   didn't tell them that I wasn't, yes.
 4        Q     Right.  It would be good if you weren't on
 5   it, right, because you understand --
 6        A     Well --
 7        Q     Let me finish.  -- because you understand if
 8   it is in force, you're the only one on the hook for
 9   those monies?
10        A     I guess, yes.
11        Q     So did Fred Smith ever tell you, "Hey, I'm
12   going to call up Safeco and tell them that you're not
13   to be on the indemnity agreement for St. Thomas or
14   Puerto Rico"?
15        A     No.  He would never do that because then he'd
16   lose his commission on the job.  If they turned it down
17   because I wasn't on it, then he'd be out in the cold.
18   I think his commission was over a hundred thousand
19   dollars on that job.
20        Q     So your theory is that Fred Smith withheld
21   your request to get off the bond so that he could write
22   the bond and get a commission?
23        A     Sounds like a good plan to me, yes.
24        Q     Nothing in -- but there's no writing from any
25   source that documents any of these conversations or
```