1    requests?

2        A    No.  No.

3        Q    We can agree that Fred Smith was not going to

4    be sent a check for any profits that were made for St.

5    Thomas or Aguadilla, right?

6        A    I don't know what arrangement he had.

7        Q    Chris Gardella told us that was, you know,

8    that Fred Smith was not going to get any of the profits

9    from those jobs.

10       A    No.  He already made his money when he got

11   the bond from Local Towing up front.

12       Q    And the idea was Local Towing would get its

13   money by getting the bond and performing the work,

14   right?

15       A    That's right.

16       Q    Up until the point that Fran Empey dies,

17   would it be fair to say that the partnership between

18   Fran Empey and Local Towing had a good track record

19   doing projects together?

20       A    Well, it seemed to me they did, yes.  I

21   wasn't involved in all of them.

22       Q    Okay.  At least up until the time of the

23   Washington, D.C., job, it was really the power of your

24   signature that got the bonds issued for all of the jobs

25   that Fran Empey did together with Local Towing?

1       A     I don't know what other jobs they did.

2       Q     Well, they did Washington, D.C., right?

3       A     I know they did a job in New Orleans I had

4    nothing to do with.

5       Q     Let's talk about --

6       A     And they did some other side jobs that had

7    nothing to do with bonds.

8       Q     Let's talk about the ones that you were

9    involved in.  The Washington, D.C., you signed on for

10   that job, right?

11      A     Yes.  It's right here, yes.

12      Q     Did you have an understanding of whose

13   signature carried the most weight with the bonding

14   company to get that bond issued, whether it was yours

15   or Chris's or Jessica's?

16      A     Well, I assume it was mine.

17      Q     Now, were there other jobs where you also

18   signed the bonds as an indemnitor for Local Towing?

19      A     There were two other jobs that I don't even

20   remember signing for but they did for the Army Corps:

21   the one in Wilmington and the one in Florida.

22      Q     And in both of those instances, it would have

23   been the power of your signature that carried the

24   financial weight compared with Chris's and Jessica's at

25   the time?

48

1       A    I don't remember.

2       Q    The only thing that changed after the

3    Washington job would be that Local Towing had some

4    money in the bank that it had made from that job,

5    right?

6       A    It seemed so, yes.

7       Q    Would it be fair to say that on those prior

8    three jobs where you signed as the indemnitor,

9    Washington, Wilmington, Florida, you weren't relying on

10   Fran Empey's signature as an indemnitor in those

11   instances, right?

12      A    I don't remember then, but I don't think so.

13   But I can't remember.

14      Q    We can agree as a general matter, though --

15      A    Yes.

16      Q    -- that you would only rely on someone else's

17   signature if they had the financial backing to pay off

18   in the event that --

19      A    Yes.

20      Q    -- monies came due under the indemnity

21   agreement?

22      A    Well, he had the expertise and the time, and

23   he worked the job, and he had sweat and blood in it.

24      Q    Right.

25      A    So that was his part.

49

```
1         Q     Right.  So up until the time of the
2    completion of the Washington, D.C., job the arrangement
3    was yourself, you provided the financial strength to
4    get the bonds issued --
5         A     Right.
6         Q     -- and Fran Empey was the technical
7    expertise, so it was a good business relationship?
8         A     Yes, yes.
9         Q     It's your testimony that -- strike that.
10              Did Safeco issue the bonds for Wilmington and
11   for Florida, do you know?
12        A     I don't remember.
13        Q     Your experience previously was, though, that
14   you had to sign a separate indemnity agreement for each
15   job; is that right?
16        A     Exactly, yes.
17        Q     On Exhibit No. 2, I don't see the -- anything
18   in that document that references a specific job.  Why
19   is that?
20        A     I don't know why.  I think it's a bad
21   practice of the bonding company to have people sign
22   things like that.
23        Q     You had never seen that practice before --
24        A     No.
25        Q     Let me finish because we're going to talk
```

1    over each other.

2            You had never seen the practice of signing an

3    indemnity agreement that would be an ongoing obligation

4    prior to being informed by Safeco that they felt you

5    were still on the bonds for the St. Thomas and the

6    Aguadilla projects?

7        A    No.

8        Q    Would it be fair to say that during the St.

9    Thomas and the Aguadilla projects, you didn't have any

10   concerns about being on those bonds?

11       A    During the jobs?

12       Q    Right.

13       A    Yes.

14       Q    No concerns at all?

15       A    Except for my son's well-being.  My concerns

16   were feeling for him.

17       Q    So if there were correspondence either from

18   you or to you indicating that you were on the bonds for

19   the Aguadilla and the St. Thomas projects during the

20   projects, that's news to you?  You haven't seen those

21   documents?

22       A    No.

23       Q    And you're certain that you never made a

24   request during the St. Thomas project to be taken off

25   the bond?

51

```
 1        A    Exactly, because I never thought I was on it
 2   in the first place.
 3        Q    Fran Empey had been out of the business for a
 4   number of years between the time he had his own
 5   business and when he started business with Local
 6   Towing.  Are you aware of that?
 7        A    No.
 8        Q    Are you aware that he had some projects way
 9   in the past, I think you told me, that had failed
10   financially?
11        A    I learned that afterwards.
12        Q    After what?
13        A    Well, while all this was going on, I learned
14   that he was -- he failed on some jobs.  I knew a little
15   bit about his business from dealing with him like 25
16   years ago.
17        Q    You had no knowledge that Fran Empey had some
18   health issues prior to the St. Thomas and Aguadilla
19   jobs?
20        A    Exactly, yes, I had no knowledge that he had
21   health problems.
22        Q    Never had any conversations with anybody
23   about Fran Empey's health --
24        A    No.
25        Q    -- prior to his death?
```

1        A     No, never did.

2        Q     Exhibit No. 2, the indemnity agreement, could

3   you turn to page 3 where the signatures are?

4        A     Yes.

5        Q     There doesn't appear to be anywhere on that

6   document for Fran Empey to sign.

7        A     No, there isn't.

8        Q     Did you have an understanding at the time you

9   signed that document as to whether Fran Empey was also

10  going to be executing that document?

11       A     I don't remember.

12       Q     Would it be fair to say that you signed that

13  document without requiring as a prerequisite to your

14  signature that Fran Empey also sign the document?

15       A     No.

16       Q     I think we had a double negative.  Could you

17  tell me what your answer is?

18       A     I did not think about Fran Empey necessary --

19  the necessity of having Fran Empey sign this.  Is that

20  what your question is?

21       Q     Yes.

22       A     When I signed this, I didn't think about it

23  because I was told by Fred Smith that this is what to

24  do, and I did what he did -- said to do.

25       Q     At the time you signed Exhibit No. 2, you

1    weren't relying on Fran Empey signing a similar

2    document?

3        A    No, because Fred Smith didn't tell me he had

4    to.

5        Q    And it's fair to say, based on your prior

6    conversations this morning, that at the time that you

7    signed Exhibit No. 2 in October '99, you were the

8    financial strength of the company at that point in

9    time?

10       A    I would say that's true, yes.

11       Q    Did Fred Smith ever promise you or say

12   anything to you at the time that you were signing

13   Exhibit No. 2 that he was also going to have Fran Empey

14   sign the same document?

15       A    I don't remember, no.

16       Q    When you signed Exhibit No. 2, did you sign

17   at the same time as Chris Gardella and Jessica

18   Gardella?  Did everybody do it at once or was it done

19   in multiple locations?

20       A    I don't remember.  It was probably multiple

21   because Chris's wife didn't come into the office too

22   often.  He must have had her sign at home.

23       Q    When -- as I understand your testimony, Fran

24   Empey was introduced to your son, Chris Gardella, and

25   not to you by Fred Smith?

54

 1        A    Yes.
 2        Q    Did you and Chris do any -- strike that.
 3             Did you and/or Chris do any background check
 4    into Mr. Empey before you started doing business
 5    together to find out a little more about him?
 6        A    Well, Chris was doing his own thing.  I
 7    really -- I didn't have any input into that.  I found
 8    out after the fact that he was dealing with Fran Empey.
 9        Q    How old was Chris when you gave him the
10    company?
11        A    Must have been 30, 31.
12        Q    In hindsight, was he a little young to take
13    over that level of responsibility?
14        A    Probably, yes.
15        Q    You were looking to get out of the business
16    yourself at the time?
17        A    Well, the first job they did is when Fred
18    Smith got Empey involved in it and Chris used Empey's
19    advice and almost blew the job, and he had to fire
20    Empey and had to finish the job himself and do
21    something different.  Empey wasn't that much of a hot
22    shot that he knew everything.
23        Q    Well, I'm sorry, which job was that?
24        A    The first job was in Stonington, Connecticut.
25    It was a pump dredge job.

1          Q     He had to fire Fran Empey?

2          A     Well, Fran got him to rent a dredge that was

3     trucked in and put together and towed up there from

4     Norwalk that didn't work, that we had to take out, and

5     Chris had to go with a time frame on the job; he had to

6     go get another dredge that was trucked in from

7     Minnesota and brought up, and he finished the job with

8     the men that Fran had, but Chris is the one who

9     orchestrated finishing up.  So he wasn't -- he's not a

10    slouch.  He knew what he was doing in certain ways.

11         Q     But he was still young?

12         A     He was young, but he was good at it, and he

13    still is.

14         Q     If you hadn't owned the company, do you think

15    that Chris had the background and skills that a similar

16    company to Local Towing would have hired him to

17    supervise projects like St. Thomas or Aguadilla?

18         A     I don't know.  They might have.

19         Q     Probably those companies would have preferred

20    someone at Fran Empey's level of field experience as

21    opposed to Chris's?

22         A     A little older, yes, probably.

23         Q     How old are you, Mr. Gardella?

24         A     Sixty-nine.

25         Q     Are you retired?

56

1       A    Retarded.  Retired, yes.  Don't put that in
2    there.
3       Q    Just so I understand it, as far as your
4    claims in this case, you're not claiming that as far as
5    you know that Safeco was supposed to get Fran Empey to
6    sign the indemnity agreement for the St. Thomas or
7    Aguadilla jobs?  You simply don't know one way or the
8    other; is that right?
9       A    Right.
10      Q    Was there any discussion during the Aguadilla
11   job or the St. Thomas job with anyone and yourself
12   about reducing the amount of the profit that Michael
13   Empey or his brother would get because, you know, Chris
14   and your family had pumped, you know, additional monies
15   into this job to keep it afloat?
16      A    I wasn't involved in their business.  It
17   sounds like that would have been a good conversation,
18   but I wasn't involved in it.
19      Q    You were aware that by March of 2001, that
20   Local Towing had gone through all the money that it had
21   made on its prior jobs, right?
22      A    That was during the job in St. Thomas?
23      Q    Yes.
24      A    I found that out then, yes.
25      Q    Why did you care?

1        A    He was my son.

2        Q    So you did have some knowledge about what was

3    going on out there?

4        A    Yes.  I did go to the job, I said before, I

5    think in February.

6        Q    Okay.

7        A    I went down to see it, and I saw that it was

8    a tough situation.

9        Q    Let me show you Exhibit No. 9.  This is a

10   letter that I think you wrote to Fred Smith in April of

11   2001.  I'm just going to stand behind you so I can look

12   on with you.

13            You can take a look at it.  You don't have to

14   read the whole thing, but if you want to familiarize

15   yourself generally, I have a couple of questions for

16   you.

17       A    Okay.  (Pause.)

18                THE WITNESS:  Did you see this?

19                MR. BRAWLEY:  Can you mark this for me,

20   too?

21                (Exhibit 11, May 1, 2001 letter to Jim

22   Gardella from Fred Smith, marked.)

23                MR. BRAWLEY:  Exhibit 11, folks, is a

24   May 1, 2001 letter to Jim Gardella from Fred Smith.

25                THE WITNESS:  This one's from --

58

```
 1   BY MR. BRAWLEY:

 2       Q    Different exhibit.

 3       A    Oh, different.

 4       Q    I'm going to show your lawyer first.

 5       A    All right.

 6       Q    All set?  Mr. Gardella, let me show you

 7   Exhibit 11, which is a May 21st letter from Fred Smith

 8   to yourself.  I just ask you to take a minute to take a

 9   look at that.

10            (Discussion off the record.)

11       Q    Let me just show you Exhibit 9 to start with.

12   That's a letter from you dated April 25th, 2001, to

13   Fred Smith, correct?

14       A    Yes.

15       Q    No question you wrote that letter and sent it

16   to Fred Smith, right?

17       A    Yes.

18       Q    Let me just point you to the second full

19   paragraph where it says, "I did know some things about

20   Fran's past, and obviously he was not bondable for

21   various reasons."

22            Do you see where I've just read there?

23       A    Yes.

24       Q    What are you referring to there?

25       A    About the things I knew about his past, do
```

59

1     you mean?

2          Q    Yes.

3          A    Well, he was in the dredging business 25

4     years ago, and I know he didn't have the best

5     reputation.

6          Q    Right.

7          A    He did a little job for me like 25 years ago,

8     never paid the bills.  But I didn't -- I don't know

9     when I learned, but he had a big pump dredge that got

10    damaged, ruined in a storm, didn't finish the job out

11    the end of Long Island someplace.  He was the kind of

12    guy he was up and down, up and down.  He'd make a lot

13    of money, then he'd lose it.  He would do a lot of jobs

14    and then he would do a bad one.

15         Q    Exhibit 11 is a memo dated May 1st, 2001,

16    starts off, "Dear Jim."  It is a letter from Fred

17    Smith.

18         A    Yes.

19         Q    I'm sorry, letter to Jim Gardella, yourself,

20    from Fred Smith.

21         A    Yes.

22         Q    Have you seen that document before today?

23         A    No.

24         Q    Are you sure about it?

25         A    I'm not sure of it, but I really don't

```
 1    remember reading this whole thing.  It is a four-page
 2    letter.
 3         Q    Yes.
 4         A    Especially the first paragraph is absolutely
 5    wrong.
 6         Q    Let's go through the first, really, the
 7    second paragraph on the first line.  Can you see where
 8    I'm reading?  It says, "Almost every project that has
 9    been completed under the relationships of the Empeys
10    and LTI has been bonded with your personal financial
11    guarantee."
12              Now, I've read that correctly, right?
13         A    You read that correctly, yes.
14         Q    It goes on to say, "This guarantee has been
15    required from the beginning due to Chris and the
16    Empeys' inability to provide adequate financial backing
17    to guarantee the bond."
18              Am I reading that correctly?
19         A    Yes, that's correct.
20         Q    Now, if we go down that paragraph, the
21    sentence that starts, "It seems odd."  Do you see where
22    I'm reading?
23         A    Yes.
24         Q    "It seems odd if you were apprehensive about
25    the relationship with the Empeys, be it Francis and
```

```
 1    Michael or their abilities, and Chris that you would
 2    agree to bond the projects or allow the project to
 3    continue without your intervention."
 4            Now, would you agree that it at least appears
 5    there that Fred Smith is confirming to you in May of
 6    2001 that you're the -- you're the indemnitor on the
 7    bond on the projects?
 8        A    I don't agree with what he's saying in that
 9    sentence.
10        Q    I know you don't agree with what he's saying.
11        A    Yes.
12        Q    But it seems he is saying that in May of
13    2001, telling you, "Hey, you're on the bonds"?
14        A    No, that's not what that sentence says.  It
15    says, "If you were apprehensive about the relationship
16    with the Empeys, it's odd that if you were apprehensive
17    that you would agree to bond the projects or allow the
18    projects to continue."
19        Q    What he seems to be saying, Fred Smith seems
20    to be saying in this that you're the indemnitor on the
21    bonds for the Aguadilla and St. Thomas projects?
22        A    That's what he's saying, but I don't agree
23    with it.
24        Q    Did you ever respond to Exhibit No. 11 and
25    tell Fred Smith, "I disagree with you.  I'm not on the
```

1    bonds for these projects"?

2         A    I never saw the letter.

3         Q    Well, Chris Gardella produced this letter to

4    us.

5         A    Well, he may have had it in the file, but he

6    didn't show it to me.  Where is it addressed to?

7         Q    We can agree that Exhibit No. 11, after the

8    paragraphs that we have discussed, it goes on to talk

9    in some detail about what's going on at the project and

10   what some of the disagreements between Chris Gardella

11   and the Empeys are at the time, right?

12        A    Looks like it's Fred Smith's thoughts of

13   what's going on on the job, yes.

14             MR. BRAWLEY:  I'm just going to take two

15   or three minutes.  I just want to read a document.  I

16   don't want to keep everyone sitting here.  All right,

17   Duncan?

18             MR. HUME:  Yes.

19             THE WITNESS:  I will read this in a

20   little more detail too.

21             MR. BRAWLEY:  Okay.

22             (Recess:  12:41 p.m. to 1:57 p.m.)

23   BY MR. BRAWLEY:

24        Q    Mr. Gardella, we had talked earlier in the

25   day about the conversation you had with Fred Smith

1    after the Washington, D.C., job.  Do you recall that

2    testimony?

3         A    Yes.

4         Q    Approximately when did that conversation

5    occur?  What was the time frame or the date?

6         A    I think they were winding up the job around

7    April of that year.

8         Q    Do you know what year that was?

9         A    What's the date of the -- of this thing?  The

10   thing that I signed?

11        Q    Exhibit No. 2, the indemnity agreement was

12   October 6th of 1999, I believe.

13        A    So it would be around April of '00.

14        Q    April of 2000?

15        A    2000.

16        Q    So as of April of 2000, you had told Fred

17   Smith you didn't want to be involved in any more, I

18   think you phrased it overseas projects on behalf of

19   Local Towing?

20        A    At that time they were loading the equipment

21   on a barge to go to Puerto Rico, and I did not want to

22   be involved in any jobs in Puerto Rico or out of the

23   country.

24        Q    That's essentially what you told Fred Smith?

25        A    Yes.

1        Q     "I don't want to be involved in any foreign

2    jobs," or words to that effect, in April of 2000?

3        A     No.   I didn't want to be involved in any more

4    jobs with the company since they are loading equipment

5    to go out of the country.

6        Q     That was around April of 2000?

7        A     Yes, before they left Washington with all

8    their equipment.

9        Q     Now, when you signed these indemnity

10   agreements, one thing the surety requires is you make

11   certain financial disclosures so they can basically

12   check to see if you're creditworthy?

13       A     Yes.

14       Q     Now, in 2001, you provided your financial

15   information to Safeco?

16       A     I don't remember physically doing it, but I

17   guess the secretary did that, yes.

18       Q     Okay.   What was the purpose of you providing

19   Safeco with your own, you know, personal financial

20   information in 2001?

21       A     I don't know that I did it in 2001.   I did it

22   in October of '99.

23       Q     Do you recall whether you provided financial

24   information to Safeco or any other party so that they

25   could provide it to Safeco in 2001?

1     A    I don't recall doing that, no.

2     Q    If you did do that, the purpose, obviously,

3   would be to show them that you were still a good credit

4   risk, right?

5     A    Yes.

6     Q    How did it work?  When you did provide

7   financial information to Safeco, who did you provide it

8   to?  Did it go through Fred Smith?  Did it go through

9   Sapochetti?  Did it go directly to Safeco?

10     A    I don't know.  The secretary at Local Towing

11   had my financial statement in her file, and I think she

12   did it.

13     Q    Would she have to have your authorization to

14   do it?

15     A    She would have had, yes.

16     Q    Okay.  Can we agree that at any time you were

17   providing financial information about yourself to

18   Safeco, you understood that the reason you were

19   providing that information to them was that you had

20   indemnity obligations on bonds that had been issued by

21   Safeco?

22     A    If I knew that -- the financials were being

23   provided, I would have questioned it.

24     Q    Right.  Go ahead.  I'm sorry.

25     A    If she just did it without my permission, I

```
 1    wouldn't have known that she did it, that she provided

 2    it.

 3         Q    I thought we agreed that she wouldn't do it,

 4    that she would only release your personal financials if

 5    she had your permission to do that.

 6         A    She didn't listen to me.  She listened to my

 7    son.

 8         Q    But Chris wouldn't have instructed -- I think

 9    Chris told us that you were supposed to be off the

10    indemnity for St. Thomas and Aguadilla.

11         A    Right.

12         Q    So he wouldn't have authorized the release of

13    your personal financial information?

14         A    He should not have, no.

15         Q    So it's your testimony that you didn't

16    authorize any release of your personal financial

17    information to Safeco or any other entities in 2001?

18         A    I don't remember.

19         Q    If it was released, that's a bit of a problem

20    because your position in the case is you weren't

21    supposed to be indemnifying anymore, right?

22         A    Well, for instance, she provided it to the

23    finance company on that machine finance thing without

24    me knowing it.

25         Q    At whose instruction did she do that?
```

1        A    I don't know.  Probably on Chris's.
2        Q    You didn't agree to finance -- to act as a
3    guarantor on the machine?
4        A    I did.  But I didn't realize what I was doing
5    at the time on that one.
6        Q    How so?
7        A    Well, I mean it was a three-hundred-plus-
8    thousand-dollar financial obligation, a loan on the
9    backhoe, that I did sign for.
10        Q    Did you have to pay on that yourself?
11        A    I've been -- it's in the court now.  It's --
12    they are suing me for it.
13        Q    Okay.  Where is that?
14        A    They have attached my house.  They've already
15    got it.
16        Q    Is it a Connecticut case?
17        A    It's out of Indiana.
18        Q    Where did they file the lawsuit, though?
19    Here or Indiana?
20        A    Indiana.
21        Q    And they've got an attachment on your home?
22        A    Yes.
23        Q    What was it that you didn't understand about
24    your indemnity agreement in that instance?
25        A    It wasn't that I didn't -- I just signed it

 1    without looking at the overall picture.  And it ended

 2    up where he couldn't pay for it.

 3                      (Exhibit 12, May 17, 2001 letter to Mr.

 4    Smith from James Gardella, marked.)

 5                      MR. BRAWLEY:  For the record, Exhibit 12

 6    is a letter from James Gardella to Fred Smith dated May

 7    17th, 2001.

 8         Q    Could you take a look at that for me, Mr.

 9    Gardella.

10                      (Discussion off the record.)

11         Q    Mr. Gardella, you had a chance to look at

12    Exhibit No. 12.  Is that a letter from you to Fred

13    Smith dated May the 17th of 2001?

14         A    Yes.

15         Q    Can we agree that in the first line it says,

16    "In answer to your letter of May 1st," your letter of

17    May 17th is basically responding to Exhibit 11 which is

18    Fred Smith's letter of May 1st, right?

19         A    Yes.

20         Q    Can we agree that in your response to Fred

21    Smith's letter, you don't state to him anywhere in that

22    response that you did not agree to be on the indemnity

23    agreement for either the St. Thomas project or the

24    Aguadilla project?

25         A    It does not say it in this letter, no.

1    Q    Does not say that?

2    A    Right.

3    Q    Also, you told me earlier you don't remember

4    seeing the May 1st letter.  Does your response to that

5    letter refresh your memory?

6    A    I said to Duncan at lunch, I think I remember

7    this letter and it infuriated me so much that I blanked

8    it out or threw it in the garbage.

9    Q    We can agree that you in fact responded on

10   May 17 to Fred Smith's May 1st letter?

11   A    Yes.

12   Q    Of the points you chose to address, you did

13   not chose to address the statements that Mr. Smith

14   appears to be making that you're on the indemnity

15   agreement for the two projects?

16   A    I didn't address that point in the letter,

17   no.

18   Q    Now, there were some allegations in the

19   third-party complaint that keyman life insurance was

20   supposed to be obtained for Fran Empey.  Do you have

21   any familiarity with that issue about whether Mr. Empey

22   was supposed to get the keyman or not?

23   A    By what I heard at the office.  I had no -- I

24   wasn't part of any of that discussion with Smith and

25   Chris that I could recall.

1      Q    So you had no conversations with anybody at

2    Associated about the securing of keyman life insurance

3    for Fran Empey?

4      A    The only thing I heard -- no, I didn't.

5      Q    Okay.  Tell me what you heard around the

6    office.

7      A    I heard from Chris that he was supposed to be

8    insured, supposed to have been insured.  I don't know

9    who promised who what or anything.

10     Q    But you weren't involved in the specific

11   discussions with either Safeco, Associated, or Chris

12   about what the specifics of the agreement were with

13   regard to securing of keyman life insurance for Fran

14   Empey?

15     A    No.

16     Q    So if Chris Gardella says there was some type

17   of an agreement that Fran Empey was supposed to get

18   keyman life insurance before the bonds were issued, you

19   don't have any specific knowledge of that type of

20   agreement?

21     A    No.  No, I don't.

22     Q    Your signature on Exhibit 2, the indemnity

23   agreement, you didn't condition that signature upon

24   Fran Empey securing keyman life insurance, correct?

25     A    Correct.

1       Q      I would take it you don't have any

2   understanding whose duty, obligation, responsibility it

3   was to secure the keyman life insurance, if any, for

4   Fran Empey?

5       A      I don't.

6       Q      Do you know what the role of Charles

7   Sapochetti was in connection with St. Thomas or

8   Aguadilla, the accountant?

9       A      I know he was the accountant that Fred Smith

10  made us use in order to get the bonding.

11      Q      When you say that, did you have to provide

12  your financial information to him so he could provide

13  it to Safeco so they could say, "Hey" -- so they could

14  determine whether you were qualified for them to issue

15  you the bonds?

16      A      I know because I went through that exercise

17  before Chris was involved, and in order to get bonding

18  which I got even before Chris got involved with the

19  company, and Sapochetti was the one that Fred Smith

20  said to use to -- to make the statements show what they

21  wanted to see to make the bonding -- make the company

22  have the ability to get the bonding.

23      Q      So, in other words, you would provide

24  information to Sapochetti, who would put it in a format

25  that would be presented to Safeco?

72

1         A    Yes.

2         Q    The purpose of the financial disclosures to

3    Sapochetti was so that he could prepare it in a format

4    to show Safeco that you were financially worthy of

5    being --

6         A    Yes.

7         Q    -- for them to take the risk and allow you to

8    sign the indemnity agreement and issue the bonds?

9         A    Absolutely, yes.

10        Q    Now, you say that Fred Smith said that

11   Charles & Associates would present it in a certain way.

12   Are you saying that Charles Sapochetti somehow

13   misrepresented your financial condition in the

14   statements he submitted to Safeco?

15        A    I didn't say that.  He submitted statements

16   that I never saw, and we did get the bonding from

17   Safeco or whatever bonding company we had before.

18        Q    Did you ever ask him to send you copies of

19   what he was sending to Safeco?

20        A    Yes.

21        Q    Did he do that?

22        A    No.

23        Q    He refused?

24        A    I didn't follow through, and we got the

25   bonding, so I didn't follow through with it.

1    Q    Just so I understand, you're not saying that

2    he did anything objectionable in what he submitted to

3    Safeco.  You're talking about bonds -- strike that.

4          You were talking with Charles Sapochetti

5    about bonds that were submitted before Aguadilla and

6    St. Thomas?

7    A    Yes.

8    Q    You are not saying he did anything improper;

9    you just didn't see what he was submitting?

10    A    I don't know about the bonds, but we got the

11    bonds.

12    Q    You don't know if information Charles

13    Sapochetti submitted to Safeco was accurate or not?

14    A    I don't.

15    Q    Do you know if Charles Sapochetti is still in

16    business?  Is he working, do you know?

17    A    I don't know.

18    Q    In the third-party complaint, one of the

19    allegations is that Associated and Fred Smith advised

20    and guided Local and Gardella.  Do you know what that's

21    referring to?  What type of advice and guidance that

22    Fred Smith provided to Local, it says "Gardella."  I

23    don't know if that means you or George.

24    A    It means George, I believe.

25    Q    Do you know what they're referring to there?

74

1       A    No.

2       Q    At some point, you said you had gone down to,

3    what is it, St. Thomas in February of '02?

4       A    Yes.

5       Q    Was there a lot of people at that meeting?

6    Was there kind of a get-together between yourself and

7    George, the Empeys?  Was Fred Smith or Terry Smith down

8    there for that meeting?

9       A    No.  Just myself and -- and Empey and my son.

10      Q    Okay.

11      A    I think once we went to the office of the

12   engineer that was doing the job.

13              (Discussion off the record.)

14              MR. KELLEY:  I'd like to introduce the

15   notice of deposition as Exhibit 13.  Could we have that

16   marked.

17              (Exhibit 13, notice of deposition,

18   marked.)

19              MR. BRAWLEY:  The deposition notice that

20   was served for today's deposition has a document

21   request on it.

22              MR. HUME:  Right.

23              MR. BRAWLEY:  Is it going to be the

24   position, Duncan, that all the documents that are

25   responsive were produced by George Gardella and/or will

```
1    be produced when we get these additional documents that

2    were taken off the computer system?

3                    MR. HUME:  Right.

4                    MR. BRAWLEY:  So responsive to this

5    deposition notice, James Gardella would have no

6    documents that were not going to be produced by George

7    Gardella?

8                    MR. HUME:  No.

9

10                   CROSS-EXAMINATION BY MS. McCARTHY:

11

12        Q    Mr. Gardella, my name is Diane McCarthy, and

13   I'm an attorney representing Melwain Enterprises in

14   this matter.  Have you ever heard of an entity called

15   Melwain Enterprises?

16        A    I was going to ask you who Melwain

17   Enterprises was.  I have heard the name.  I can't

18   connect it, though.

19        Q    How about a gentleman named Wayne Price?

20        A    Yes.

21        Q    How do you know Wayne Price?

22        A    He is the bonding agent.  As I know him, he

23   and Fred Smith are the bonding company.

24        Q    Do you believe that Fred Smith and Wayne

25   Price have a business partnership together or some form
```

1    of business entity?

2         A    No.  I thought Wayne Price was the bonding

3    company.  I learned since they are -- bonding company's

4    in Seattle, but his wife signed the bond, and he's the

5    one who is the representative for the company, I heard

6    since.  I've only dealt with Fred Smith or Wayne Price.

7         Q    You have spoken with Wayne Price?

8         A    Yes.

9         Q    Do you recall in relation to -- when is the

10   first time you spoke with Wayne Price, if you recall?

11        A    I don't recall, but I did go into his office

12   once with my son, Chris, and I met his wife there.  I

13   forgot why he wasn't there.  But it was in Long Island

14   someplace.

15        Q    Did you deal with Wayne Price before your son

16   took over the company?

17        A    No.

18        Q    Did Wayne Price ever say that he was an agent

19   of Associated to you?

20        A    An agent of Associated, no.

21        Q    Did he ever say that he was an agent of Fred

22   Smith?

23        A    No.

24        Q    Did he ever say to you that he and Fred Smith

25   were joint venturers?

1         A      He didn't say that.  I assumed they were.

2    That's what he said.

3         Q      What's your understanding of a joint

4    venturer?

5         A      I think the two of them split the commission

6    that they made on these various jobs that Local Towing

7    did.

8         Q      And what's your basis for that understanding?

9         A      Why else would they be doing it?  That's what

10   they're in business for, to make money.

11        Q      Did they ever disclose to you that they were

12   going to be submitting commissions for any bonds issued

13   to Local Towing?

14        A      They didn't tell me, but most brokers don't

15   tell you their business, but that's why they're there,

16   I assume.

17        Q      Okay.  Did you understand what, if any, kind

18   of relationship did Wayne Price have or Melwain have in

19   respect to obtaining keyman life insurance for Fran

20   Empey?

21        A      I didn't know anything about that.

22        Q      And have you ever heard of an entity called

23   Associated -- excuse me -- AFNY, Inc.?

24        A      What's it stand for?

25        Q      Your complaint just has it as AFNY, Inc.

```
 1        A    My complaint?

 2        Q    Yes.

 3             MR. HUME:  Third-party complaint.

 4        A    I assume that's Smith's company, but I can't

 5   say that for sure.

 6        Q    Okay.  Don't assume.  If you don't know, you

 7   don't know.

 8        A    Yes.

 9        Q    That's fine.  So there was one time that you

10   and Chris went to visit Wayne Price and Mary Ann Price

11   at their office?

12        A    Yes.

13        Q    Did you talk with Wayne Price or Mary Ann

14   Price after that visit?

15        A    Maybe once or twice.  I can't remember.

16        Q    Do you recall what that -- what the substance

17   of the visit was?

18        A    I think at the time Chris was having a

19   problem with Fred Smith trying to run things on the

20   job, and he was complaining to Wayne Price to sort of

21   buffer him from Smith.  I think that's why we went over

22   there.

23        Q    Do you recall generally, spring, fall,

24   winter, when that meeting was, of what year?

25        A    It's probably while the job in St. Thomas --
```

```
 1    it was probably right after Empey's death, you know,

 2    maybe in the fall of 2000 that would be.

 3         Q    Was it before -- it was after Fran died?

 4         A    Yes.

 5         Q    Was it before the job commenced?

 6         A    It might have been, yeah.

 7         Q    Was there anyone else at that meeting?

 8         A    No.

 9         Q    So it was you, yourself, Chris, Wayne, and

10    Mary Ann, the four of you?

11         A    Yes.

12         Q    Do you know how long it lasted?

13         A    Only a few minutes.  Wasn't very long.

14         Q    Were there any documents that you were asked

15    to sign?

16         A    I don't remember.

17         Q    Do you recall any more specifics about any

18    conversations that you had during the meeting?

19         A    I don't really.  I only went along just to

20    take the ride with my son.  So I didn't really know

21    what was going on.

22         Q    What kind of complaints did your son express

23    to Wayne Price about Mr. Smith?

24         A    I think what he was telling me about how Mr.

25    Smith was trying to run the job with Michael Empey, and
```

```
 1    how he didn't agree with what was going on down there.

 2        Q    I'm sorry, who didn't agree with it?

 3        A    How he didn't agree how Michael Empey was

 4    handling the jobs.

 5        Q    Chris didn't agree or Mr. Price didn't agree?

 6        A    Chris didn't agree with the way Michael Empey

 7    was running the job.

 8        Q    What did Chris, if you know, what did he

 9    expect Mr. Price to do about Chris's complaints?

10        A    I don't know.  I don't know.

11        Q    Did anything happen with regards to -- that

12    you know -- did Mr. Price do anything to alleviate

13    Chris's complaints?

14        A    I don't know.

15        Q    After the meeting, you recall speaking to Mr.

16    Price maybe once or twice; is that correct?

17        A    Just vaguely.  I really have not much to say

18    to him.  I don't know.

19        Q    Do you recall who contacted whom?

20        A    No.

21        Q    Do you recall what your conversations were

22    about?

23        A    No, I don't.

24        Q    Did you ever ask Mr. Price to make sure that

25    you were not going to be the indemnitor on the St.
```

1    Thomas or Aguadilla projects?

2        A    No.

3        Q    Did he ever tell you that you were not going

4    to be the indemnitor?

5        A    We never discussed it.

6        Q    Other than the litigation in Indiana in which

7    you're involved, were you involved in any other

8    litigation right now besides this matter?

9        A    My ex-wife is trying to get more blood out of

10   me.  That's one thing.  Over 12 years ago, I was

11   divorced.  They never give up.

12       Q    Other than --

13       A    You probably don't know what I'm talking

14   about.

15       Q    Any other litigation?

16            THE WITNESS:  Do I have any other

17   litigation?

18            MR. HUME:  Not that I'm aware of.

19       A    Being in the boat business and selling boats

20   and stuff, there's always something, but no formal

21   lawsuits that I can remember.

22       Q    Okay.  Do you have any other children besides

23   Chris?

24       A    Yes.

25       Q    How many other children do you have?

1        A    Three.

2        Q    What are their ages, names?

3        A    Chris is the youngest.  He has an older

4   brother, 39, and two older sisters, 41 and 42.  They're

5   all married, and I have nine grandchildren.

6        Q    Good for you.

7        A    Yes.

8        Q    And when you were in business without Chris,

9   who did you generally use to obtain bonds for your

10  projects?

11       A    Boy, that's a -- earlier on it was easier to

12  get bonds, and I had a phone number for a guy in

13  Washington, D.C., could call him up, and he'd get me a

14  bond like that.  There was no problem.  I did dredging

15  jobs and had the equipment and track record and did

16  jobs for local municipalities and for the Army Corps,

17  small jobs around Long Island Sound and stuff.

18            Then there came a time where it was

19  impossible to get bonds from anybody.  Business

20  changed, I guess.  Some guy who was a paperhanger from

21  Brooklyn who couldn't even speak English correctly got

22  a bond to do the Coast Guard job in Long Island, like a

23  two-million-dollar job.  I couldn't get a bond.  I had

24  all the equipment.  He knew nothing about water, had no

25  equipment, wasn't used to working on the waterfront.

1    So I had to sub the job from him, and then they stuck
2    me for the money.

3          I did a couple of jobs like that for another
4    guy for the town of Westport.  I couldn't get the bond,
5    and I was right next door in Norwalk.  Some guy who had
6    no equipment at all, no nothing, got the bond.  I don't
7    know how he did it, but I did the job for him for the
8    town, and he stuck me for $150,000.  I had to sue him
9    and finally we won in an arbitration, and the lawyer
10   took half the money, practically, and I got about
11   75,000 out of it.

12         So I said, "Why are these guys getting bonds,
13   I can't?  I have all the equipment and everything."
14   Somebody introduced me to Fred Smith, a specialist in
15   getting hard-to-get bonds.  And that's how I got to
16   meet Fred.

17         Q    And prior to 1999, your dealings with Fred
18   were for the various bonds, was it one indemnity
19   agreement per project?

20         A    Always was.  That was the way I thought of
21   it.  I always signed a bond for a job.  I never knew
22   what a general indemnity agreement was.

23         Q    Did you ever hear that Mr. Empey was involved
24   in a Bridgeport, Connecticut, project that went real --
25   that went south?

84

```
1        A    No.
2        Q    What was the name of the secretary at Local
3   Towing that you mentioned had access to your financial
4   statement?
5        A    Susie DiCairno, I think her last name was.
6        Q    Is she still employed by you or Chris?
7        A    No.
8        Q    Have you ever had the opportunity to look at
9   the financial statement that was prepared by Mr.
10  Sapochetti since he submitted it to Safeco?
11       A    I saw the one that he did for Local Towing
12  for Chris.  I never saw the one he did for me before
13  Chris was involved.
14       Q    If you were presented with a copy of that
15  document, could you ascertain whether the
16  representations contained on it are true?
17            MR. HUME:  Objection.  He can answer.
18            THE WITNESS:  Does that mean I answer?
19            MR. HUME:  Yes, answer it.
20       A    There were some things in it that weren't
21  totally true.
22       Q    For example, what?  What wasn't true?
23       A    I think he attributed some assets to Chris
24  that he didn't own.
25       Q    Okay.  (Pause.)  Do you know how old Michael
```

1    Empey was at the time of the project in St. Thomas?

2         A    Not exactly, but I think he was around

3    Chris's age.

4              MS. McCARTHY:  Okay.  I have no other

5    questions.  Thank you.

6              THE WITNESS:  You're welcome.

7

8         FURTHER CROSS-EXAMINATION BY MR. BRAWLEY:

9

10        Q    I have got a couple more.

11             We had talked earlier, I think you had told

12   me that the Washington job had ended around April of

13   2000, and that's an approximate time frame when you

14   told Fred Smith you didn't want to be involved in these

15   overseas projects, right?

16        A    Could have been March.  I know it was in the

17   spring.

18        Q    How long was the Washington job?

19        A    It started right around Thanksgiving,

20   November, and it went through to March.

21        Q    A couple-month job?

22        A    Yeah.  Because it was the Pentagon marina,

23   attached to the Pentagon, and they dredge in the winter

24   when nobody's using the marinas.

25        Q    I see.

1          A      So that's what it's geared for.

2                      MR. BRAWLEY:  I was going to suggest,

3     Duncan, that I would now question Mr. Gardella about

4     the damage claims made in his third-party complaint,

5     but I think we've all agreed that before any meaningful

6     questioning can occur, that we need to review the

7     documents that Chris Gardella is getting off his

8     computer that contain certain financial information or

9     hopefully contain the financial information for the

10    projects that would allow us to question intelligently

11    on those subjects.

12                      MR. HUME:  Okay.

13                      MR. BRAWLEY:  So we will suspend, and

14    you are going to produce the documents that are

15    obtained from Chris Gardella's computer or his basement

16    where they were locked up, and we will pick new dates

17    to finish both the depositions of George and James

18    Gardella?  Does that make sense to everybody?

19                      MR. HUME:  Yes.

20                      MR. KELLEY:  Yes.

21                      (Deposition adjourned:  2:45 p.m.)

22

23

24

25

87

```
1                           JURAT
2
3             I, JAMES R. GARDELLA, do hereby certify that
4       the foregoing testimony taken on May 5, 2004, is true
5       and accurate, including any corrections noted on the
6       corrections page, to the best of my knowledge and
7       belief.
8
9
10
11
                              JAMES R. GARDELLA
12
13
14
15
16
17      At              in said county of              ,
18      this    day of          , 2004, personally appeared
19      JAMES R. GARDELLA, and he made oath to the truth of the
20      foregoing corrections by him subscribed.
21
22
23      Before me,                        , Notary Public
24      My commission expires:
25
```

88

```
 1                    TRANSCRIPT CORRECTIONS

 2
        REPORTER:    JAMES A. SCALLY
 3
        CASE STYLE:  SAFECO INSURANCE COMPANY OF AMERICA AND
 4                   GENERAL INSURANCE COMPANY OF AMERICA
                     VS
 5                   LOCAL TOWING, INC., GEORGE GARDELLA,
                     JESSICA HELQUIST, and JAMES GARDELLA
 6                   VS
                     ASSOCIATED INSURANCE AGENCY, INC.,
 7                   FREDERICK J. SMITH, AFNY, INC, ASSOCIATED
                     FACILITIES OF AMERICA, LTD., MELWAIN
 8                   ENTERPRISES, INC., CHARLES ASSOCIATES,
                     P.C., and CHARLES SAPOCHETTI
 9
        PAGE    LINE  CORRECTION
10

11

12

13

14

15

16

17

18

19

20

21

22

23
                                    NAME:
24

25                                  DATE:
```

```
 1                    STATE OF CONNECTICUT

 2

 3         I, JAMES A. SCALLY, a Registered Professional
      Reporter/Commissioner within and for the State of
 4    Connecticut, do hereby certify that I took the
      deposition of JAMES R. GARDELLA on May 5, 2004, at the
 5    offices of Hume & Associates, One Landmark Square,
      Stamford, Connecticut.
 6
           I further certify that the above-named deponent
 7    was by me first duly sworn to testify to the truth, the
      whole truth, and nothing but the truth concerning his
 8    knowledge in the matter of the case of SAFECO INSURANCE
      COMPANY OF AMERICA AND GENERAL INSURANCE COMPANY OF
 9    AMERICA VS LOCAL TOWING, INC., GEORGE GARDELLA, JESSICA
      HELQUIST, and JAMES GARDELLA, VS ASSOCIATED INSURANCE
10    AGENCY, INC., FREDERICK J. SMITH, AFNY, INC, ASSOCIATED
      FACILITIES OF AMERICA, LTD., MELWAIN ENTERPRISES, INC.,
11    CHARLES ASSOCIATES, P.C., and CHARLES SAPOCHETTI now
      pending in the United States District Court, District
12    of Connecticut.

13         I further certify that the within testimony was
      taken by me stenographically and reduced to typewritten
14    form under my direction by means of COMPUTER ASSISTED
      TRANSCRIPTION; and I further certify that said
15    deposition is a true record of the testimony given by
      said witness.
16
           I further certify that I am neither counsel for,
17    related to, nor employed by any of the parties to the
      action in which this deposition is taken; and further,
18    that I am not a relative or employee of any attorney or
      counsel employed by the parties hereto, nor financially
19    or otherwise interested in the outcome of the action.

20         WITNESS my hand and affixed my seal this 17th day
      of May, 2004.
21

22
                          James A. Scally, RPR, CRR
23                        Commissioner

24
      My commission expires
25    May 31, 2004
```

90

1

2
                          James A. Scally, RPR, CRR
3                    Brandon Smith Reporting Service
                              44 Capitol Avenue
4                          Hartford, CT 06106

5

6

7

8
     May 17, 2004
9

10
     Duncan B. Hume, Esq.
11   Hume & Associates
     One Landmark Square
12   Stamford, Connecticut 06901

13   Dear Mr. Hume:

14   The transcript of James R. Gardella taken on May 5,
     2004, has been prepared.
15
     Please call our office to make arrangements for Mr.
16   Gardella to read and sign the transcript.

17   Sincerely yours,

18

19   James A. Scally, RPR, CRR, LSR #80
     Court Reporter
20

21

22

23

24

25

91

```
 1                   Brandon Smith Reporting Services
                              44 Capitol Avenue
 2                     Hartford, Connecticut 06106
                              (860) 549-1850
 3
        May 17, 2004
 4

 5      In re:               Safeco Insurance Company of America
                             and General Insurance Company of
 6                           America vs. Local Towing, Inc.,
                             George Gardella, Jessica Helquist,
 7                           and James Gardella vs. Associated
                             Insurance Agency, Inc., Frederick J.
 8                           Smith, AFNY, Inc, Associated
                             Facilities of America, Ltd., Melwain
 9                           Enterprises, Inc., Charles
                             Associates, P.C., and Charles
10                           Sapochetti
        Deposition of:       James R. Gardella
11      Date:                May 5, 2004

12

13
        The following items checked pertain to the above
14      captioned case:

15           ORIGINAL TRANSCRIPT enclosed in protective,
             sealed white envelope.
16
             EXHIBITS attached to ORIGINAL TRANSCRIPT.
17
             READING/SIGNING WAIVED        NOT WAIVED
18

19      When you receive the notarized JURAT and ERRATA SHEETS
        from the deponent, DO NOT open the sealed envelope.
20      Just attach the notarized sheets to the outside of said
        envelope and properly retain for the Court.
21

22
                        Signed
23                            James A. Scally
                              Brandon Smith Reporting
24

25                      Date sealed
```